**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **BUC-EE'S, LTD.** | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 4:15-CV-03704** |
| | § | |
| **SHEPHERD RETAIL, INC., ET. AL** | § | **JURY TRIAL DEMANDED** |
| **Defendants.** | § | |

<u>**DEFENDANTS' OPPOSED MOTION FOR NEW TRIAL**</u>

Defendants, Shepherd Retail, Inc., Blanco Restaurant, Inc., Live Oak Retail, Inc., Harlow Food, Inc., Mariam, Inc., S.W. Retail, Inc., Falfurrias Highway Foods, Inc., and Highway 46 Retail, Inc. (collectively, "Defendants"), hereby submit this Motion for New Trial, in accordance with Federal Rule of Civil Procedure 59(a), and show the following

TABLE OF CONTENTS

I.    TABLE OF AUTHORITIES..................................................................................... iii

II.    INTRODUCTION.................................................................................................. 1

III.    LEGAL STANDARD .......................................................................................... 2

IV.    ARGUMENT ........................................................................................................ 2

A.    Plaintiff's Claim for Trademark Dilution Should Have Been Dismissed Before Trial 2

B.    The Court's Failure to Exclude Buc-ee's Dilution Claim Irreparably Tainted the Trial ............................................................................................................................. 7

C.    The Great Weight of the Evidence Suggests There is No Likelihood of Dilution ...... 10

   i.    No reasonable jury could find 7.8% association sufficient to support a claim for dilution by blurring ..................................................................................................... 10

   ii.    Plaintiff presented no evidence of impairment ............................................. 14

   iii.    No reasonable jury could find Buc-ee's to be famous throughout the entire state of Texas prior to May 2012 ...................................................................................... 15

D.    The Great Weight of the Evidence Suggests There is No Likelihood of Confusion .. 16

   i.    The results of Dr. Robertson's survey weigh strongly against a finding of a likelihood of confusion ............................................................................................... 17

   ii.    Differences in the parties' logos weigh against a finding of a likelihood of confusion 20

   iii.    Differences in the physical appearance of the parties' stores weighs against a finding of a likelihood of confusion ........................................................................... 21

   iv.    The length of time Defendants have been using the ALLIGATOR LOGO weighs against a finding of a likelihood of confusion ............................................................ 27

   v.    The fact that Defendants operate stand-alone restaurants weighs against a finding of a likelihood of confusion ............................................................................. 28

   vi.    Plaintiff presented only a scintilla of evidence suggesting a likelihood of confusion 28

E.    In the Alternative, Defendants Request a New Trial to Determine Whether the Use of the ALLIGATOR LOGO at Defendants' Restaurants is Likely to Cause Confusion . 29

F.    Defendants Were Unfairly Prejudiced Because the Entire Jury Pool Was Biased in Buc-ee's Favor ............................................................................................................. 30

G.    Defendants Were Unfairly Prejudiced by the Misrepresentations of Plaintiff's Counsel and Dr. Alex Simonson ................................................................................... 31

   i.    Plaintiff's counsel intentionally misrepresented to the jury the court's holding in Jada Toys, Inc. v. Mattel, Inc. ................................................................................... 32

*ii.*    *Dr. Alex Simonson lied about the applicability of the Central Limit Theorem* .......... 34

*iii.*    *Plaintiff's closing slides included material misrepresentations*.............................. 37

H.    **Evidentiary Errors Unfairly Prejudiced Defendants**.................................................. 38

*i.*    *Dr. Alex Simonson's opinions regarding a likelihood of dilution should have been excluded*.................................................................................................................................... 38

*ii.*    *The testimony of Leslie J. Lott should have been excluded*.......................................... 40

*i.*    *Because the testimony of Leslie Lott was allowed, Elizabeth King should not have been excluded* ........................................................................................................................... 44

*ii.*    *The Testimony of Joy and Ernest Hernandez Should Have Been Excluded* ............. 45

*iii.*    *The Hernandezes should not have been allowed to testify as to the statements of Defendants' unidentified cashier* ..................................................................................... 49

*iv.*    *Joy and Ernest Hernandezes' Facebook posts should not have been excluded* ......... 50

*v.*    *Dr. Kim Robertson should have been allowed put the Hernandezes' testimony into context* .................................................................................................................................. 51

*vi.*    *Defendants should have been able to argue Plaintiff believes it has the sole right to use a friendly, smiling, cartoon animal* ................................................................................. 53

*vii.*    *Defendants' sales figures should not have been excluded*........................................ 54

*viii.*    *Plaintiff's previous lawsuits of the BEAVER LOGO should have been admitted under FRE 406* ...................................................................................................................... 55

*ix.*    *Evidence of Bucky's three Houston area convenience stores should not have been excluded*.................................................................................................................................... 58

*x.*    *Defendants should have been allowed to argue Dr. Simonson's dilution survey showed multiple questions on the same page* ..................................................................... 59

I.    **The Denial of Defendants' Motion for Mistrial and a New Jury Panel Unfairly Prejudiced Defendants**................................................................................................................. 61

V.    **CONCLUSION** ..................................................................................................................... 62

# I.    TABLE OF AUTHORITIES

**Cases**

*1-800 Contacts, Inc. v. Lens.Com, Inc.*, 722 F.3d 1229 (10th Cir. 2013) ................................ 15, 53

*Academy of Motion Picture Arts and Sciences v. Alliance of Professional & Consultants Inc.*,
    104 U.S.P.Q.2d 1234, 2012 WL 5189401 (T.T.A.B. Sept. 27, 2012) ......................................... 4

*Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252 (5th Cir. 1980) ................................... 31, 53

*Bazile v. Bisso Marine Co.*, 606 F.2d 101 (5th Cir. 1979)...................................................... 3

*Bd. of Regents of the Univ. of Houston Sys. v. Houston Coll. Of Law, Inc.*, 214 F. Supp. 3d 573
    (S.D. Tex. 2016)........................................................................................................ 31

*Cf. Colburn v. Bunge Towing, Inc.*, 883 F.2d 372 (5th Cir. 1989) ..................................... 42

*Everest Capital Ltd. v. Everest Funds Mgmt., L.L.C.*, 393 F.3d 755 (8th Cir. 2005)................... 18

*Exxon Corp. v. Texas Motor Exchange, Inc.*, 628 F.2d 500 (5th Cir. 1980) ......................... 13, 20

*First Southern Fed. Sav. v. First Southern Sav.*, 614 F.2d 71 (5th Cir. 1980) ........................... 53

*Gap, Inc. v. G.A.P. Adventures, Inc.*, 100 U.S.P.Q.2d (BNA) 1417 (T.T.A.B. 2011) ................. 17

*Helene Curtis Indus., Inc. v. Suave Shoe Corp.*, 13 U.S.P.Q.2d (BNA) 1618 (T.T.A.B. 1989) .. 13

*Henri's Food Prods. Co v. Kraft, Inc.*, 717 F.2d 352 (7th Cir. 1983) ......................................... 13

*Hershey Co. v. Promotion in Motion, Inc.*, No. 07-cv-1601 (SDW), 2013 WL 12157828 (D.N.J.
    Jan. 18, 2013) ........................................................................................................ 19

*Isbell v. DM Records, Inc.*, 774 F.3d 859 (5th Cir. 2014) ......................................................... 42

*Jada Toys, Inc. v. Mattel, Inc.*, 518 F.3d 628 (9th Cir. 2008)................................... 14, 35, 36, 37

*Jet, Inc. v. Sewage Aeration Sys.*, 165 F.3d 419 (6th Cir. 1999) ............................................... 6, 7

*Kellogg Co. v. Toucan Golf, Inc.*, 337 F.3d 616 (6th Cir. 2003) ............................................... 16

*Latiolais v. Whitley*, 93 F.3d 205 (5th Cir. 1996) ........................................................ 49, 50, 67

*McNeil Nutritionals, LLC v. Heartland Sweeteners, LLC*, 511 F.3d 350 (3d Cir. 2007) ....... 32, 52

*Merriam-Webster, Inc. v. Random House, Inc.*, 35 F.3d 65 (2d Cir. 1994) ............................... 20

*Moseley v. V Secret Catalogue*, 537 U.S. 418 (2003)............................................................... 17

*Pharmacia Corp. v/ Alcon Labs., Inc.*, 201 F. Supp. 2d 335 (D.N.J. 2002) ........................ passim

*RJR Foods, Inc. v. White Rock Corp.*, 603 F.2d 1058 (2d Cir. 1979) .................................. 13, 20

*Rolex Watch U.S.A., Inc. v. AFP Imaging Corp.*, 101 U.S.P.Q.2d (BNA) 1188 (T.T.A.B. 2011)15

*Sanofi-Aventis v. Advancis Pharm. Corp.*, 453 F. Supp. 2d 834 (D. Del. 2006)........................... 5

*Shows v. Jamison Bedding, Inc.*, 671 F.2d 927 (5th Cir. 1982)................................................. 2

*Smith v. Transworld Drilling Co.*, 773 F.2d 610 (5th Cir. 1985) ......................................... passim

*Star Indus. v. Bacardi & Co.*, 412 F.3d 373 (2d Cir. 2005)..................................................... 20

*Viacom Inc. v. Ingram Enters.*, 141 F.3d 886 (8th Cir. 1998) .................................................. 6

*Volkswagen AG v. Dorling Kindersley Publ'g, Inc.*, 614 F. Supp. 2d 793 (E.D. Mich. 2009) .... 16

*Wallber v. Ziegler*, 470 F. App'x 230 (5th Cir. 2012)................................................................. 42

*Westchester Media Co. L.P. v. PRL USA Holdings, Inc.*, 103 F. Supp. 2d 935 (S.D. Tex. 1999),
    *aff'd in part, vacated in part sub nom.* ................................................................................. 5

*Westchester Media v. PRL USA Holdings, Inc.*, 214 F.3d 658 (5th Cir. 2000) ........................... 5

**Statutes**

15 U.S.C. § 1125(c)(2)(B)(iii) ........................................................................................ 63

15 U.S.C. § 1125(c)(6)..........................................................................................6, 8, 11, 12
15 U.S.C. §1115 ............................................................................................................ 11
Fed. R. Civ. P. 12(b)(6).................................................................................................. 8
FED. R. CIV. P. 59(a)....................................................................................................... 7
Fed. R. Evid. 401 ...................................................................................................... 60, 64
FED. R. EVID. 402 ..............................................................................................13, 52, 60, 64
Fed. R. Evid. 403 ................................................................................................... passim
FED. R. EVID. 702 ..................................................................................................... 23, 44

## Other Authorities

ALVIN C. BURNS & RONALD F. BUSH, MARKETING RESEARCH 342 (6th ed. 2010) ..................... 40
DAVID R. ANDERSON, DENNIS J. SWEENEY, & THOMAS A. WILLIAMS, STATISTICS FOR BUSINESS
    AND ECONOMICS 268 (2011) ..................................................................................40, 45
GERALD L. FORD, Dilution Surveys Update 1998 Practicing Law Institute, 537 PLI/Pat 551
    (1998) ............................................................................................................... 16
H.R. REP. No. 104-374 (1995)..................................................................................... 12
Jacob Jacoby, *Considering the Who, What, When, Where and How of Measuring Dilution*, 24
    Santa Clara High Tech. L.J. 601 (2008).................................................................. 42
JACOB JACOBY, TRADEMARK SURVEYS VOLUME I: DESIGNING, IMPLEMENTING, AND EVALUATING
    SURVEYS 367 (2013) ............................................................................................ 40
JACOB JACOBY, TRADEMARK SURVEYS VOLUME I: DESIGNING, IMPLEMENTING, AND EVALUATING
    SURVEYS 371 (2013) ......................................................................................... 40, 41
JOSEPH F. HAIR, JR., ROBERT P. BUSH, & DAVID J. ORTINAU, MARKETING RESEARCH WITHIN A
    CHANGING INFORMATION ENVIRONMENT 313 (2006)....................................................39, 40, 45
WILLIAM R. DILLON, THOMAS J. MADDEN, & NEIL H. FIRTLE, MARKETING RESEARCH IN A
    MARKETING ENVIRONMENT 289 (2d ed. 1987) ............................................................ 40
WILLIAM R. DILLON, THOMAS J. MADDEN, & NEIL H. FIRTLE, MARKETING RESEARCH IN A
    MARKETING ENVIRONMENT 292 (2d ed. 1987) ............................................................ 41

## II.    INTRODUCTION

There have been at least six surveys in this case based on the BEAVER LOGO and the ALLIGATOR LOGO. They were Plaintiff's survey, Defendants' survey, the Houston Chronicle survey, the ABC13 Houston Facebook Survey, TexAgs survey, Austin American Statesman survey, and the San Antonio Express News survey. The common thread is that their results unanimously support a conclusion there is no likelihood of confusion. Over 90% of the people being surveyed said no way was there any confusion or in Plaintiff's survey, no dilution. The common response was that this was a frivolous or "stupid" lawsuit. So, the question is, how did we end up here?  What went wrong? Unfortunately, a long list of things.

In this case, Plaintiff sued Defendants for trademark infringement, trademark dilution by blurring, and other related unfair competition claims, alleging that Defendants' ALLIGATOR LOGO is likely to cause confusion with and likely to dilute the distinctiveness of Plaintiff's BEAVER LOGO. Defendants own two U.S. trademark registrations for the Choke Canyon ALLIGATOR LOGO. *See* Ex. 1. The Lanham Act states that "[t]he ownership by a person of a valid registration . . . on the principal register under this chapter shall be a complete bar to an action against that person, with respect to that mark that (A) is brought by another person under the common law or a statute of a State; and (B)(i) seeks to prevent dilution by blurring or dilution by tarnishment." 15 U.S.C. § 1125(c)(6). This provision is known as the federal registration defense. Because Plaintiff's claim for dilution by blurring was brought under Texas law, and because Defendants own two federal trademark registrations, Plaintiff's dilution claim should have been dismissed. However, as discussed in greater detail below, the Court refused to do so. In addition to being erroneous, this decision fundamentally altered this nature of this case and irreparably prejudiced Defendants and denied them a fair trial.

1

In addition, the parties submitted over twenty (20) of motions *in limine* prior to trial. In ruling on these motions, virtually unanimous in Plaintiff's favor, the Court erroneously excluded significant and relevant portions of Defendants' evidence and admitted portions of Plaintiff's evidence that was both irrelevant and unfairly prejudicial to Defendants. These decisions, outlined below, irreparably harmed Defendants' ability to defend themselves in this case and deprived Defendants of their constitutional right to a fair jury trial.

At trial, the jury returned a verdict in favor of Plaintiff on all counts. Because the jury's decision was largely influenced by numerous erroneous decisions of the Court, Defendants respectfully request a new trial.

## III.    LEGAL STANDARD

"The court may, on motion, grant a new trial on all or some of the issues—and to any party—as follows: (A) after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court . . . ." FED. R. CIV. P. 59(a). "A new trial may be granted, for example, if the district court finds the verdict is against the weight of the evidence, the damages awarded are excessive, the trial was unfair, or prejudicial error was committed in its course." *Smith v. Transworld Drilling Co.*, 773 F.2d 610, 613 (5th Cir. 1985).

"The trial court in passing on a motion for a new trial need not take the view of the evidence most favorable to the verdict winner, but may weigh the evidence." *Shows v. Jamison Bedding, Inc.*, 671 F.2d 927, 930 (5th Cir. 1982). *See also Bazile v. Bisso Marine Co.*, 606 F.2d 101, 105 (5th Cir. 1979) ("Although a trial judge cannot weight the evidence when confronted with a motion notwithstanding the verdict, in a motion for new trial the judge is free to weigh the evidence.").

## IV.    ARGUMENT

### A.    Plaintiff's Claim for Trademark Dilution Should Have Been Dismissed Before Trial

Plaintiff's claim for Texas state trademark dilution should never have made it to trial. The Lanham Act states that "[t]he ownership by a person of a valid registration . . . on the principal register under this chapter shall be a ***complete bar*** to an action against that person, with respect to that mark, that . . . seeks to prevent dilution by blurring or dilution by tarnishment." 15 U.S.C. 1125(c)(6) (emphasis added). Because (1) Defendants own two federal trademark registrations, *see* Ex. 1, (2) those registrations are presumed to be valid under federal law, and (3) Plaintiff did not file a claim for cancelation of Defendants' registrations in this case, Plaintiff's claim for trademark dilution should have been dismissed prior to trial.

On April 8, 2016, Defendants filed a Rule 12(b)(6) motion to dismiss for failure to state a claim. *See* Dkt. 24. Five days later, on April 13, 2016, Defendants amended that motion to include a request that Plaintiff's claim of trademark dilution be dismissed based on the federal registration defense. *See* Dkt. 28. However, the issues raised in Defendants' motion to dismiss was never ruled on. Instead, nearly seven months later on November 3, 2016, it was denied as moot after Plaintiff amended its complaint to remove its frivolous trade dress claim. *See* Dkt. 72. On November 11, 2016, Defendants again sought to dismiss Plaintiff's dilution claim based on the federal registration defense in their Motion for Partial Summary Judgment. Dkt. 74-13. On September 21, 2017, the Court denied Defendants' motion as it pertained to Plaintiff's dilution claim, holding that Plaintiff's petition for cancelation before the USPTO, which was not filed until October 25, 2016, challenged the validity of Defendants' registrations thereby preventing the application of the federal registration defense. Dkt. 212. This holding was erroneous as a matter of law.

The expert trademark tribunal TTAB in *Academy of Motion Picture Arts and Sciences v. Alliance of Professional & Consultants Inc.*, 104 U.S.P.Q.2d 1234, 2012 WL 5189401 (T.T.A.B. Sept. 27, 2012), was the about the only tribunal to fully analyze the "complete bar" and its

3

reasoning is sound. The Trademark Trial and Appeal Board ("TTAB") has applied the "complete bar" rule and state law dilution claim are completely barred in a cancellation proceeding. Congress left the statute in force against state law dilution claims.

Moreover, even this Court has previously acknowledged this is not the way the federal registration defense was intended to be applied. Southern District of Texas U.S. Magistrate Judge Milloy addressed this as follows:

> "Here, the court agrees with Westchester that the purpose of the federal statute appears clear. If a party asserts a dilution claim against one who owns a federally registered mark, it must proceed under the federal dilution statute. Allowing state law dilution claims to proceed against owners of federally registered marks would interfere with federal law and discourage the federal registration of marks, contrary to the purpose of the Lanham Act. *See* H.R.Rep. No. 104–374 at 7 (1995), reprinted in 1995 U.S.C.C.A.N. 1029, 1034. Section 1125(c)(3) "provides a further incentive for the federal registration of marks and recognizes that to permit a state to regulate the use of federally registered marks is inconsistent with the intent of the Lanham Act 'to protect registered marks used in such commerce from interference by state, or territorial legislation'").
>
> Westchester's POLO mark is located on the principal register, and it appears that, under the plain language of the statute, and the limited authorities on this issue, Plaintiffs' preclusion argument is well taken. *See* 15 U.S.C. § 1125(c)(3). As there is no Fifth Circuit authority on point, to hold otherwise would ignore the plain language of the Act. For that reason, the court concludes, in sum, that the FTDA is a bar to PRL's claim under Tx.Bus. & Com.Code § 16.29."

*Westchester Media Co. L.P. v. PRL USA Holdings, Inc.*, 103 F. Supp. 2d 935, 977 (S.D. Tex. 1999), *aff'd in part, vacated in part sub nom. Westchester Media v. PRL USA Holdings, Inc.*, 214 F.3d 658 (5th Cir. 2000).

Although some courts have declined to apply the federal registration defense where the validity of the defendant's registration has been challenged, no court has done so when faced when facts comparable to those in this case. Indeed, all the cases cited by the Court as support for its decision not to apply the federal registration defense are distinguishable. In *Sanofi-Aventis v. Advacis Pharm. Corp.*, the court, in conducting a bench trial, refused to apply the federal registration defense because it had, prior to addressing the plaintiff's state-law dilution claim,

4

already found there to be a likelihood of confusion between the parties' marks. *See Sanofi-Aventis v. Advancis Pharm. Corp.*, 453 F. Supp. 2d 834, 844–45 (D. Del. 2006). The court reasoned that its finding of a likelihood of confusion would lead to the cancelation of the defendant's mark, thereby rendering the federal registration defense inapplicable. *See id.* But, in this case Defendants raised the federal registration defense more than two years before trial, long before any decision as to a likelihood of confusion had been made. Therefore, this case is factually distinguishable from *Sanofi*.

In *Viacom, Inc. v. Ingram Enters.*, the court noted in a footnote that "[a]lthough [the federal registration defense] provides a 'complete bar' to state dilution claims, Viacom could block this defense, for example, by establishing that Ingram does not own a 'valid registration.'" *Viacom Inc. v. Ingram Enters.*, 141 F.3d 886, 891 n.8 (8th Cir. 1998). It did not, however, hold that filing a petition for cancelation in the USPTO after the case was already filed, and after the defendant had already moved to dismiss the plaintiff's claim for trademark dilution on the basis of the federal registration defense, was sufficient to prevent the application of the federal registration defense. For this reason, the *Viacom* court's vague notation regarding the federal registration defense does not support the Court's decision not to apply the defense in this case.

Finally, in *Jet, Inc. v. Sewage Aeration Sys.*, the court declined to apply the federal registration defense because the plaintiff amended its complaint to include a claim for cancellation of the defendant's trademark. *See Jet, Inc. v. Sewage Aeration Sys.*, 165 F.3d 419, 424 (6th Cir. 1999). Despite amending its complaint three times, Plaintiff filed no claim for cancelation in this case. In fact, Plaintiff intentionally chose not to file a claim for cancelation in this case because it knew that if it did, Defendants' registrations would become a significant part of this case. Instead, in an attempt to keep Defendants' registrations out of evidence, Plaintiff filed a petition for

5

cancelation in the USPTO (which it knew would be automatically stayed) ten months after this case was filed and begged the Court not to apply the federal registration defense on that basis. Thus, the facts of *Jet, Inc. v. Sewage Aeration Sys.* are completely different from the facts of this case. Without a claim for cancelation ***in this case***, Plaintiff's claim for trademark dilution should have been dismissed in accordance with 15 U.S.C. § 1125(c)(6).

Both Plaintiff and the Court have focused on the inclusion of the word "valid" in §1125(c)(6). But, as the Lanham Act states, federally registered marks are presumed valid. 15 U.S.C. §1115. Because Plaintiff did not file a claim for cancelation in this case and had not even filed its petition for cancelation in the USPTO before the TTAB until about eight months after Defendants requested the enforcement of the federal registration defense, Plaintiff posed no challenge to the validity of Defendants' trademarks. For this reason, they should have been considered valid and the federal registration defense should have been enforced. There is zero precedent for the notion that filing a claim for trademark infringement is a challenge to the defendant's trademark sufficient to prevent the application of the federal registration defense. In fact, one of the cases cited by the Court, *Jet, Inc.*, suggests that the only reason the federal registration defense was not applied was because the plaintiff amended its complaint to include a claim for cancelation of the defendant's trademark. *See Jet, Inc. v. Sewage Aeration Sys.*, 165 F.3d 419, 424 (6th Cir. 1999). Plaintiff filed no such claim.

As the House of Representatives Committee on the Judiciary's report makes clear, the federal registration defense was intended to be a "complete bar" to state-law dilution claims brought against owners of federally registered trademarks in order to create a "further incentive for the federal registration of marks and [to recognize] that to permit a state to regulate the use of federally registered marks is inconsistent with the intent of the Lanham Act 'to protect registered

marks used in such commerce from interference by state, or territorial legislation.'" H.R. REP. No. 104-374, at 7 (1995). Yet, that is exactly what happened. Plaintiff used Texas's anti-dilution statute not only to regulate Defendants' use of its federally registered trademarks but also as means of distracting and confusing the jury and admitting into evidence that significantly prejudiced Defendants and would otherwise have been inadmissible. In declining to apply the federal registration defense and holding that the outcome of Plaintiff's trademark infringement claim would determine the validity of Defendants' trademarks and therefore the applicability of the federal registration defense, the Court disregarded the purpose of § 1125(c)(6) and essentially turned its application into a jury issue, something it was never intended to be. *See id.* This holding was erroneous. Moreover, because this error fundamentally changed the course of this case, and the evidence that was admitted, in a way which caused Defendants unfair and irreparable prejudice, this error was harmful and sufficient to warrant a new trial. *See Smith v. Transworld Drilling Co.*, 773 F.2d 610, 613 (5th Cir. 1985).

**B.     The Court's Failure to Exclude Buc-ee's Dilution Claim Irreparably Tainted the Trial**

The Court's failure to dismiss Plaintiff's claim for trademark infringement opened the door for the admission of a swath of otherwise inadmissible evidence, all of which unfairly prejudiced Defendants at trial. The most significant evidence that was admitted because of the inclusion of Plaintiff's dilution claim is the testimony of Dr. Alex Simonson, including the results of his fame survey and failed dilution.

At trial, Dr. Simonson testified that 7.8% "association" is sufficient to support a claim for trademark dilution. *See* Ex. 2 at 29:6–30:13. Dr. Simonson also testified that because of the Central Limit Theorem, his finding of 18% association in the Houston area with 33 people is statistically significant. *See* Ex. 2 at 113:22–114:14. As described below, both statements are false. Despite

7

what Plaintiff misrepresented to the Court and to the jury, no court has ever found 7.8% association to be sufficient to support a claim for trademark dilution, nor does the Central Limit Theorem apply to the 33 respondents Dr. Simonson surveyed in the Houston area. These false statements undoubtedly affected the jury's perception of this entire case. Because they came from the mouth of an expert witness, these lies legitimized Plaintiff's dilution infringement claims in the eyes of the jury.

Trademark infringement and trademark dilution involve many of the same issues. Given this overlap, it's highly likely the jury was confused. Thus, by convincing the jury that the results of his surveys indicated a likelihood of dilution, a blatant falsehood, Dr. Simonson convinced the jury there was also a likelihood of confusion. Had Plaintiff's dilution claim been properly dismissed prior to trial, Plaintiff's evidence would have been wholly insufficient to support a claim for trademark infringement. Plaintiff presented no survey evidence of a likelihood of confusion, nor did it rebut Defendants' survey evidence on likelihood of confusion indicating a total lack thereof. Instead, it used Dr. Simonson's testimony to confuse and mislead the jury and lend a false and unsupported sense of legitimacy to its infringement claim.

In addition to his dilution survey, Dr. Simonson conducted a fame survey in this case. However, whether Plaintiff's Buc-ee's mark is famous is completely irrelevant to Plaintiff's claim for trademark infringement; it was only relevant to Plaintiff's claim for trademark dilution. Therefore, the mere inclusion of Dr. Simonson's testimony that 89% of Texans recognize the BEAVER LOGO was prejudicial to Defendants. *See* FED. R. EVID. 402 ("Irrelevant evidence is not admissible."). Moreover, the results of Dr. Simonson's fame survey prejudiced Defendants because, by highlighting Buc-ee's success and consumer recognition, they supported Plaintiff's false and unsupported narrative that Defendants intended to ride the coattails of Buc-ee's success.

Furthermore, Dr. Simonson's credentials, which would not have been admissible without Plaintiff's dilution claim, were used by Plaintiff's counsel to trash the credibility of Defendants' expert Kim Robertson. During cross examination of Dr. Robertson, Plaintiff's counsel, Tim Rechtien, argued that because Dr. Robertson had not conducted one thousand surveys like Dr. Simonson, he was somehow unreliable. *See* Ex. 3 at 112:2–114:2. This argument is ridiculous. All it shows is that Dr. Robertson did not choose to be a career testifying expert as Dr. Simonson did. That does not change the fact that as a marketing professor, Dr. Robertson has studied thousands of consumer research surveys. He is intricately familiar with the requirements of likelihood of confusion and dilution surveys and how they are conducted. In fact, even Plaintiff did not dispute Dr. Robertson's qualification as an expert witness. Nonetheless, Plaintiff used to this meaningless distinction to destroy Dr. Robertson's credibility in front of the jury. However, the only reason Plaintiff's counsel was able to compare the number of surveys conducted by Dr. Robertson to those conducted by Dr. Simonson is because Plaintiff dilution claim was not dismissed. Had the federal registration defense been applied as it should have been, this argument would not have been available to Plaintiff. Sure, Plaintiff would still have been able to argue that Dr. Robertson had not conducted enough consumer surveys for the results of his likelihood of confusion survey to be reliable. However, this argument is infinitely less convincing than comparing the six surveys conducted by Dr. Robertson to the thousand conducted by Dr. Simonson. For this reason, also, the failure to dismiss Plaintiff's dilution claim and subsequent admission of Dr. Simonson's testimony unfairly prejudiced Defendants.

Dr. Simonson's testimony drastically changed the course of the trial and although they had nothing to do with a likelihood of confusion, the results of Dr. Simonson's failed dilution survey and fame survey helped convince the jury Plaintiff's pitiful trademark infringement claim was

9

legitimate. Even though Defendants presented survey evidence indicating less than 1% confusion, and the fact that Plaintiff presented no survey evidence of its own on the issue of a likelihood of confusion, the jury miraculously ruled in favor of Plaintiff on its infringement claim. Without Dr. Simonson's testimony, there is no way the jury would have reached the result it did. For this reason, the inclusion of evidence relevant only to Plaintiff's dilution claim which the Court improperly failed to dismiss caused Defendants unfair and irreparable prejudice. Accordingly, Defendants respectfully request a new trial. *See Smith v. Transworld Drilling Co.*, 773 F.2d 610, 613 (5th Cir. 1985).

> ### C.　　The Great Weight of the Evidence Suggests There is No Likelihood of Dilution

After four days of testimony, the jury rendered a verdict in favor of Plaintiff on its claim for dilution by blurring. For the reasons discussed below, the jury's verdict is against the weight of the evidence. Therefore, Defendants request the Court grant its motion for new trial. *See Smith v. Transworld Drilling Co.*, 773 F.2d 610, 613 (5th Cir. 1985).

> #### i.　　*No reasonable jury could find 7.8% association sufficient to support a claim for dilution by blurring*

The only evidence of association between the ALLIGATOR LOGO and the Buc-ee's BEAVER LOGO that Plaintiff presented at trial was the expert testimony of Dr. Alex Simonson.[1] Dr. Simonson testified that he conducted an association survey in this case in which he showed one version of the ALLIGATOR LOGO to 205 respondents. After factoring in his control group, Dr. Simonson's survey achieved a pitiful 7.8% net association rate. Although there is no generally

---

[1] Plaintiff will likely argue that the testimony Joy and Ernest Hernandez, two of Plaintiff's fact witnesses, is also evidence of an association between the ALLIGATOR LOGO and the BEAVER LOGO. But, it is clear from the Hernandezes' testimony that any association in their mind between Plaintiff and Defendants' stemmed not from the similarity of the Parties' logos but from similarities in the setup of the parties' stores. *See* Ex. 4 at 147:10–16; 148:1–5; 158:18–159:4. Thus, the Hernandezes' testimony is not evidence of association between the ALLIGATOR LOGO and the BEAVER LOGO.

adhered to threshold for liability pertaining to association surveys because of the paucity of real dilution cases, three things are clear: (1) a claim for trademark dilution requires a higher level of association than trademark infringement does confusion; (2) no court has ever found an association rate as low as 7.8% sufficient to support a claim for trademark dilution; and (3) courts have found association rates much higher than 7.8% to be insufficient to support a claim for trademark dilution.

In *Pharmacia Corp v. Alcon Labs., Inc.*, the court held that although there is no bright line for liability regarding dilution surveys, dilution requires a higher percentage of association that infringement does confusion. 201 F. Supp. 2d 335, 380 (D.N.J. 2002) (alterations in original) (quoting GERALD L. FORD, Dilution Surveys Update 1998 Practicing Law Institute, 537 PLI/Pat 551, 562 (1998)) ("A dilution claim may require a slightly higher number 'because the nature of the underlying cause of action is different. It is harder to establish that consumers believe that a defendant's product is put out by the plaintiff . . . than it is to establish dilution which simply requires a showing that defendant's product calls to mind the plaintiff's brand name. [A plaintiff] doesn't have to make the source association. A plaintiff just [has] to show that the plaintiff's brand is called to mind or that looking at the defendant's product makes them think of plaintiff . . . .'"). As Dr. Simonson himself testified at trial, "the standard typically for likelihood of confusion is 15 percent." Ex. 2 at 30:13-14; *see also Exxon Corp. v. Texas Motor Exchange, Inc.*, 628 F.2d 500 (5th Cir. 1980) (finding there to be a likelihood of confusion based on a survey showing 15% of respondents were confused); *RJR Foods, Inc. v. White Rock Corp.*, 603 F.2d 1058, 1061 (2d Cir. 1979) (finding survey results between 15% and 20% sufficient to support a finding of a likelihood of confusion). Because dilution requires a higher percentage of association than infringement does confusion, and because infringement requires at least 15% confusion, Dr. Simonson's finding of

11

7.8% association is clearly insufficient to support a jury finding of a likelihood of dilution. *See Henri's Food Prods. Co v. Kraft, Inc.*, 717 F.2d 352, 358 (7th Cir. 1983) ("The remaining question is whether the district court was correct in holding that a 7.6% confusion finding weighs against infringement. We hold that it was."); *Helene Curtis Indus., Inc. v. Suave Shoe Corp.*, 13 U.S.P.Q.2d (BNA) 1618, 1626 (T.T.A.B. 1989) ("There is little doubt that, when compared to survey results considered as evidence in other cases involving a likelihood of confusion, a 7.6 percent level of confusion is not very significant.").

Furthermore, no court has ever found 7.8% association sufficient to support a claim for trademark infringement.[2] Despite what Plaintiff misrepresented not only to the Court but to the jury, the court in *Jada Toys* did not hold an "association" survey finding 7% association was independently sufficient to support a claim for trademark dilution. In fact, no association survey was conducted in that case. Instead, two likelihood of confusion surveys were conducted, one finding there to be a 28% confusion rate between the names HOT RIGZ and HOT WHEELS, the other finding a 7% confusion rate between parties' product packaging. *See Jada Toys, Inc. v. Mattel, Inc.*, 518 F.3d 628, 636 (9th Cir. 2008) The Ninth Circuit found that both surveys, when considered together, were sufficient to create a genuine issue of material fact. *Id.* That is entirely different than what Plaintiff has suggested. *See* Ex. (5/21 trial transcript) at 128:10-129:6. Not once did the court in *Jada Toys* suggest that 7% dilution "was more than sufficient." *Id.* Nor has any other court.

Moreover, the burden of proof in *Jada Toys* was different than in this case. Here, Plaintiff was required to establish a likelihood by a preponderance of the evidence. But, in *Jada Toys*, the

---

[2] *See* Pharmacia, 201 F. Supp. 2d at 380–81 (noting 29% is the "lowest percentage of dilution in any reported decision basing a finding of dilution on a survey").

issue was whether the defendant was entitled to summary judgment on the plaintiff's dilution claim. *Id.* All the plaintiff in that case needed only to show that a genuine issue of material fact existed. Thus, even if Plaintiff hadn't intentionally misrepresented that case's holding, it would still be distinguishable from this case.

Finally, several courts have found association rates much higher than 7.8% to be insufficient to support a claim for trademark dilution. *See* Pharmacia, 201 F. Supp. 2d at 380–81 ("Even fully crediting Mr. McCullough's survey, it is insufficient on its face to support a preliminary injunction for trademark dilution. That survey shows at best a dilution level of 14%. That is less than half of the lowest percentage of dilution in any reported decision basing a finding of dilution on a survey."); *see also Rolex Watch U.S.A., Inc. v. AFP Imaging Corp.*, 101 U.S.P.Q.2d (BNA) 1188, 1196 (T.T.A.B. 2011) (finding 42% association to be insufficient to prove a likelihood of dilution). These cases highlight the insignificance of Dr. Simonson's survey results. Though Dr. Simonson himself testified that 7.8% association is significant, no case law or academic literature suggests that it is. In fact, because dilution requires a higher percentage than infringement,[3] they suggest the opposite. *See, e.g.*, *1-800 Contacts, Inc. v. Lens.Com, Inc.*, 722 F.3d 1229, 2149 (10th Cir. 2013) (alteration in original) (quoting 6 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 32:189 (4th ed. 2013)) ("[W]hen the percentage results of a confusion survey dip below 10%, they can become evidence which will indicate that confusion is not likely."). If survey results lower than 10% are evidence that confusion is not likely, survey results showing 7.8% association should similarly be evidence that dilution is not likely.

Despite the jury's verdict on Buc-ee's claim for dilution by blurring, the great weight of the evidence suggests there is no likelihood of dilution between the ALLIGATOR LOGO and the

---

[3] *See* Pharmacia, 201 F. Supp. 2d at 380.

BEAVER LOGO. Because (1) dilution requires a higher percentage of association than infringement does confusion (at least 15%), (2) no court has ever found survey results as low as 7.8% to be sufficient, and (3) courts have found association rates well above 7.8% to be insufficient, no reasonable jury could have found there to be a likelihood of dilution based on Dr. Simonson's survey finding of 7.8% association between the ALLIGATOR LOGO and the BEAVER LOGO. Accordingly, Defendants respectfully request the Court Grant Defendants' request for a new trial. *See Smith v. Transworld Drilling Co.*, 773 F.2d 610, 613 (5th Cir. 1985).

### ii.    *Plaintiff presented no evidence of impairment*

At trial, Plaintiff offered no evidence of impairment. That is, Plaintiff has presented no evidence that a mental association in the mind of consumers between the ALLIGATOR LOGO and the BEAVER LOGO will impair the distinctiveness of the BEAVER LOGO. However, impairment is an essential element of a claim of trademark dilution under Texas law. *See* TEX. BUS. & COM. CODE § 16.001(3) ("'Dilution by blurring' means an association arising from the similarity between a mark or trade name and a famous mark that impairs the famous mark's distinctiveness."); *see also Kellogg Co. v. Toucan Golf, Inc.*, 337 F.3d 616, 628 (6th Cir. 2003) (affirming the district court's denial of the plaintiff's dilution claim because the plaintiff failed to present any evidence of impairment); *Volkswagen AG v. Dorling Kindersley Publ'g, Inc.*, 614 F. Supp. 2d 793, 808 (E.D. Mich. 2009) (denying the plaintiff's motion for summary judgment in regard to its claim for dilution by blurring, despite evidence of association between the junior mark and the senior mark, because the plaintiff failed to establish that an association between the junior mark and the senior mark would impair the senior mark's ability to identify its goods and services); *Gap, Inc. v. G.A.P. Adventures, Inc.*, 100 U.S.P.Q.2d (BNA) 1417, 1431 (T.T.A.B. 2011) (entering judgment for the defendant where the plaintiff failed to prove that, "as a result of the likelihood

14

that consumers will associate the marks, [the plaintiff was] likely to suffer an impairment of the distinctiveness of its marks").

At trial, Plaintiff only presented insignificant survey evidence of association. Nonetheless, "the mere fact that consumers mentally associate the junior user's mark with a famous mark is not sufficient to establish actionable dilution. *Moseley v. V Secret Catalogue*, 537 U.S. 418, 433 (2003). This is because "such mental association will not necessarily reduce the capacity of the famous mark to identify the goods of its owner, the statutory requirement for dilution." *Id.*; *see* 4 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 24:120 (4th ed. 2011) ("The fact that people 'associate' the accused mark with the famous mark does not in itself prove the likelihood of dilution by blurring."). Plaintiff presented no evidence that any association between the ALLIGATOR LOGO and the BEAVER LOGO would impair the ability of the BEAVER LOGO to identify the goods or services of Buc-ee's. Because the jury found there to be a likelihood of dilution without any evidence of impairment, the jury's verdict on Plaintiff's claim for dilution by blurring is against the great weight of the evidence. Accordingly, Defendants respectfully request the Court Grant Defendants' request for a new trial. *See Smith v. Transworld Drilling Co.*, 773 F.2d 610, 613 (5th Cir. 1985).

### iii.    *No reasonable jury could find Buc-ee's to be famous throughout the entire state of Texas prior to May 2012*

At trial, the jury found that the BEAVER LOGO was famous throughout the entire state of Texas before Defendants first used their ALLIGATOR LOGO in May of 2012. *See* Dkt. 344 at 2. This finding is against the great weight of the evidence. Plaintiff presented no evidence that its BEAVER LOGO was widely recognized in places like Amarillo or El Paso prior to Defendants' first use. In fact, even Plaintiff's own evidence indicates that it was not. All the evidence in this case indicates that if BEAVER LOGO is famous at all, it is famous only for its travel centers, not

15

for its small convenience stores. There is nothing special about Buc-ee's small stores and most them do not even offer the services, such as large, clean bathrooms, that Buc-ee's is known for. In 2012, Plaintiff only had 3 travel centers in operation, all of which are in southeast Texas. The closest of those three travel centers, Buc-ee's Madisonville location, is more than 500 miles away from Amarillo. Buc-ee's Luling location, the closest travel center to El Paso that was open in 2012, is more than 600 miles away from El Paso. Even if you consider all 24 Buc-ee's stores that were open in 2012 (travel centers and small stores combined), the still come nowhere close to north or west Texas. All of them are in southeast Texas. Nor did Buc-ee's advertise its stores in north or west Texas in 2012. For the purposes of trademark dilution, the fame requirement is a difficult one to satisfy. *See Everest Capital Ltd. v. Everest Funds Mgmt., L.L.C.*, 393 F.3d 755, 763 (8th Cir. 2005) ("The judicial consensus is that 'famous' is a rigorous standard."). Plaintiff has presented no evidence suggesting that its BEAVER LOGO was widely recognized throughout parts of rural north or west Texas prior to Defendants' first use in May of 2012. Because the jury's verdict, as it relates to the fame of the BEAVER LOGO, is against the great weight of the evidence and includes areas where the BEAVER LOGO could not possibly have been famous in May of 2012, Defendants' request a new trial to determine exactly where BEAVER LOGO was famous, if at all, before Defendants' fist use of the ALLIGATOR LOGO. *See Smith v. Transworld Drilling Co.*, 773 F.2d 610, 613 (5th Cir. 1985).

> **D.     The Great Weight of the Evidence Suggests There is No Likelihood of Confusion**

Both parties presented evidence at trial on the issue of a likelihood of confusion. Notwithstanding the jury's verdict on that issue, most of that evidence suggests no likelihood of confusion exists between the ALLIGATOR LOGO and the BEAVER LOGO.

### i.    *The results of Dr. Robertson's survey weigh strongly against a finding of a likelihood of confusion*

Defendants' expert, Dr. Kim Robertson, conducted a likelihood of confusion survey in this case and testified the results of that survey showed a confusion rate between the ALLIGATOR LOGO and the BEAVER LOGO of 0.7%. Given that trademark infringement generally requires at least 15% confusion,[4] such a low confusion rate is insurmountable evidence that no likelihood of confusion exists.

Plaintiff offered no testimony to rebut Dr. Robertson's findings. Nor did Plaintiff offer its own survey evidence of a likelihood of confusion,[5] a fact which itself weighs against a finding of a likelihood of confusion. *See Star Indus. v. Bacardi & Co.*, 412 F.3d 373, 388 (2d Cir. 2005) ("Star's failure to present its own consumer survey weighs against a finding of consumer confusion."); *Merriam-Webster, Inc. v. Random House, Inc.*, 35 F.3d 65, 72 (2d Cir. 1994) ("The lack of survey evidence counts against a finding of actual confusion."); 5-5 GILSON ON TRADEMARKS § 5.04 ("Some courts conclude that failure to present a survey is itself evidence against a finding of confusion."). Instead, Plaintiff attacked Dr. Robertson on cross examination. Specifically, Plaintiff focused on three things: (1) Dr. Robertson's qualifications; (2) the universe

---

[4] *See* Ex. 2 at 30:13–14; *see also Hershey Co. v. Promotion in Motion, Inc.*, No. 07-cv-1601 (SDW), 2013 WL 12157828, *16 (D.N.J. Jan. 18, 2013) ("[S]urveys showing confusion rates of less than 10% are strong evidence that confusion is not likely."); *Exxon Corp. v. Texas Motor Exchange, Inc.*, 628 F.2d 500 (5th Cir. 1980) (finding there to be a likelihood of confusion based on a survey showing 15% of respondents were confused); *RJR Foods, Inc. v. White Rock Corp.*, 603 F.2d 1058, 1061 (2d Cir. 1979) (finding survey results between 15% and 20% sufficient to support a finding of a likelihood of confusion).

[5] Though Plaintiff presented no survey evidence of a likelihood of confusion, it undoubtedly conducted a likelihood of confusion survey in this case. Buc-ee's gross revenues exceed one billion dollars a year, and as evidenced by the entourage of attorneys it hired to handle this case, it clearly has no qualms with spending large amounts of money to achieve its conquest of those it perceives to be competitors. The point is, Buc-ee's did not forget to conduct a likelihood of confusion survey. It knew its failure to introduce survey evidence on a likelihood of confusion, especially when it conducted two other surveys in this case, would not look good. Buc-ee's chose not to introduce survey evidence on a likelihood of confusion for one reason and one reason only: because the survey it conducted achieved results so low it would have destroyed its claim for trademark infringement.

of respondents Dr. Robertson surveyed; and (3) Dr. Robertson's control stimulus. But none of these criticisms justify a significant reduction in the weight attributable to Dr. Robertson's survey.

First, there is no question that Dr. Robertson is qualified to testify as an expert in this case. The fact that he has not conducted a thousand consumer surveys does not make him less so. Dr. Robertson has studied consumer behavior for more than forty years and while he has not built his entire career around conducting consumer surveys, he has analyzed thousands of them. Thus, under Federal Rule of Evidence 702, Dr. Robertson's knowledge, education, and experience qualify him to testify as an expert. *See* FED. R. EVID. 702.

In addition, Plaintiff criticized the universe surveyed by Dr. Robertson because it included respondents who live in areas where Choke Canyon has no stores but did not include respondents who reside in areas surrounding several of Defendants' stores. However, as Plaintiff counsel noted, the relevant universe in a likelihood of confusion survey "is people who are likely to ***come into contact*** with the accused infringer's logo." Ex. 3 at 131:15–19 (emphasis added). It is not required that the area immediately surrounding each of Defendants' stores be surveyed. Clearly, if the point is to find people who are likely to come into contact with the ALLIGATOR LOGO, it makes sense to survey the areas surrounding stores located in densely populated areas. But, the Choke Canyon stores in sparsely populated rural areas that fell outside Dr. Robertson's survey population are not located in densely populated areas.

For instance, Whitsett, Texas, where Defendants' operate one travel center, one small convenience store, and one stand-alone restaurant, is so small population data specific to Whitsett is not even available through the United States Census Bureau. According to the Live Oak County Voter Registration Office, there are only 135 registered voters in Whitsett, Texas. And, according to the Census Bureau's 2017 population estimates only 12,174 people live in all of Live Oak

18

County, a county which spans roughly 1,079 square miles. Ex. 5; Ex. 6. To highlight just how rural Whitsett is, Dallas County spans only 909 square miles and was home to 2,618,148 people in 2017. Ex. 5; Ex. 6. As Dr. Robertson testified at trial, surveying areas with such small populations would be ineffective because not enough people live there. For this reason, he chose to survey the three areas—North, East, and South-Central Texas—that comprise roughly 80% of Texas's population.

The people most likely to come into contact with the ALLIGATOR LOGO are those traveling on the major highways on which most of Defendants' stores are located. As is true with Buc-ee's travel centers,[6] those traveling long distances account for most of the sales of Defendants' convenience stores, not local residents. Furthermore, all three of the areas that produced most Dr. Robertson respondents—Dallas/Fort Worth, Houston, and San Antonio—are located on interstate highways where Defendants operate convenience stores.[7] Thus, the areas Dr. Robertson surveyed were appropriate. Although in retrospect Dr. Robertson could have asked a preliminary question to identify whether respondents would be likely to travel the highways on which Defendants' stores are located in the near future, the fact that he did not is not significant. It is extremely common for Texas drivers-license holders eighteen and older to travel on interstate highways at least occasionally. Therefore, the respondents surveyed by Dr. Robertson are the people most likely to come in contact with Defendants' ALLIGATOR LOGO, at least to the extent those people are identifiable.

Finally, Plaintiff complains about Dr. Robertson's control stimulus. But, this argument carries no weight. Even if you ignore Dr. Robertson's control stimulus entirely, the results of his

---

[6] *See* Trial Exhibit PTX031.

[7] Interstate Highway 35, on which Defendants' Atascosa travel center is situated, runs through Dallas/Fort Worth. Defendants also operate a convenience store in Seguin, Texas on Interstate Highway 10, the main route between Houston and San Antonio. Finally, Interstate Highway 37 connects San Antonio to Whitsett, Texas where defendants have one travel center, one small convenience store, and a stand-alone restaurant.

survey would still only indicate 2.7% confusion as to source and 1.3% confusion as to affiliation. Neither is anywhere close to the 15% rate of confusion that even Plaintiff's expert agreed is the generally accepted requirement for a finding of a likelihood of confusion. Accordingly, the results of Dr. Robertson's likelihood of confusion survey are entitled to great weight and strongly suggest no likelihood of confusion exists between the ALLIGATOR LOGO and the BEAVER LOGO.

### ii. Differences in the parties' logos weigh against a finding of a likelihood of confusion

In its Third Amended Complaint, Plaintiff lists a number of ways in which the ALLIGATOR LOGO and the BEAVER LOGO are similar. *See* Dkt. 78 at page 10. These "similarities" are nonsense. Features like cartoon animals, hats, red tongues, and yellow backgrounds are generic. Buc-ee's was not the first to use these features. In fact, Buc-ee's owner admitted at trial that he copied the idea for the Buc-ee's Beaver from IPANA Toothpaste. *See* Ex. 7 at 89:20-25; *see also* Ex. 8. Just one glance at the parties' logos makes clear how different they are. Most obviously, Defendants use an alligator as their logo while Buc-ee's uses a beaver. Defendants' ALLIGATOR LOGO, as it most frequently used, also features the words "Choke Canyon Bar-B-Q" surrounding the alligator. The beaver in Buc-ee's BEAVER LOGO is not surrounded by any words. In fact, none of Buc-ee's design mark registrations feature any words at all; only the beaver in isolation. *See* Ex. 9.

As a designation of source, the words "Choke Canyon Bar-B-Q" set the ALLIGATOR LOGO apart from all other logos, including the BEAVER LOGO. Other versions of the ALLIGATOR LOGO feature the words "Choke Canyon Travel Center" or "Choke Canyon Bar-B-Q & Travel Center." These words set the ALLIGATOR LOGO apart as well. Finally, Defendants use the ALLIGATOR LOGO without words on a limited number of products. However, even without the words, the most distinguishing feature of the ALLIGATOR LOGO

20

remains: the alligator. The alligator is the central feature of Defendants' logo just as the beaver is the central feature of Plaintiff's. No matter what is on his head or what color his tongue is, the Choke Canyon Alligator looks nothing like the Buc-ee's Beaver. Thus, it is unreasonable to assume that consumers will be confused in anyway by Defendants' use of the ALLIGATOR LOGO. Accordingly, the dissimilarity of the parties' logos weighs strongly against a finding of a likelihood of confusion.

### iii.    *Differences in the physical appearance of the parties' stores weighs against a finding of a likelihood of confusion*

The fourth likelihood of confusion factor, the identity of the retail outlets and purchasers, requires, among other things, an examination of the physical appearance of the parties' stores. *See Exxon Corp. v. Texas Motor Exch.*, 628 F.2d 500, 505–06 (5th Cir. 1980) (discussing the physical appearance of the parties' stores when analyzing the identity of retail outlets and purchasers). In this case, the parties' stores look nothing alike. If they did, Plaintiff never would have dropped its claim for trade dress infringement. As the photos below illustrate, the parties' stores are completely different both inside and out.

 

 

The only similarity between the parties' stores is that both Choke Canyon's and Buc-ee's travel centers are larger than the average convenience store. However, even in terms of size the parties' stores are hardly similar. Although Defendants have 8 convenience stores, only two of those are travel centers. The remaining six are small convenience stores and are only about 3,000 square feet. Defendants' largest travel center, located in Atascosa, Texas, is roughly 15,000 square feet. Compared to the size of Buc-ee's travel centers this is nothing. As Arch Aplin testified at trial, the average size of Buc-ee's travel is between 40,000 and 50,000 square feet. Further, Buc-ee's largest travel center, located in New Braunfels, Texas, is roughly 67,000 square feet. As Amjad Panjwani testified at trial, this one store is larger than all of Defendants' stores combined.

Furthermore, Defendants sell Exxon gas at both of their travel centers. All of Plaintiff's stores on the other hand sell unbranded gasoline. Thus, the fuel pumps, which are the first thing customers see when they pull into a convenience store, look nothing alike.

 

22

Defendants' look no different than any other convenience store selling EXXON, CHEVRON or SHELL gas. The ALLIGATOR LOGO is not used on Defendants' fuel canopies or on the fuel pumps themselves.



BUCEES0004193

The only logo used on Defendants' fuel canopies and fuel pumps is the logo associated with the branded gas that store sells. For instance, the fuel canopies and pumps at both of Defendants' travel centers feature the Exxon logo. In contrast, Plaintiff uses the BEAVER LOGO all over its fuel canopies and fuel pumps.



23

Moreover, the highway signs stationed in front of the parties' stores bear no similarities.

 

At its restaurants and Whitsett travel center, Defendants use the following sign:



25

At their Atascosa travel center Defendants use the following signs:

 

As these photo show, the signs out front of Defendants' Atascosa travel center never feature the ALLIGATOR LOGO in isolation; they do so in conjunction with the EXXON logo and the PARADO logo, another trademark owned by Defendants. None of Defendants' small convenience stores have a street sign bearing the ALLIGATOR LOGO outside the store. Apart from ice machines positioned in front of the store, they do not use the ALLIGATOR LOGO outside the store at all. In contrast, all of Plaintiff's travel centers and several its smaller stores use the following sign:



As can be seen for this photo, Plaintiff's signs typically feature only the BEAVER LOGO, nothing else. From a long distance, Buc-ee's signs are nothing more than a yellow circle in the sky. If Buc-ee's is as famous as it claims to be, consumers would no doubt have come to recognize that yellow circle as a landmark easily distinguishable from all other highway signs. Indeed, that is the whole point. That's why Buc-ee's signs are so simple. Defendants' highway signs look completely different. They are not circular, they are rectangular. There is nothing particularly unique about them, they advertise Exxon gas just like thousands of other convenience stores throughout the state of Texas.

Considering these differences in the physical appearance of the parties' stores, it is impossible for anyone who visits one of Defendants' stores to believe they are at Buc-ee's. Similarly, it would be absurd for anyone to think that Buc-ee's, a company known for its extraordinarily large travel centers and the relentless use of its Beaver Logo, is somehow affiliated

26

with Choke Canyon, a company that uses an alligator as its mascot, sells branded gasoline, and whose largest store is nearly 30,000 square feet smaller than Buc-ee's average travel center. Accordingly, the physical appearance of the parties' stores weighs strongly against a finding of a likelihood of confusion.

> ### iv.    *The length of time Defendants have been using the ALLIGATOR LOGO weighs against a finding of a likelihood of confusion*

Defendants first used their ALLIGATOR LOGO on May 4, 2012. From then until December 23, 2015 when they were sued by Plaintiff, Defendants open and notoriously used their ALLIGATOR LOGO on IH 35 and IH 37. Even after this case began, Defendants continued to use their ALLIGATOR LOGO at all ten of their locations and on billboard advertisements located on Interstate Highway 35 and Interstate Highway 37. In total, more than 6 years passed between the time Defendants first used their ALLIGATOR LOGO and the time the jury reached their verdict in this case on May 22, 2018. During that time, the Parties' stores combined generated many millions of transactions. *See* Trial Exhibit PTX209. Despite all these combined transactions and over six years of continuous use of the ALLIGATOR LOGO, there have been no legitimate instances of actual confusion between the ALLIGATOR LOGO and the Buc-ee's Beaver Logo. Defendants had over $150,000,000.00 in income but the Court denied Defendants their right to show this to the jury.

Obviously, Plaintiff will point to the Hernandezes and argue they are evidence of actual confusion. But, as Defendants have pointed out time and time again, the Hernandezes' testimony is highly unreliable and if they were confused at all it was due to similarities in the parties' stores, not their logos. Regardless, their testimony is entitled to little weight given the number of transactions that have taken place since Defendants began using their ALLIGATOR LOGO. *See Homeowners Group, Inc. v. Home Marketing Specialists, Inc.*, 931 F.2d 1110, 1110 (6th Cir. 1991)

27

([T]he existence of only a handful of instances of actual confusion after a significant time or a significant degree of concurrent sales under the respective marks may even lead to an inference that no likelihood of confusion exists."); *Sun Banks, Inc. v. Sun Fed. Savs. & Loan*, 651 F.2d 311, 319 (5th Cir. 1981) (finding nineteen reports of actual confusion over three years to be insufficient to support a finding of a likelihood of confusion); *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 263 (5th Cir. 1980) ("[T]he fact that only three instances of actual confusion were found after nearly 15 years of extensive concurrent sales under the parties' respective marks raises a presumption against likelihood of confusion in the future."). Therefore, fact that Defendants used the ALLIGATOR LOGO for over six years with no real evidence of actual confusion weighs against a finding of a likelihood of confusion.

### v. The fact that Defendants operate stand-alone restaurants weighs against a finding of a likelihood of confusion

One of the factors to be considered in a likelihood of confusion analysis is the similarity of the products or services. *See Bd. of Regents of the Univ. of Houston Sys. v. Houston Coll. Of Law, Inc.*, 214 F. Supp. 3d 573, 584 (S.D. Tex. 2016). The greater the similarity between the parties' products and services, the greater the likelihood of confusion; the greater the dissimilarity, the less likely is confusion. *See* Dkt. 341 at 20. In this case, Defendants operate two stand-alone restaurants. Plaintiff, however, operates no restaurants at all. Therefore, the existence of Defendants' restaurants weighs against a finding of a likelihood of confusion.

### vi. Plaintiff presented only a scintilla of evidence suggesting a likelihood of confusion

The only evidence Plaintiff presented of a likelihood of confusion is the testimony of Joy and Ernest Hernandez. However, as is clear from their testimony, if the Hernandezes were actually confused, which is a big if, they were confused by the setup of the parties' stores, not by their

respective logos. Moreover, even if the Hernandezes were actually confused by Defendants' use of the ALLIGATOR LOGO, which they were not, they are the only customers out of the millions who have visited the parties' stores who have been confused by Defendants' ALLIGATOR LOGO. Defendants have operated open and notoriously for more than six years and the Hernandezes are the only customers who claim to have been confused by Defendants' logo. Thus, their testimony is entitled to little weight. *See McNeil Nutritionals, LLC v. Heartland Sweeteners, LLC*, 511 F.3d 350, 366 (3d Cir. 2007) (quoting 4 J. Thomas McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 23.14 (4th ed. 2007) ("[E]vidence of only a small number of instances of actual confusion can be dismissed as inconsequential or *de minimis*.")).

Beyond the Hernandezes, there is no evidence that Defendants' use of the ALLIGATOR LOGO is likely to cause confusion with the BEAVER LOGO. As shown above, however, Defendants have presented a plethora of evidence suggesting there is no likelihood of confusion. The results of Defendants' likelihood of confusion survey indicate the confusion rate between the ALLIGATOR LOGO and the BEAVER LOGO is less than 1%. Given that it is generally accepted that a claim for trademark infringement requires at least 15% confusion, Defendants' survey results alone are sufficient to outweigh Plaintiff's "evidence" of a likelihood of confusion. Considering these results and all the other evidence discussed above, it is clear that the jury's verdict on Plaintiff's claim for trademark infringement is against the great weight of the evidence introduced at trial. Accordingly, Defendants request the Court grant them a new trial on the issue of a likelihood of confusion. *See Smith v. Transworld Drilling Co.*, 773 F.2d 610, 613 (5th Cir. 1985).

> **E.     In the Alternative, Defendants Request a New Trial to Determine Whether the Use of the ALLIGATOR LOGO at Defendants' Restaurants is Likely to Cause Confusion**

In the event the Court denies Defendants' request for a new trial on the issue of a likelihood of confusion, Defendants request that, in the alternative, the Court grant Defendants a new trial to determine whether Defendants' use of the ALLIGATOR LOGO at its stand-alone restaurants is likely to cause confusion with the BEAVER LOGO. Plaintiff presented no evidence at trial that Defendants' restaurants are likely to cause confusion with the BEAVER LOGO. Defendants, however, presented ample evidence that they would not. In particular, Defendants evidence shows (1) Defendants' restaurants look nothing like Plaintiff's travel centers and convenience stores,[8] (2) the products and services sold by Defendants' restaurants are completely different than those sold by Plaintiff's travel centers and convenience stores, (3) the advertisements for Defendants' restaurants look nothing like the advertisements for Plaintiff's travel centers,[9] and (4) Defendants' restaurants target a different customer base than Plaintiff's travel centers and convenience stores. Accordingly, in the event the Court denies Defendants' request for a new trial on the issue of a likelihood of confusion, Defendants request the Court grant Defendants a new trial to determine whether Defendants' use of the ALLIGATOR LOGO at its stand-alone restaurants is likely to cause confusion with the BEAVER LOGO. *See Smith v. Transworld Drilling Co.*, 773 F.2d 610, 613 (5th Cir. 1985).

F.       **Defendants Were Unfairly Prejudiced Because the Entire Jury Pool Was Biased in Buc-ee's Favor**

The location of the trial in this case significantly prejudiced Defendants. It was impossible for Defendants to receive a fair trial in Houston given its population's extreme bias in favor of Buc-ee's. Twenty-one out of Buc-ee's thirty-three stores are in the Houston metropolitan area. This large concentration of Buc-ee's stores in the Houston area has led to increased awareness of

---

[8] *See* Trial Exhibits D-272 & D-323.

[9] *See* Ex. 10.

Buc-ee's and its marks throughout the Houston area. *See* Ex. 2 at 27:24–28:7. Not surprisingly, this heightened awareness of Buc-ee's and its marks manifested itself in the jury pool in this case. Out of fifty potential jurors, all but four or five had been to Buc-ee's. *See* Ex. 11 at 21:4–7. In addition, almost the entire jury pool said they "loved" Buc-ee's, *see* Ex. 11 at 128:13–15, several of whom "loved" Buc-ee's so much they felt they could not be impartial jurors. *See* Ex. 11 at 20:9–18; 30:4–5; 117:10–17. This shows a clear bias towards Buc-ee's in the Houston area.

Furthermore, when asked how many people had been to a Choke Canyon store, only one juror, juror 35, raised their hand. *See* Ex. 11 at 21:10–15. However, it was later determined that juror 35 lied and had not visited one of Defendants' locations. Juror 35 announced before the entire jury panel that he had visited Defendants' store and thought he was in Buc-ee's. This statement was false. *See* Ex. 11 at 112:11-113:5. Defendants asked for a new jury panel, but this was denied. Thus, none of the fifty potential jurors had visited a Choke Canyon location, though virtually all of them had been to Buc-ee's.

The fact that the entire jury pool was aware of Buc-ee's, when coupled with the fact that none of them had ever been to a Choke Canyon store, skewed this case in Buc-ee's favor from the very beginning. Although many of the jurors who said they loved Buc-ee's claimed they could set aside their bias and judge this case on its merits, it is impossible for someone who cares so strongly about one party to truly be impartial. Therefore, the jury pool's bias in favor of Buc-ee's in this case unfairly prejudiced Defendants' right to a fair trial. Accordingly, Defendants' request the court grant Defendants a new trial. *See Smith v. Transworld Drilling Co.*, 773 F.2d 610, 613 (5th Cir. 1985).

**G.    Defendants Were Unfairly Prejudiced by the Misrepresentations of Plaintiff's Counsel and Dr. Alex Simonson**

31

>   ### i.   *Plaintiff's counsel intentionally misrepresented to the jury the court's holding in* **Jada Toys, Inc. v. Mattel, Inc.**

At trial, Plaintiff fought long and hard to inflate the significance of Dr. Simonson's embarrassingly low finding of 7.8% association. Part of Plaintiff's strategy was to have one of its half-dozen attorneys, Tim Rechtien, lie about the court's holding in *Jada Toys v. Mattel*. During his cross-examination of Defendants' expert, Dr. Kim Robertson, Rechtien implied several times that the court in *Jada Toys* held 7% association was sufficient to support a claim for trademark dilution. Indeed, the following exchange shows Rechtien's misrepresentations.

> **Q:** So, you think having 2 million people in Texas that are miss associating the two marks is not a big deal?
>
> **A:** I think it would be would have to be closer to 15 to 20 percent.
>
> **Q:** And again your only support for that is your own logic and you saw a case or something?
>
> **A:** Yes.
>
> **Q:** And that you didn't see another case that said 7 percent was enough?
>
> **A:** I did not.
>
> **Q:** Right.
>
> **A:** Actually there was one case where there was a 7 percent some odd finding but that was one of two surveys that were done the other survey in that case showed 28 percent confusion.
>
> **Q:** But the Court relied on the 7 percent dilution, right?
>
> **A:** I don't know which the Court relied on I can tell you if that's the one we're talking about that there were two surveys done one showed 28 percent and one showed 7 percent the Court in a total decided that that was evidence of dilution.
>
> **Q:** Well and the Court actually said seven percent was more than sufficient?
>
> **A:** I don't know.
>
> **Q:** Because you haven't read it?
>
> **A:** I haven't read the specific case no.
>
> **Q:** So you haven't read the case okay?
>
> **A:** Well actually I I have I've looked at the summary I haven't read the actual case.

32

**Q:** Right. And so you're not aware that it says that seven percent of a sufficient enough?

**A:** That would be correct.

*See* Ex. 3 at 128:4–129:9. Dr. Robertson is not aware that the court in *Jada Toys* said seven percent dilution was sufficient because this was a lie. In fact, no likelihood of dilution survey was even conducted in that case. Instead, there were two likelihood of *confusion* surveys conducted by Plaintiff, one finding 28% *confusion* the other finding 7% *confusion*, which the 9th Circuit found created a genuine issue of material fact as to whether there was a likelihood of dilution. Nonetheless, Rechtien misrepresented to the Court and to the jury that the court in *Jada Toys* "actually said seven percent was more than sufficient" to sustain a claim for trademark dilution, a statement of law he knew to be false. *See* Ex. 3 at 127:5–8. Not once did the court state that 7% association was sufficient to support a claim for trademark dilution. *See Jada Toys, Inc. v. Mattel, Inc.*, 518 F.3d 628 (9th Cir. 2008). The court simply said that, **when considered together**, the two surveys were sufficient to create a genuine issue of material fact. *See id.* That is significantly different than Rechtien told the both the jury and the Court. In misrepresenting the 9th Circuit's holding in *Jada Toys*, Rechtien told the jury that results even lower than Dr. Simonson's 7.8% had previously been the basis for a finding of a likelihood of dilution. That is simply not true, and Rechtien knew it.

As stated in the Local Rules for the United States District Court for the Southern District of Texas, "[l]awyers who practice before this court are required to act as mature and responsible professionals, and the minimum standard of practice shall be the Texas Disciplinary Rules of Professional Conduct." S.D. Tex. Local Rule 1(A). Rule 3.03 of the Texas Disciplinary Rules of Professional Conduct ("TDRPC") states, "A lawyer shall not knowingly . . . make a false statement of material fact or law to a tribunal." TEX. DISC. R. PROF'L CONDUCT R. 3.03. For the purposes of Rule 3.03, "[l]egal argument based on a knowingly false representation of law constitutes

33

dishonesty toward the tribunal." *Id*. Thus, in lying to the Court and the jury, Rechtien breached both the TDRPC and the rules of this Court. However, even more significant than Rechtien's professional misconduct is the fact that his intentional misstatements of the law unfairly prejudiced Defendants by giving the jury a false impression of what a finding of a likelihood of dilution requires. It is entirely possible that absent Rechtien's lies, the jury would have found 7.8% association insufficient to support a claim of trademark dilution, especially because at least one court has previously done so. *See Pharmacia*, 201 F. Supp. 2d at 380 (finding 14% association insufficient to support a claim for trademark dilution). Because the jury's verdict is based, at least in part, on the lies of Plaintiff's counsel, Defendants' are entitled to a new trial. *See Smith v. Transworld Drilling Co.*, 773 F.2d 610, 613 (5th Cir. 1985).

### ii. *Dr. Alex Simonson lied about the applicability of the Central Limit Theorem*

The results of Dr. Simonson's dilution survey purportedly shows that, of the 33 respondents from the Houston area, 18% percent were reminded of the BEAVER LOGO when shown the ALLIGATOR LOGO. At trial, Dr. Simonson testified that these 33 respondents were a statistically significant sample size according to the Central Limit Theorem ("CLT"). "The [central limit] theorem states that for almost all defined target populations, the sampling distribution of the mean . . . or the percentage . . . value derived from a ***simple random sample*** will be approximately normally distributed, provided the sample size is sufficiently large (i.e., when [the sample size] is > or = 30)." JOSEPH F. HAIR, JR., ROBERT P. BUSH, & DAVID J. ORTINAU, MARKETING RESEARCH WITHIN A CHANGING INFORMATION ENVIRONMENT 313 (2006) (emphasis added). Defendants do not dispute the CLT is a generally accepted statistical principle. Defendants do, however, dispute that the CLT is applicable to the results of Dr. Simonson's dilution survey.

34

Two broad families of sampling plans exist, one termed *probability* (including *random*) *sampling* and the other termed *nonprobability sampling*. JACOB JACOBY, TRADEMARK SURVEYS VOLUME I: DESIGNING, IMPLEMENTING, AND EVALUATING SURVEYS 367 (2013). The key to the CLT is that, for it to apply, the sample must be *random*. *See* JOSEPH F. HAIR, JR., ROBERT P. BUSH, & DAVID J. ORTINAU, MARKETING RESEARCH WITHIN A CHANGING INFORMATION ENVIRONMENT 313 (2006). In the statistical context, a "simple random sample" is "a sample selected such that each possible sample . . . has the same probability of being selected." DAVID R. ANDERSON, DENNIS J. SWEENEY, & THOMAS A. WILLIAMS, STATISTICS FOR BUSINESS AND ECONOMICS 268 (2011). Expert witnesses often prey on nonscientists' ignorance of the statistical definition of this very commonly used word. In fact, as Dr. Jacob Jacoby notes, "in a not inconsequential number of instances, surveys claimed or implied to be 'random' or 'probability' surveys, upon examination, turn out to be nothing of the sort." JACOB JACOBY, TRADEMARK SURVEYS VOLUME I: DESIGNING, IMPLEMENTING, AND EVALUATING SURVEYS 371 (2013). Such was true of Dr. Simonson's dilution survey. At trial, Dr. Simonson testified that the 33 people from Houston analyzed in his dilution survey were "essentially randomly chosen." *See* Ex. 2 at 140:16–19. However, this claim is patently false. In his dilution survey, Dr. Simonson employed quotas for both age and gender. *See* Trial Exhibit PTX074 at 2. Thus, Dr. Simonson's dilution survey was a quota sample, a type of nonprobability sample, not a random sample. *See* WILLIAM R. DILLON, THOMAS J. MADDEN, & NEIL H. FIRTLE, MARKETING RESEARCH IN A MARKETING ENVIRONMENT 289 (2d ed. 1987) ("Quota sampling involves selecting specific numbers of respondents who possess certain characteristics known or presumed to affect the subject of the research study."); *see also* ALVIN C. BURNS & RONALD F. BUSH, MARKETING RESEARCH 342 (6th ed. 2010) (There are four nonprobability sampling methods: convenience samples, purposive samples, referral samples, and

35

quota samples."). Because Dr. Simonson's dilution survey employed a quota sample rather than a random sample, the CLT does not apply to the 33 respondents he surveyed in the Houston area. Therefore, his finding of 18% association in the Houston area is statistically insignificant.

There is no doubt Dr. Simonson knew the CLT was inapplicable when he testified at trial that is was applicable. After all, he's conducted over 1,000 surveys. He knows the difference between a random (probability) sample and a quota (nonprobability) sample. He also knows that the CLT does not apply to nonprobability samples. Dr. Simonson lied when he testified the CLT applied to the 33 respondents he surveyed in the Houston area. He was not wrong, he did not misspeak, he lied, and he did so at the direction of Plaintiff's counsel. Even the authority Dr. Simonson cited at trial, *see* Ex. 2 at 115:4–14, acknowledges that Dr. Simonson's conduct was unethical. For example, the textbook *Marketing Research in a Marketing Environment* states that "[i]t is unethical, and potentially extremely misleading, to treat a nonprobability sample as if it were a probability sample." WILLIAM R. DILLON, THOMAS J. MADDEN, & NEIL H. FIRTLE, MARKETING RESEARCH IN A MARKETING ENVIRONMENT 292 (2d ed. 1987); *see also* JACOB JACOBY, TRADEMARK SURVEYS VOLUME I: DESIGNING, IMPLEMENTING, AND EVALUATING SURVEYS 371 n.15 (2013) (citing cases in which the court misunderstood the statistical definition of "random") ("Haphazard does not mean random, and while it is not unusual that nonscientists fail to appreciate the significant distinction between the two, it seems somewhat disingenuous when experts blur this distinction.").

Because Dr. Simonson (1) lied about the applicability of the CLT to the results of his dilution survey, (2) intentionally deceived the Court and the jury, and (3) by his false testimony deprived Defendants of a fair trial, Defendants respectfully request the Court grant their Motion for New Trial. *See Smith v. Transworld Drilling Co.*, 773 F.2d 610, 613 (5th Cir. 1985).

### iii.   Plaintiff's closing slides included material misrepresentations

In addition to the lies discussed above, Plaintiff's counsel made material misrepresentations to the jury during closing arguments. Slide 76 of Plaintiff's closing slides is entitled, "Any Actual Association – No Minimum Percentage Required." *See* Ex. 12. This is blatantly false. According to Plaintiff's logic, 1% association would be sufficient to support a claim for trademark dilution. Although dilution's threshold for liability is not as clear as it is for trademark infringement, at least one court has found 14% association, almost twice the amount found by Plaintiff's expert, to be insufficient. *See Pharmacia*, 201 F. Supp. 2d 335, 380. However, notwithstanding Plaintiff's lies to the Court and the jury, no court has ever found 7.8% association to be enough. Academic research on this issue also suggests that a minimum of 10% association is required. *See* Jacob Jacoby, *Considering the Who, What, When, Where and How of Measuring Dilution*, 24 Santa Clara High Tech. L.J. 601, 634 (2008) ("[I]t seems that rates of 10% or more might be considered actionable."). Therefore, to say that no minimum percentage is required is a misrepresentation of the law.

Obviously, any misrepresentation made by Plaintiff to the jury would be unfairly prejudicial to Defendants. However, the prejudicial effect of this misrepresentation is exasperated because (1) it was intended to give the jury a false impression of the law regarding the required amount of association, and was therefore irreparably prejudicial,[10] and (2) it was made during closing arguments. *Cf. Colburn v. Bunge Towing, Inc.*, 883 F.2d 372, 375 (5th Cir. 1989) ("A district court may order a new trial if improper closing argument irreparably prejudices a jury verdict.") (quoting *Nissho-Iwai Co. v. Occidental Crude Sales, Inc.*, 848 F.2d 613, 619 (5th Cir.

---

[10] *See Isbell v. DM Records, Inc.*, 774 F.3d 859, 872 (5th Cir. 2014) ("A closing statement may implicate the interest of substantial justice when counsel's assertions are 'either false or without basis in the record.'") (quoting *Wallber v. Ziegler*, 470 F. App'x 230, 233 (5th Cir. 2012)).

1988)). Accordingly, Defendants request the Court grant them a new trial based on the intentional misrepresentation included in slide 76 of Plaintiff's closing slides. *See Smith v. Transworld Drilling Co.*, 773 F.2d 610, 613 (5th Cir. 1985).

Plaintiff will likely argue that Defendants did not object to slide 76 at trial. However, Defendants did not object because they did not become aware of Plaintiff's misrepresentations in its closing slides until after trial. The reason for this is because, despite the parties' agreement to produce their closing slides by email by 7:00pm the evening before closing arguments, *see* Ex. 13, Plaintiff refused to produce its closing slides until roughly an hour before closing arguments began. And, when Plaintiff finally did produce its closing slides, it gave Defendants only one paper copy of their slides to share between their entire team. No electronic copy of Plaintiff's closing slides was ever produced to Defendants. Defendants emailed Plaintiff a copy of their closing slides just after 7:00 pm on Sunday May 20, 2018. *See* Ex. 14. Yet, Plaintiff refused to send its closing slides to Defendants. Defendants informed Plaintiff on the night of May 20, 2018 that they only intended to bring three witnesses the next day and that their direct examination of those witnesses would take about three hours. *See* Ex. 15. Still Plaintiff refused, adamant that closing arguments would not take place until Tuesday May 22, 2018. *See* Ex. 15. This is just another of Plaintiff's dirty tricks. Plaintiff knew closing arguments would be done Monday May 21, 2018 just as well as Defendants. It chose not to give Defendants its closing slides so that it could deprive Defendants of the opportunity to object to any of its ninety-seven slides, many of which turned out to be incredibly misleading. For this reason, Defendants' failure to object to misrepresentations included in Plaintiff's closing slides at trial should not be held against them.

**H.    Evidentiary Errors Unfairly Prejudiced Defendants**

        *i.    Dr. Alex Simonson's opinions regarding a likelihood of dilution should have been excluded*

Dr. Simonson's opinions regarding a likelihood of dilution between the ALLIGATOR LOGO and the Beaver Logo should have been excluded because they are based on unreliable principles. Dr. Simonson's opinion that a likelihood of dilution exists between the ALLIGATOR LOGO and the Beaver Logo should have been excluded because this opinion is based on the unreliable principle that 7.8% association is sufficient to support a claim for trademark dilution. As stated above, dilution requires a higher percentage of association than infringement does confusion. *See* Pharmacia, 201 F. Supp. 2d at 380. Dr. Simonson himself testified at trial that it is generally accepted that a claim for trademark infringement requires at least 15% confusion. *See* Ex. 2 at 30:13–14. Thus, a claim for trademark dilution requires a finding of at least 15% association. This is supported by the court's holding in *Pharmacia*, where the court found 14% association to be insufficient to support a claim for trademark dilution. *See* 201 F. Supp. 2d 335, 380. Dr. Simonson's finding of 7.8% association, a finding so low no court has ever found it to be sufficient, is significantly below this 15% threshold. Therefore, Dr. Simonson's opinion that a likelihood of dilution exists in this case should have been excluded because it is based on the unreliable principle that 7.8% association is sufficient to suggest a likelihood of dilution. *See* FED. R. EVID. 702 ("A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: . . . (c) the testimony is the product of reliable principles and methods.").

Moreover, Dr. Simonson's opinion that his finding of 18% association in the Houston area indicates a higher likelihood of dilution as the parties expand should have been excluded because it is based on the unreliable principle that a non-random, quota sample of 33 respondents is statistically significant according to the Central Limit Theorem. The Central Limit Theorem applies only to random samples, *see* JOSEPH F. HAIR, JR., ROBERT P. BUSH, & DAVID J. ORTINAU,

39

MARKETING RESEARCH WITHIN A CHANGING INFORMATION ENVIRONMENT 313 (2006), that is "a sample selected such that each possible sample . . . has the same probability of being selected." DAVID R. ANDERSON, DENNIS J. SWEENEY, & THOMAS A. WILLIAMS, STATISTICS FOR BUSINESS AND ECONOMICS 268 (2011). However, because he employed quotas for both age and gender, *see* Trial Exhibit PTX074 at 2, Dr. Simonson's survey was a quota sample, not a random sample. Thus, the CLT does not apply to the 33 respondents he surveyed in the Houston area. *See* JOSEPH F. HAIR, JR., ROBERT P. BUSH, & DAVID J. ORTINAU, MARKETING RESEARCH WITHIN A CHANGING INFORMATION ENVIRONMENT 313 (2006).  For this reason, Dr. Simonson's opinion that his finding of 18% association in the Houston area indicates a higher likelihood of dilution as the parties expand is based on the unreliable principle that his non-random, quota sample of 33 respondents is made significant by the CLT. Accordingly, this opinion should have been excluded.

As discussed above, the inclusion of Dr. Simonson's testimony fundamentally altered the course of the trial. Because Dr. Simonson's opinions regarding a likelihood of dilution between the ALLIGATOR LOGO and the BEAVER LOGO should have been excluded, the failure to exclude this testimony significantly prejudiced Defendants. Therefore, Defendants respectfully request a new trial. *See Smith v. Transworld Drilling Co.*, 773 F.2d 610, 613 (5th Cir. 1985).

### ii.    *The testimony of Leslie J. Lott should have been excluded*

The Court allowed Buc-ee's to turn Defendants' two trademark registrations into a "scarlet" ®. The testimony of Leslie J. Lott unfairly prejudiced Defendants because (1) it allowed Plaintiff to attack Defendants' registrations without a claim for cancelation in this case, (2) Lott made several misleading statements to the jury, and (3) any prejudice that was caused to Plaintiff by the admission of Defendants' registrations (of which there was none) was cured by the inclusion of a jury instruction directly addressing the effect of Defendants' registrations.

40

In an attempt to keep Defendants' two federal trademark registrations out of evidence, Plaintiff deliberately chose not to file a claim for cancelation in this case. Plaintiff knew that if it included a claim for cancelation in its complaint, it would guarantee the admissibility of Defendants' registrations and put them front and center. So, Plaintiff filed a claim for cancelation in the United States Patent and Trademark Office ("USPTO") rather than in this case and sought to exclude Defendants' registration via motion *in limine*. The Court initially granted Plaintiff's motion, but on reconsideration allowed Defendants' to present their registrations at trial. However, as a condition of admission, the Court also allowed Plaintiff to present expert testimony, the testimony of Leslie J. Lott, to explain the significance of Defendants' registrations. Yet, she did nothing of the sort. Instead, the Court's decision to allow Lott's testimony opened the door for Plaintiff to turn improperly attack the validity of Defendants' registrations, turning them into the scarlet ®.

At trial, Lott testified that the USPTO did not consider Buc-ee's marks when analyzing Defendants' trademark applications. *See* Ex. 4 at 149:10–21. Immediately thereafter, Lott testified that the design code searching system is "imperfect" because it is "too exact" and "too constraining," *see* Ex. 4 at 151:6–9, obviously insinuating that Buc-ee's marks should have been considered when analyzing Defendants' applications. However, the logic behind this insinuation is flawed. By Lott's logic, all trademark registrations featuring animal logos should be compared to all trademark registrations featuring an animal logo. Such a search would turn up tens, potentially hundreds, of thousands of results. This would entirely defeat the purpose of using design codes; to narrow the results of trademark searches. Thus, this attack on Defendants' registrations was wholly improper.

41

Lott also attacked Defendants' registrations by testifying that, if the examining attorney would have searched hypothetical design codes such as "water animals or cartoon animals," the BEAVER LOGO would have come up. *See* Ex. 4 at 151:6–20. Allowing Lott to testify as to what would have happened is some hypothetical situation that, based on current trademark search protocol never would have happened, is highly prejudicial in and of itself. But the damage didn't stop there, this testimony is also entirely misleading, and at least in part, false.

First, even if the USPTO did have search codes such as water animals or cartoon animals, there is no guarantee the examining attorney would have found the BEAVER LOGO. Examining attorneys often use an "and" code to search for multiple features of a mark simultaneously and exclude marks that have not been assigned both of those codes. For example, Buc-ee's Registration No. 4,007,064 has been assigned codes 26.01.21 ("Circles that are totally or partially shaded") and 03.09.24 ("Stylized small mammals, rodents, kangaroos, wallabies"). *See* Ex. 9. Thus, if an examining attorney conducted a search using "and" and both these codes, the results would include Buc-ee's Registration No. 4,007,064 but exclude any mark that is also not assigned both codes. This is one of several search tools examining attorneys use to narrow their search. Thus, to say that using a code for water animals or cartoon animals would have disclosed the BEAVER LOGO is highly misleading. The only way it would have done so is if the examining attorney conducted a search using *only* water animals or *only* cartoon animals.

Second, codes relating to cartoon animals do exist. Almost every animal category, including the categories that include both beavers (03.09.26) and alligators (03.21.06) include a subcategory that covers "costumed animals and those with human attributes in this division." *See* Ex. 16. Therefore, for Lott to imply that it is impossible to search for cartoon animals is simply not true.

42

Finally, Lott testified that Defendants did not "tell the examining attorney about BEAVER LOGOs and its registrations," *see* Ex. 4 at 149:23–150:10, insinuating that Defendants had some sort of obligation to do so or at the very least that it is standard practice to do so, neither of which is true and inferring Defendants had committed fraud on the USPTO. Thus, this testimony was extremely misleading. Furthermore, Defendants do not believe that their ALLIGATOR LOGO in any way resembles the BEAVER LOGO. Therefore, Defendants would have had absolutely no reason to inform the examining attorney of BEAVER LOGO.

All this was without a claim for cancelation. Without a claim for cancelation, the validity of Defendants' trademark registrations was not an issue necessary for the jury to decide. Therefore, Lott's attacks on the validity of Defendants' registrations were irrelevant to the issues before the jury in this case and served no purpose other than to prejudice Defendants. Accordingly, the inclusion of Lott's testimony was unfairly prejudicial to Defendants.

Moreover, Lott's testimony was an unnecessary waste of time because the parties agreed to a jury instruction that specifically addressed the effect of Defendants' registrations. *See* Dkt. 288-4 at 21. The admission of Defendants' trademark registrations caused no risk of prejudice to Plaintiff. Indeed, all the Court allowed Defendants to do was to state that they applied for two federal trademark registrations and that both were granted. Given the litany of issues addressed at trial and the severe limitations on Defendants' ability to discuss their registrations at trial, there was no risk of prejudice of Plaintiff and certainly no risk so severe that it could only be cured by expert testimony. If any risk existed at all, it would have been extinguished by jury instruction 3.4. Thus, the Court's admission of Lott's testimony unfairly prejudiced Defendants, especially because, as discussed below, the Court deprived Defendants the right to offer their own expert in response. What should have weighed heavily in Defendants' favor became a scarlet ®.

43

Accordingly, Defendants respectfully request a new trial be granted. *See Smith v. Transworld Drilling Co.*, 773 F.2d 610, 613 (5th Cir. 1985).

> ### i. *Because the testimony of Leslie Lott was allowed, Elizabeth King should not have been excluded*

The Seventh Amendment states that, "In suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved . . . ." U.S. CONST. amend. VII. The Fifth Circuit has interpreted this provision to guarantee parties "a constitutional right to a fair trial in a civil case." *Latiolais v. Whitley*, 93 F.3d 205, 207 (5th Cir. 1996). "A trial was not fundamentally fair if a party's cause was substantially prejudiced by errors at trial." *Id.* Here, the Court's erroneous decision to allow the testimony of Leslie Lott yet exclude that of Elizabeth King irreparably prejudiced Defendants' ability to defend themselves in this case.

During a hearing on January 30, 2018, the Court stated that Defendants' would be able to expand their discussion of their trademark registrations if Plaintiff decided to present expert testimony regarding Defendants' registrations. *See* Ex. 17 at 39:1–10. Despite this, and despite allowing Plaintiff to the present expert testimony of Leslie Lott regarding the effect, however, misleading, of Defendants' registrations, the Court refused to allow Defendants to present the expert testimony of Elizabeth King; testimony Defendants intended to use in response to the testimony of Leslie Lott. *See* Ex. 18 at 39:23–41:2. In doing so, the Court tied Defendants' hands behind their backs, and deprived them of their constitutional right to a fair jury trial.

Without the opportunity to present the rebuttal testimony of their expert, Elizabeth King, Defendants were left with no meaningful way to respond to the misleading, and completely irrelevant, testimony of Leslie Lott. Plaintiff will likely argue that even without their own expert, Defendants were still given the opportunity to cross-examine Lott. However, Plaintiff knows full well that expert testimony is often very persuasive both because it comes from the mouth of an

expert and because it typically involves issues the jury is otherwise unlikely to understand. Furthermore, as Plaintiff repeatedly stressed at trial, attorney argument is not evidence. In contrast, expert testimony is. Therefore, had Defendants been able to present the rebuttal testimony of Elizabeth King, the jury would have been able to consider Defendants' registrations considering both Lott's and King's interrelations of their significance. However, because Defendants were denied the opportunity to call King as a witness, the jury had before it only Plaintiff's one-sided interpretation.

Because the Court's decision to allow the expert testimony of Leslie Lott and exclude that of Elizabeth King opened the door for Plaintiff to trash Defendants' trademark registrations without affording Defendants a meaningful opportunity to respond, Defendants' cause was substantially prejudiced. Accordingly, Defendants were deprived of their Seventh Amendment right to a fair trial. *See Latiolais*, 93 F.3d 205, 207 (5th Cir. 1996). Defendants, therefore, request a new trial. *See Smith v. Transworld Drilling Co.*, 773 F.2d 610, 613 (5th Cir. 1985).

### ii.     The Testimony of Joy and Ernest Hernandez Should Have Been Excluded

The testimony of Joy and Ernest Hernandez should have been excluded because (1) the Hernandezes' testimony was highly unreliable, (2) the Hernandezes were not actually confused by the ALLIGATOR LOGO, and (3) even if they were actually confused, it was the only alleged instance in over six years of open and continuous use by Defendants, and therefore inconsequential.

According to their declarations, the Hernandezes first visited Defendants' Atascosa travel center in January 2015, shortly after it opened. *See* Dkt. 303 Exs. E & F. Based on one of Joy Facebook posts, we also know the Hernandezes visited Defendants' Atascosa store on February 24, 2015, roughly a month after their first visit. In that Facebook post, Joy Hernandez stated that

45

Choke Canyon "had a lot [she] fell in love with." *See* Ex. 19. Although she expressed confusion as to why Defendants chose the name Choke Canyon, not once did she express being reminded of Buc-ee's in any way. Nor did she mention the ALLIGATOR LOGO at all. In addition, neither Joy Hernandez nor Ernest Hernandez reported their alleged confusion to either Defendants or Plaintiff.

It wasn't until a year and a half later, on July 23, 2016, that Joy Hernandez expressed her "confusion." *See* Ex. 20. However, she did so in response to a ABC13 Houston Facebook post that was in effect survey specifically asking Facebook users to report whether they felt the ALLIGATOR LOGO is too similar to the BEAVER LOGO. *See* Ex. 20. Not only is this not your typical instance of confusion, it is highly unreliable. To begin with, Joy Hernandez admitted at trial that she, and presumably her husband, were there to help Buc-ee's. *See* Ex. 2 at 156:9–11. ("Q: And can you tell us why you're here today. A: . . . [T]o help—you know, for Buc-ee's."). That's only the beginning. Outside of the fact that they visited Defendants' Atascosa location, it is impossible to verify any of the Hernandezes' testimony. Neither Plaintiff nor Defendants have any way of determining exactly what happened or what was said during the Hernandezes' visit to Defendants' store. Only a handful of the people who worked at Defendants' Atascosa store during that time still work for Defendants, and none of them remember any customer asking whether Choke Canyon and Buc-ee's are sister companies. *See* Ex. 21. In addition, Fred Perez, who was the manager at Defendants' Atascosa store for the first several months after it opened, testified at trial that none of his employees ever mentioned a customer asking whether Choke Canyon and Buc-ee's are sister companies. Furthermore, the Hernandezes remember no details about Defendants' employee, other than that they believe it was a man. Thus, Defendants had no meaningful way of even narrowing down who this mystery employee could have been. As these facts make clear, the reliability of the Hernandezes' testimony is incredibly suspect.

Moreover, the Hernandezes' testimony makes clear that if they were confused at all as to whether Choke Canyon and Buc-ee's are sister companies, it was because of the setup of the parties' stores, not the similarity of their logos. *See* Ex. 2 at 147:10–16; 2-148:1–5; 2-158:18–159:4. Thus, because trade dress was not an issue in this case, their testimony was irrelevant and should have been excluded for this reason alone. *See* FED. R. EVID. 402 ("Irrelevant evidence is not admissible.").

Finally, even if the Hernandezes were confused by Defendants' use of the ALLIGATOR LOGO, which they were not, their testimony should have been excluded as "inconsequential or *de minimis.*" *See McNeil Nutritionals, LLC v. Heartland Sweeteners, LLC*, 511 F.3d 350, 366 (3d Cir. 2007) (quoting 4 J. Thomas McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 23.14 (4th ed. 2007) ("[E]vidence of only a small number of instances of actual confusion can be dismissed as inconsequential or *de minimis*.")); *see also* 4 J. Thomas McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 23.14 (5th ed. 2018) (citing numerous cases). Even though Defendants open and notoriously used the ALLIGATOR LOGO for over six years before trial in this case began, the Hernandezes are the only instance of "actual confusion" Plaintiff presented at trial. During that six-year period, Plaintiff and Defendants combined generated a tremendous amount of sales. Nonetheless, even after hiring a private investigator, the Hernandezes were all Plaintiff could come up with. Given the problems with the credibility of the Hernandezes' testimony addressed above, and the number of people who were exposed to the parties' marks between the time Defendants first used the ALLIGATOR LOGO and the time of trial, this is simply not enough. The Hernandezes' testimony should have been excluded. *See McNeil Nutritionals*, 511 F.3d at 366.

Because the Hernandezes' testimony should have been excluded for the reasons above, its admission was extremely prejudicial to Defendants. This is particularly true because it opened the door for Plaintiff to inflate the significance of the Hernandezes' testimony and argue that evidence of actual confusion alone is sufficient to find a likelihood of confusion. *See* Ex. 3 at 193:21–194:1. As Defendants have mentioned repeatedly, this argument, though theoretically true, does not apply in this case. Substantial evidence of actual confusion alone may be sufficient. However, insignificant instances of confusion such as that of the Hernandezes, if they were even confused at all, are entitled to very little weight, and in some cases lead to the inference that no likelihood of confusion exists at all. *See 1-800-Contacts, Inc. v. Lens.com, Inc.*, 722 F.3d 1229, 1245 (10th Cir. 2013) (holding "a single customer-service record is entitled to little weight."); *Homeowners Group, Inc. v. Home Marketing Specialists, Inc.*, 931 F.2d 1110, 1110 (6th Cir. 1991) ([T]he existence of only a handful of instances of actual confusion after a significant time or a significant degree of concurrent sales under the respective marks may even lead to an inference that no likelihood of confusion exists."); *Sun Banks, Inc. v. Sun Fed. Savs. & Loan*, 651 F.2d 311, 319 (5th Cir. 1981) (finding nineteen reports of actual confusion over three years to be insufficient to support a finding of a likelihood of confusion); *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 263 (5th Cir. 1980) ("[T]he fact that only three instances of actual confusion were found after nearly 15 years of extensive concurrent sales under the parties' respective marks raises a presumption against likelihood of confusion in the future."); *First Southern Fed. Sav. v. First Southern Sav.*, 614 F.2d 71 (5th Cir. 1980) (finding there to be no substantial likelihood of confusion despite several instances of actual confusion); *see also* 5-5 Gilson on Trademarks § 5.04 (internal citations and quotation marks omitted) ("[P]erhaps as important as the number of instances of confusion are the kinds of persons confused and the degree of confusion."). Without

the Hernandezes' testimony and Plaintiff's misleading argument, this case likely would have ended in Defendants' favor. Thus, Because the Heranndezes' testimony should have never been admitted, Defendants respectfully request the Court grant them a new trial. *See Smith v. Transworld Drilling Co.*, 773 F.2d 610, 613 (5th Cir. 1985).

### iii.    The Hernandezes should not have been allowed to testify as to the statements of Defendants' unidentified cashier

Joy and Ernest Hernandez's testimony regarding the unidentified Choke Canyon cashier should have also been excluded based on Federal Rule of Evidence 403, as any probative value that their testimony might have provided was substantially outweighed by the danger of unfair prejudice to Defendants. The first point showing a lack of probative value is that no Choke Canyon employee ever reported being asked whether Buc-ee's and Choke Canyon were sister companies, nor would any Choke Canyon employee have ever said that. Fred Perez, employee of Defendants since March of 2014, was in charge of preparing the store to open on January 13, 2015. *See* Ex. 21 at ¶13–14. Throughout the first month of the store's opening, Mr. Perez held regular staff meetings with all the 65 employees, where he would have heard about such questions being asked. At that time, 25 of the 65 employees were male, 10 of which were still working for Defendants as of January 2, 2018. *See id* at ¶24–26. Fred Perez questioned the remaining 10 male employees about the Hernandez incident, showing them the declarations, and none had any recollection of either the Hernandez couple approaching them with such a question nor hearing about anybody else being asked such a question. Even further weakening any probative value that might exist is the fact that neither of the Hernandezes are able to recollect any discerning feature about the cashier. At trial, Joy still wasn't 100% percent sure that she had spoken with a man, saying that she "believe[d] it was a man," and that she was trusting her husband's memory because "he has a better memory than [she does]." *See* Ex. 2 at 168:19–23. Ernest Hernandez's testimony showed us,

49

however, that his memory was likely less than perfect, as he remembered purchasing Exxon gas at Buc-ee's (which they have never sold) and did not recognize a picture showing the inside of the Choke Canyon travel center he was supposedly confused at. *See* Ex. 2 at 151:14–15 and 152:24–153:1. Detracting from Joy Hernandez's credibility even more than her memory is the fact that she testified in court that the purpose of her being at trial was "to help, you know, for Buc-ee's." *See* Ex. 2 at 156:9–11.

Allowing Joy and Ernest Hernandez to testify as to the unidentified Choke Canyon cashier at trial effectively allowed two individuals to present unconfirmed, foggy account to the jury, which has the effect of portraying to the jury that this comment was made that Defendants are covering up. Because the risk of unfair prejudice substantially outweighed the probative value of the Hernandezes' statements regarding their alleged encounter with Defendants' employee, the Court erred in allowing this testimony to be used at trial.

### iv. *Joy and Ernest Hernandezes' Facebook posts should not have been excluded*

At the same hearing that the Court decided that Joy and Ernest Hernandez would be able to testify as to their story, Defendants argued that if the Hernandezes would be able to testify, then Defendants should be able to present the Facebook posts made by the Hernandezes, *see* Ex. 20; Ex. 22, that brought attention them in the first place. *See* Ex. 23 at 9:10–21. Nonetheless, the Court excluded the Hernandezes' Facebook posts, ruling that Defendants could mention the fact that the Hernandezes were discovered by Plaintiff because of their responses to an ABC13 Houston Facebook post, but could not show the jury the posts themselves. *See* Ex. 23 at 11:25–12:5. This decision was erroneous.

These Facebook posts are incredibly significant because they are necessary to accurately put the circumstances surrounding the Heranandezes' testimony into perspective. Although

allowing to mention that the Hernandezes were discovered by Plaintiff because of their responses to an ABC13 Houston Facebook post partially cures the prejudice caused to Defendants, it does so only to a limited degree. Without showing the jury the Herandezes' Facebook posts themselves, it impossible for the jury to truly grasp the significance of the post the Hernandezes responded to. That is the key here. The Hernandezes responded to an ABC13 Houston Facebook post about this case that, after showing the Choke Canyon and BEAVER LOGOs side-by-side, asked Facebook users whether they thought the two logos were too similar. Obviously, responding that you were confused after being asked that question is much less persuasive than freely volunteering the fact that you were confused. Thus, the Hernandezes' Facebook posts relate directly to their credibility, an issue for the jury and the jury alone to decide. Without the ability to present these posts to the jury, the circumstances surrounding the Hernandezes' alleged confusion went right over the jury's head. Therefore, the Court's exclusion of this evidence unfairly prejudiced Defendants.

Furthermore, these Facebook posts are not unfairly prejudicial to Plaintiff; they are statements made by two of their witnesses. The fact that they were made on Facebook does not change that. Had these statements been made in an email or a letter there is no question they would have been admitted. Similarly, the Hernandezes' Facebook posts presented no risk of confusing the issues in this case or misleading the jury. In fact, their admission would have clarified for the jury the circumstances surrounding Plaintiff's discovery of the Hernandezes. Finally, these posts posed no risk of wasting time. They would have been quickly addressed by Defendants' counsel and that would have been it. For these reasons, and because the Court's exclusion of this evidence substantially prejudiced Defendants, Defendants respectfully request a new trial.

> ***v.    Dr. Kim Robertson should have been allowed put the Hernandezes' testimony into context***

51

In response to Plaintiff's Motion to Strike the Supplemental Expert Declaration of Kim Robertson, Dkt. 296, the Court precluded Dr. Robertson from testifying as to the weight to be given to the Hernandezes' testimony as well as to the number and content of the responses to the July 23, 2016 ABC13 Houston Facebook post which was the genesis of the involvement in this case. *See* Dkt. 332 ¶1; *see also* Ex. 20. This ruling unfairly prejudiced Defendants in two ways.

First, it prevented Dr. Robertson from explaining that, by the Hernandezes' own admission, their "confusion" was based on numerous factors that have nothing to do with the parties' logos. *See* Ex. 2 at 147:10–16; 148:1–5; 158:18–159:4. Dr. Robertson should have been allowed to explain that, from a scientific perspective, testimony such as the Hernandezes' is the reason why survey experts employ control variables; to isolate responses based on misperceptions. Second, the Court's order prevented Defendants from explaining that the Hernandezes were two of more than 500 people who responded to the July 23, 2016 ABC13 Houston Facebook poll. *See* Ex. 24. Of those 500+ people, only 5-6%, including the Heranandezes, felt there was significant similarity between the ALLIGATOR LOGO and the BEAVER LOGO. *See* Ex. 24 at ¶17. Both points were necessary to accurately put the Herandezes' testimony into context. There will always be someone who answers "yes" to a question, no matter how ridiculous. That's exactly what happened here. The ABC13 Houston Facebook poll asked people whether an alligator was confusingly similar to a beaver. Obviously, most people said no. The Hernandezes happened to be a part of the insignificant number of people who felt differently. By depriving Defendants of the ability to adequately explain to the jury, from a scientific perspective, how the context of the Hernandezes' testimony affects its significance, the Court unfairly prejudiced Defendants' ability to defend itself.

Furthermore, Plaintiff could use expert testimony to put Defendants' trademark registrations. Because, as described above, the Hernandezes' testimony was highly unreliable and

52

incredibly prejudicial to Defendants, Defendants should have been afforded the same opportunity as it relates to the Hernandezes' testimony. Because they were not, Defendants request a new trial. *See Smith v. Transworld Drilling Co.*, 773 F.2d 610, 613 (5th Cir. 1985).

### vi. *Defendants should have been able to argue Plaintiff believes it has the sole right to use a friendly, smiling, cartoon animal*

Plaintiff moved on September 8, 2017 that the Court should preclude Defendants from arguing or suggesting that Buc-ee's believes or claims that it has the sole right to use a smiling, friendly, cartoon animal for a logo. *See* Dkt. 207 at 6. Plaintiff argued that the assertion was irrelevant to the case and should be excluded under Federal Rules of Evidence 401, 402, and 403. Tracy Richardson, one of Buc-ee's attorneys, argued at the December 14, 2017 hearing that Buc-ee's did not think that it had the sole right to use a friendly, smiling, cartoon animal, "nor would [they] ever." *See* Ex. 25 at 48:9-18. This assertion by is false, however. One of the many things Plaintiff complains of in its Third Amended Complaint is Defendants' "improper use of a friendly smiling cartoon animal." *See* Dkt. 78 at 10, ¶29. Even Mr. Richardson admits that it is a factor that Buc-ee's considers in its claim when he said in the hearing that it wasn't a "stand-alone comment" and that Defendants improper use of a friendly smiling cartoon animal is "taken into consideration with all the other factors, too." *See* 25 at 49:6-8. Despite all of this, the Court still precluded Defendants from talking to the jury about a claim that Buc-ee's had made in its complaint. *See* 25 at 49:9-11.

Federal Rule of Evidence 403 allows the court to exclude evidence if its probative value is outweighed by unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence. The probative value of presenting to the jury that Buc-ee's believes it as the sole right to use a friendly, smiling, cartoon animal, something that it explicitly stated in its complaint, would not remotely be outweighed by a danger of any of the

adverse effects that Rule 403 mentions. The assertion is admittedly prejudicial to Buc-ee's, but not unfairly so, and the use of this argument would in no way confuse any issue or waste any time.

### vii.    Defendants' sales figures should not have been excluded

Plaintiff moved on September 8, 2017 that Defendants be precluded from referencing, introducing, or arguing about Defendants' income statements from 2014 and 2015. *See* Dkt. 207 at 13. Plaintiff claimed that the documents were not relevant to any issue in the case, and that any use of the income statements to compare the relative size of Buc-ee's to Defendants is unfairly prejudicial. *Id.* Mr. Hanor argued at the December 14, 2017 hearing that the income statements would show that Defendants had grossed over a hundred million in sales, and that this showed that they were so big of a company that Plaintiffs should have known about them. *See* Ex. 25 at 70:16-23. The Court acknowledged Mr. Hanor's argument that the delay suggests that Buc-ee's didn't really think that there was any evidence of infringement or confusion, *see* Ex. 25 at 72:18-22, and that Buc-ee's would have sued Choke Canyon "a lot earlier if there really was any intent, if there really was any evidence of confusion*." See* Ex. 25 at 73:3-5. Judge Ellison ultimately decided to keep the income statements out of court, however, due to concern that the parties would "get into a whole lengthy sideshow" that would create a "six-week trial." *See* Ex. 25 at 73:8-15. The Court granted Plaintiff's motion on December 15, 2017. *See* Dkt. 247 at 2.

Federal Rule of Evidence 403 allows the court to exclude evidence if its probative value is outweighed by unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence. Although Judge Ellison voiced undue delay and wasting time as concerns related to the presentation of the income statements, the reality is that it would not have increased the length of trial at all. The probative value to Defendants that the income statements was very high in relation to the time it would have taken to present it. The

presentation of the income statements would have allowed Defendants to further illustrate their point to the court that this lawsuit was not about trademark infringement or dilution, rather it was about Buc-ee's feeling threatened by Choke Canyon's purchase of a property within proximity of Buc-ee's Luling travel center. In fact, Defendants argued this point at trial, and there were never any negative effects such as undue delay or wasting of time. Allowing Defendants to include an extra exhibit in its argument about Plaintiff's true intention for suing Defendants would not have increased the length of trial by any more than a few minutes, if at all. The presentation of Defendants' income statements would have laid heavily on the probative side of Federal Rule of Evidence 403's scale, and the Court's exclusion of this evidence merits the granting of a new trial.

### viii.    *Plaintiff's previous lawsuits of the BEAVER LOGO should have been admitted under FRE 406*

Plaintiff moved on July 14, 2017 that Defendants be precluded from presenting, referencing, or introducing any evidence, argument, or material related to Buc-ee's prior enforcement matters of its BEAVER LOGO against third-parties or related to alleged anticompetitive conduct. *See* Dkt. 159. Plaintiff argued that Buc-ee's previous lawsuits were irrelevant in this case and should be excluded under Federal Rules of Evidence 401 and 402, claiming that evidence of these lawsuits has nothing to do with Plaintiff's infringement and dilution claims against Defendants in the instant matter. *See id.* at 3. Plaintiff further argued that evidence of the lawsuits should be excluded under Federal Rule of Evidence 403, claiming that their relevance would be substantially outweighed by danger of prejudice to Buc-ee's, distracting and confusing the jury, and creating unnecessary delay. *See id.* Mr. Hanor argued at the September 13, 2017 hearing that the evidence of these lawsuits carries much more relevance than Plaintiff would admit, as they all involve the same identical Beaver mark, identical goods and services, and share identical claims. *See* Ex. 26 at 62:10-21. He continued to say that these identical suits were

55

all settled almost immediately, and that presentation of this evidence would be highly relevant to Defendants as it shows how the suits were used to bully small businesses into settling. *See* Ex. 26 at 63:16-25. Judge Ellison granted Plaintiff's motion, excluding the prior lawsuits. *See* Ex. 26 at 68:8-9.

Federal Rule of Evidence 406 allows for evidence of an organization's routine practice to be admitted proving that on a certain occasion the organization acted in accordance with the routine practice. The lawsuits that Buc-ee's has filed in the past were motivated by the same reasons this lawsuit was brought against Defendants. In each of the lawsuits, Buc-ee's brought the lawsuit with the goal of eliminating any possible competition that these small businesses might eventually pose. These lawsuits also share another common denominator with Choke Canyon: the logos look nothing like that of the Buc-ee's Beaver:









The Choke Canyon ALLIGATOR LOGO has been simply the latest target in Buc-ee's routine practice of filing trademark infringement lawsuits against any gas station that presents any sort of competition and uses a cartoon figure. Defendants sought to present the evidence of these lawsuits to explain this to the jury. In the absence of this pertinent information, the Court permitted Buc-ee's to portray to the jury that this lawsuit was simply an isolated case where it was defending its trademark. The reality, which the Court effectively silenced through its order, is that Choke Canyon is just the latest potential competitor to Buc-ee's that has been sued under the guise of a trademark claim. All the other cases involved the same BEAVER LOGO and were settled, as they were small stores that could not afford a protracted legal battle with Buc-ee's team of intellectual property attorneys in Chicago. Plaintiff struggled to prove its case to the jury, as the Beaver and

57

Alligator marks look nothing alike. If Defendants would have been allowed to show to the jury Plaintiff's routine practice of filing weak trademark claims against competitors, the case would have had a different result. The Court erred in excluding this evidence, as Federal Rule of Evidence 406 applies directly to evidence of Plaintiffs prior litigation and enforcement matters, and the risk of prejudice caused by the admission of this evidence, if any at all, does not substantially outweigh its probative value. Therefore, Defendants respectfully request a new trial. *See Smith v. Transworld Drilling Co.*, 773 F.2d 610, 613 (5th Cir. 1985).

### ix.    *Evidence of Bucky's three Houston area convenience stores should not have been excluded*

In response to Plaintiff's motion, Dkt. 333, at a hearing on May 7, 2018, the Court precluded Defendants from presenting evidence of three new BUCKY'S convenience stores in the Houston area. *See* Ex. 27 at 25:3–27:16. As a result, Defendants were forced to withdraw trial exhibits D-611–D634 and D686-691, all of which are photos of Bucky's new store. The decision on May 7, 2018 by the Court to exclude evidence of the three new BUCKY'S convenience stores was erroneous and prejudicial to Defendants.

One of the factors to consider when determining whether a likelihood of dilution exists is "[t]he extent to which the owner of the famous mark is engaging in substantially exclusive use of the mark." 15 U.S.C. § 1125(c)(2)(B)(iii). In this case, the trademark "BUC-EE'S" and the BEAVER LOGO are one in the same. Dr. Simonson's fame survey is evidence of this. There, Dr. Simonson prompted respondents with a photo of the BEAVER LOGO and measured the number of respondents who responded with the name "BUC-EE'S." Therefore, there is an inextricable link between the name Buc-ee's and the BEAVER LOGO.

The use by a competitor of the trademark BUCKY'S, which is pronounced identically to BUC-EE'S, erodes Plaintiff's exclusive use of the trademark BUC-EE'S, particularly because it is

58

being used in the same geographical area. Because the trademark BUC-EE'S and the BEAVER LOGO are one in the same, the effect of this erosion is imputable to the BEAVER LOGO. Therefore, evidence of the recently opened BUCKY'S convenience stores in the Houston area is relevant to the analysis of the likelihood of dilution factors applicable to this case. Accordingly, this evidence should not have been excluded.

Furthermore, evidence of the recently opened BUC-EE'S convenience stores is the only evidence Defendants had to contest this particular likelihood of dilution factor. Therefore, the Court's exclusion of this evidence substantially prejudiced Defendants. For this reason, Defendants request a new trial. *See Smith v. Transworld Drilling Co.*, 773 F.2d 610, 613 (5th Cir. 1985).

### x. *Defendants should have been allowed to argue Dr. Simonson's dilution survey showed multiple questions on the same page*

Plaintiff moved on September 8, 2017 that the Court should preclude Defendants from arguing or suggesting that there was a "back" button on a survey or that there were several pages not on the same page of a survey. *See* Dkt. 207 at 10. This motion arose due to survey screenshots that were included in Plaintiff's report on its likelihood of dilution survey conducted by Dr. Alex Simonson. The screenshots of the survey show a "back" button on more than one question, which would allow the survey respondents to return to a previous page and change their answers. These screenshots included in Plaintiff's own report are evidence of a fatal flaw in the survey, but Plaintiff attempts to explain them away as being screenshots from "test" versions of the surveys. The Court granted Plaintiff's motion, barring Defendants from revealing one of the survey's fatal flaws to the jury. *See* Dkt. 247 at 2.

Plaintiff argues that this evidence should be excluded under Federal Rules of Evidence 401, 402, and 403, claiming that the presentation of evidence or an argument alleging there was a

"back button" or "multiple questions" would be irrelevant and highly prejudicial. The evidence of a "back" button is clearly relevant to the weight attributable to the survey, however, as it uncovers a fatal flaw. If the survey is to be presented to the jury as being an important piece of evidence for proving Plaintiff's dilution claim, Defendants should be able to point out any flaws that the survey may have. Plaintiff claims that the evidence should be excluded per Federal Rule of Evidence 403 because it would unfairly prejudice Buc-ee's, confuse the jury, and waste time. This is argument fails.

The inclusion of a "back" button or multiple questions on the same page of a survey questionnaire is a fatal flaw. Therefore, whether Dr. Simonson's dilution survey included multiple questions on the same page goes to the weight attributed to his survey. Although Plaintiff claims the actual survey questionnaire presented to respondents of Dr. Simonson's dilution survey did not contain a "back" button or more than one question on the same page, it has not conclusively proven this to be true. All Plaintiff has produced in support of this claim are screenshots and links to take a replicated version of Dr. Simonson's survey. However, both the screenshots and the links could have been altered. Despite Defendants' requests, Plaintiff has never produced emails showing the instructions Dr. Simonson sent to the survey company or any other evidence proving what his dilution questionnaire actually looked like at the time respondents to that survey actually saw it. For this reason, the jury should have been made aware that Defendants believed Dr. Simonson's dilution questionnaire to include a "back" button or more than one question on the same page and then given the opportunity to hear Dr. Simonson's explanation for themselves. The court's order excluding this evidence deprived Defendants' the opportunity to explain this issue to the jury, and therefore prejudiced Defendants. Accordingly, Defendants respectfully request a new trial. *See Smith v. Transworld Drilling Co.*, 773 F.2d 610, 613 (5th Cir. 1985).

## I.    The Denial of Defendants' Motion for Mistrial and a New Jury Panel Unfairly Prejudiced Defendants

During voir dire on May 14, 2018, a juror identified as "Juror 35" stood up without being prompted and announced to the Court that he had "stopped at a Choke Canyon facility thinking it was a Buc-ee's." *See* Ex. 11 at 29:20–30:2. The record unfortunately does not capture non-verbal reactions, but if it did it would reflect the looks of shock, opened mouths, and raised eyebrows throughout the court. The effect on the entire room was evident. After recess directly following Plaintiff's questions in voir dire, and before the prospective jury pool was brought in, Mr. Hanor approached the bench and asked the Court to declare a mistrial in the case and impanel another jury. *See* Ex. 11 at 47:17–48:1. Mr. Hanor explained to the Court that there was no way that he could talk about Juror 35's comments with the jury without further tainting them, and that there was no way that Defendants could have a fair trial. *See* Ex. 11 at 49:21–50:1. Although the Court even conceded that Juror 35's comment was the equivalent of a juror saying, "yeah I saw it, I saw him shoot him." *See* Ex. 11 at 52:19–20.

Once both Plaintiff's and Defendants' counsel finished presenting their questions to the prospective jury pool, Juror 35 was eventually called up to the bench for further questioning. When asked by Mr. Hanor about which Choke Canyon store that he had visited, the juror responded that it was a small convenience store in Giddings, Texas. *See* Ex. 11 at 112:13–25. After Mr. Hanor informed Juror 35 that Defendants did not own a store in Giddings, Texas, the juror conceded by saying, "Okay, my mistake." *See* Ex. 11 at 113:2–5. After the Court remarked that he had "raised [his] hand for several reasons," *see* Ex. 11 at 113:20–21, and asked whether he could be a fair juror, Juror 35 responded by saying that he "thought so," but then explained that he was a high school teacher and wanted to be involved in his students' final exams and graduation activities. *See* Ex. 11 at 113:23–114:11. It is clear from the record that Juror 35 did not want to sit for this

61

trial due to prior obligations and was willing to lie if necessary to be dismissed. Juror 35's statements were clearly fabricated and motivated by the prospect of being dismissed. Notwithstanding this, the Magistrate Judge informed Mr. Hanor that she did not think that the jury had been tainted by the comment. *See* Ex. 11 at 114:22. The Court later attempted to cure the prejudicial effect of Juror 35's comment by informing the final jury panel that the juror had been mistaken and had in fact not visited any of Choke Canyon's stores at all. *See* Ex. 11 at 117:11-18. Juror 35's remarks were intentionally inflammatory and prejudicial, which became evident when he revealed his true intentions. Defendants were deprived of their Seventh Amendment Right to a fair jury trial through the Court's refusal to grant a mistrial. *See Latiolais*, 93 F.3d 205, 207 (5th Cir. 1996). Accordingly, Defendants respectfully request a new trial. *See Smith v. Transworld Drilling Co.*, 773 F.2d 610, 613 (5th Cir. 1985).

## V.    CONCLUSION

For at least the foregoing reasons, Defendants respectfully request the Court Grant Defendants a new trial.

DATED this 30th day of August, 2018.

62

Respectfully submitted,

_____

Charles W. Hanor
Texas Bar No. 08928800
Hanor Law Firm, PC
750 Rittiman Road
San Antonio, TX  78209
(210) 829-2002 Phone
(210) 829-2001 Fax
chanor@hanor.com

ATTORNEYS FOR DEFENDANTS

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document is being served this I hereby certify that on August 30, 2018, a true and correct copy of the foregoing document will be served upon counsel of record via electronic mail through the United States District Court's CM/ECF system.

Respectfully submitted,

_Charles W. Hanor_

_____

Charles W. Hanor
Texas Bar No. 08928800
Hanor Law Firm, PC
750 Rittiman Road
San Antonio, TX  78209
(210) 829-2002 Phone
(210) 829-2001 Fax
chanor@hanor.com

ATTORNEYS FOR DEFENDANTS