# EXHIBIT 25

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

BUC-EE'S, LTD.                    .  C.A. NO. H-15-3704
                                  .  HOUSTON, TEXAS
VS.                               .
                                  .  DECEMBER 14, 2017
AMJAD PANJWANI, et al             .  2:00 P.M. to 4:09 P.M.


TRANSCRIPT of MOTION HEARING
BEFORE THE HONORABLE KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE


APPEARANCES:

FOR THE PLAINTIFF:              MR. JOSEPH J. BERGHAMMER
                               MS. JANICE V. MITRIUS
                               Banner Witcoff Ltd
                               10 S Wacker Drive
                               Suite 3000
                               Chicago, IL  60608

                               MR. HARRY TRACY RICHARDSON III
                               Buc-ee's Ltd
                               327 FM 2004 Rd
                               Lake Jackson, TX  77566


FOR DEFENDANTS:                MR. CHARLES W. HANOR
                               Hanor Law Firm PC
                               750 Rittiman Rd
                               San Antonio, TX  78209


ALSO PRESENT:                  MR. AMJAD PANJWANI
                               MR. MICHAEL FINLEY



Proceedings recorded by mechanical stenography, transcript
produced by computer-aided transcription.

APPEARANCES CONTINUED

OFFICIAL COURT REPORTER:              MS. KATHY L. METZGER
                                     U.S. Courthouse
                                     515 Rusk
                                     Room 8004
                                     Houston, Texas   77002
                                     713-250-5208

P R O C E E D I N G S

*THE COURT:*  Okay.  Good afternoon and welcome back. Why don't we take appearances of counsel, beginning with plaintiffs.

*MR. RICHARDSON:*  Tracy Richardson here for Buc-ee's, Your Honor.  And I also have Joe Berghammer and Janice Mitrius.

*THE COURT:*  Welcome to all of you.

*MR. BERGHAMMER:*  Thank you.

*MS. MITRIUS:*  Thank you.

*MR. HANOR:*  Charles Hanor for defendants, and I have my client Amjad Panjwani, who's the owner.

*THE COURT:*  Okay.  Welcome to all of you, too.

We spend a lot of time in court arguing motions in limine and then at the trial I often find that the subjects of the motion in limine never come up at all or if they do come up, they're much more easily resolved in the context in which they come up.  So, I think we ought to bear that in mind as we work through these this afternoon.

Subject to that, does anybody want to make an opening statement?  I'm familiar with your papers.  Are you ready to begin with argument over each different motion in limine?

*MR. RICHARDSON:*  Judge, we know you have a limited amount of time, so --

*THE COURT:*  Well, it turns out I changed things, so,

I've got the time you need.

*MR. RICHARDSON:*  Well, if you have a preference on how you'd like to hear things, we're good to go with what you would like to hear first.

*THE COURT:*  Well, I think we ought to just go through the motions in limine one at a time.  And the person advancing the motion can go first.  The first I have are defendants' motion in limine to exclude news articles, television news reports, and Internet comments referring to plaintiff.

Do you want to say anything additional to what's in your papers, Mr. Hanor?

*MR. HANOR:*  The only thing, Your Honor, is that those probably ought to be considered in conjunction with the plaintiff's motion to exclude news articles.

*THE COURT:*  Right.  Right.

*MR. HANOR:*  We both want to exclude news articles, so we need some guidelines on how they should be.  One of our concerns is that because of the statute, we have a date here in 2012 that Buc-ee's had to have been famous by that date.  And, so, a lot of these -- a lot of the news articles are ones when they open a store, and I'm not faulting them.  There's nothing wrong with it, but we know those articles occur because they cause them to occur.  They're trying to get a little publicity, and I can understand that.  I don't think that equates with fame when it's an article that somebody picked up to fill in

space in a paper when they open a store.  I don't think that contributes a whole lot to fame in that sense.

One of the problems we have, we want to put some news articles in, too, because our expert testified about them.  And it has to do with a survey.  So, I guess we can't exclude them all and I guess -- I'm reasonable at working things out.  I don't want to lump them all together, but they're all hearsay, unless you've got a basis for them.

*THE COURT:*  Well, some.  I wasn't sure if all of them were being used to show the truth of the matter asserted or they're being used for something else.

*MR. HANOR:*  Well, they've got a Yelp comment they want to put in with some --

*THE COURT:*  Let me say this:  The Internet, I just normally don't use Internet comments at all.  We don't know if they're authentic.  We don't know if they were entered by an interested party.  I mean, the Internet, there may come a time when we feel confidence in what's on the Internet, but I don't feel that confidence today.  I'd just soon exclude everything on the Internet.

*MR. HANOR:*  Well, either let it all in or let none of it in, is how I feel about it.  And you're probably going to let none of it in, which is okay.  I can live with that, too.

*THE COURT:*  Well, tell me -- give the best possible scenario under which you admit evidence from the Internet.

MR. HANOR:  Well, I'll give you an example.  Our expert is going to testify in rebuttal to the survey of their --

THE COURT:  About the way the survey was compiled?

MR. HANOR:  The survey was conducted one month after all these news articles came out.

THE COURT:  Okay.  But those articles weren't on the Internet, were they, primarily?

MR. HANOR:  They were both.  They were both.  They were -- nowadays everything is both.  They were in *The Houston Chronicle*, the *San Antonio Express News*, *Austin American-Statesmen*, Tex-Ag, ABC television news --

THE COURT:  Clearly we have an author who's actually standing behind the article, right, or --

MR. HANOR:  Well, they weren't much of an article.  They just reported, "Here are the two logos.  This is the dispute that's going on."  So, really, that's all they were.  There weren't really any commentaries about it.  And they invited people to comment on it on the Internet.  And there were hundreds of comments about it.  So, they really just put the two logos side by side and --

THE COURT:  Do we have any assurance that they weren't -- those postings on the Internet were not employees of one company or the other?

MR. HANOR:  Oh, some of them may have been.  We don't

know.  Friends, employees, we don't know that.  Just like any time you do a survey, you know, you -- how's it go?  You can fool some of the people all of the time --

THE COURT:  Yeah, yeah.

MR. HANOR:  You're always going to get controversy when you say that.  I don't care what the survey is.  We do a control in a survey.  And we can hold up two marks that are totally different and I'll get, I don't know, 3, 4, or 5 percent of people say, "Yeah, they look just alike to me." And that happens every single time you do a survey.  That's the reason why you use a control, because you're going to get a margin of error.

THE COURT:  I know, but that doesn't help me on the Internet.

MR. HANOR:  I'm not real comfortable with it.  I think that -- I don't know that I trust it nor does anybody else nowadays, because of what they call the fake news.  We know that some of it is fake, because it's easy because you can have anonymity.  You can put anything you want to out there usually.

They're talking about newspaper articles.  And if they want to put out a news article announcing a store, you know, I'll work something out with them on that.  That's not -- they want to put a whole slew of articles in, a lot of them after May 4th, 2012, and --

THE COURT:  Only one -- there's only one store that

your client had in 2012, right?

*MR. HANOR:* Yes, sir, that's correct. We only had one travel center. And it actually opened in 2009. And in 2012, we built a restaurant right next door to it and took down the Exxon sign that's 65 feet in the air and put in a great big old alligator up on top of it. And, so, that happened in 2012. And, so, that's the one store we have.

But then we built another stand-alone restaurant a little over a year later. Then we built another travel center a little after that. And we did advertise our travel centers and restaurants and all of our convenience stores.

*THE COURT:* Okay. Mr. Richardson, do you want say anything?

*MR. RICHARDSON:* Mr. Berghammer.

*THE COURT:* Mr. Berghammer.

*MR. BERGHAMMER:* Sure. Thanks, Your Honor.

There's different types of evidence that are coming in. So, regarding evidence on the Internet, Your Honor, defendants want to put in some and we want to put in some. But I want to reserve a third bucket of evidence that defendants are seeking to exclude. But regarding the pure Internet stuff, defendants want to put in comments where people say no one is going to be confused between these marks. This lawsuit is frivolous. This lawsuit is ridiculous.

*THE COURT:* Yeah.

*MR. BERGHAMMER:* We want to put in a few comments where people say this is just like Buc-ee's. These guys are Buc-ee's wannabes. That type of commentary I think is -- you would be within your discretion to say I'm going to exclude all of that.

*THE COURT:* That's my starting assumption.

*MR. BERGHAMMER:* Because it isn't reliable. You don't know who the author is. You can argue whether or not it's being admitted for the matter asserted. But when you've got no indicia of reliability regarding whether -- regarding the author, it's less admissible. And it's different if you have a phone call into somebody. Internet stuff is different from someone calling and saying --

*THE COURT:* Yeah, yeah.

*MR. BERGHAMMER:* So, you get all that. But that's a different bucket. So, if you -- Your Honor, if you said those comments, we think there's confusion, we think there's not confusion, excluding that, I think you're well-within your right to say, yes, let's exclude it.

There's other comments, though, such as the newspaper articles that Mr. Hanor mentioned. One of the things we have to prove is that Buc-ee's has gotten publicity and has had advertising since the Seventies -- or, I mean, since 1982, I guess. And I don't remember the exact date, Your Honor, but --

THE COURT: Okay. All right. Carry on.

MR. BERGHAMMER: And we've got to put in these newspaper articles to prove it. It's in the statute 16.103 says we've got to prove duration, extent, geographic --

THE COURT: Can't you stipulate to that?

MR. BERGHAMMER: Pardon me?

THE COURT: Can't you stipulate to that?

MR. BERGHAMMER: I'd be happy to. I'd be happy to have --

THE COURT: Mr. Hanor.

MR. BERGHAMMER: -- yeah, Mr. Hanor say, We stipulate that you've had publicity and you've had advertising in these various areas since this various time. I don't need the actual articles to go in. I just need to establish to the jury that we've had publicity and advertising. So, I'm okay with stipulating to it.

THE COURT: Okay. If there's not going to be a stipulation, then you would like to put in enough evidence to show that Buc-ee's was being used as a trade name and with the same trade dress?

MR. BERGHAMMER: That's right. And it's really -- this is just a trademark case. It's just Buc-ee's --

THE COURT: Trademark.

MR. BERGHAMMER: Yeah. In this other bucket, Your Honor -- so, that's number one. Number two, there's an

admission of a party opponent.  So, Arthur Mayo, who was employed by --

THE COURT:  Spell that for the court reporter.

MR. BERGHAMMER:  M-a-y-o.  He was employed by Choke Canyon.  He was developing the Choke Canyon stores.  And he said in a newspaper article that our new store in Atascosa is going to be as good as Buc-ee's, just like Buc-ee's, something like that.  I don't quite remember the exact words.  And he admitted in his deposition, yeah, I said that in that interview in that news article.  So, we've got reliability.  It's also an admission of a party opponent, and it goes to Buc-ee's fame, that he was saying it's going to be as good as Buc-ee's or something like that.  And it goes to confusion.  That they're trying to make their store like Buc-ee's.  So, that's, again, a separate comment.  That's not just random Internet chatter. That's an admission of a party opponent.  So, we think that should come in.

We also have some photographs that are over 20 years old that kind of fit in the same bucket with the newspaper articles.  And if we can get a stipulation that these stores existed, great, we don't have to put in the photographs. But if we can't get a stipulation, we want to put in photographs and have Arch Aplin say, Here's me standing in front of the store in 1983.  Here's me standing in front of this store in 1986, et cetera, to show the jury Buc-ee's, how

widespread it was, and then to the extent a photo is in a newspaper article, that there's publicity. And those are the buckets.

The final thing regarding 2012, we dispute the 2012 date being the date of first use. We also believe, and the case law says, that evidence post defendants' date of first use is still relevant to show fame prior to the date of the suit.

THE COURT: Well, that's the whole basis of the survey, right?

MR. BERGHAMMER: That's right. That's right. And regarding the survey itself and defendants' claim, that they want to say there was publicity about the lawsuit, Your Honor has already ruled that the Simonson survey is coming in and that defendants' complaints that the survey didn't control for publicity weren't sufficient to keep it out.

Would we be willing to stipulate that there was some publicity prior to Simonson's survey? Yeah, we would. Would we be willing to say there were five newspaper articles or the Austin Statesman said this? Yeah, we would be willing to stipulate.

THE COURT: Okay.

MR. BERGHAMMER: Thank you, Your Honor.

THE COURT: Mr. Hanor.

MR. HANOR: I don't mind having one of our cooks

comment -- a chef's comment, a cook's comment in a newspaper coming in regarding the trade dress, but at the same time I don't want them excluding everything about trade dress.  So, it's a double-edged sword, because that's what that's about. That's not about name that you're talking about there.

THE COURT:  I'm afraid I'm not following you, Mr. Hanor.

MR. HANOR:  The comment they're talking about there from Arthur Mayo, he was a cook in one of our restaurants, and he made that comment about, you know, we're going to open a store.  It's going to be like Buc-ee's.  Well, it is.  It's a big store with clean bathrooms, big clean bathrooms.  It is that thing.  But that's trade dress, not anything to do with the trademark that's at issue in this case.  And they want to exclude that out at the same time.  They want to -- I can't -- they've got a motion that I can't mention anything about trade dress, but they want to put something in about trade dress and what one of our cooks said, Arthur Mayo.  And, so, that's what I consider, you know --

THE COURT:  Well, it's got to be symmetrical.  I mean, I --

MR. HANOR:  That's all I ask, is that it's even and fair in that regard.  And I'm willing to work with him on some of that stuff like that, if that's what the purpose is.

THE COURT:  Why don't y'all talk together before you

come to court?  I mean, this sounds like something that should have been worked out without the need for a hearing.

MR. HANOR:  Well, Your Honor, we did have a time set for that and we were going to talk about that.  My server went down Sunday and I didn't get it up till Tuesday night.  And we hadn't rescheduled our meeting, which we're going to talk about on Monday.  So, we did have an intention to do that.  But unlike everybody else, without a server, I've got a problem.

THE COURT:  Yeah.

MR. HANOR:  And, so, that's not -- it's certainly not their fault that we're here at that point, but you're right, we should have already discussed those things.  But we need your guidance in that regard.  And what you've told us already has given me considerable guidance, and I'll be a reasonable person.  I don't want to make a big controversy out of it. I'll work with them based on what your comments are that we've had here today.  I don't have a problem with that.

THE COURT:  Okay.  I'm ready to keep the Internet out.

In terms of publicity starting in 1982 or thereabouts, I would hope you could stipulate to that.  I mean, I've been traveling in Texas since about that time.  I mean, Buc-ee's has been around.  That shouldn't be controversial.

I don't think -- I don't think third party commentary about this lawsuit is going to be helpful, unless we can tie it very directly to the survey evidence.  Newspaper

accounts of litigation are famously inaccurate.  I mean, I live with that every day.  And I don't know what we can do to deal with the survey, to the extent there's self-examination from simultaneous publicity.  I would appreciate some guidance on that.  I generally don't like newspaper articles of any sort.  Once you admit one, there seems to be another that needs to be admitted and then you've got to decide whether letters to the editor about the newspaper articles ought to be admitted and should corrections be admitted, should on-line comments about news articles be admitted or only traditional print sources.

MR. BERGHAMMER:  So, Your Honor, just maybe a little guidance regarding that.  On the publicity, we could probably work out a way for defendants to be able to say there was publicity prior to Dr. Simonson's survey.  And they -- defendants can ask Dr. Simonson, "Did you ask a question to control for this publicity"; and Dr. Simonson will say, "Yes, I did.  I asked people to explain why they drew an association."  And the defendants could ask, "But you didn't specifically say, 'Have you seen any publicity?'"  And he will say, "No, I didn't specifically say that, but I controlled for it this way."  And the jury can evaluate all of that and determine whether they think Dr. Simonson appropriately controlled for any publicity contamination in his survey.

MR. HANOR:  And I think the answer to that is our expert will say that he did not, that a general question like

that does not control it.  And this is kind of a unique situation, because I don't really disagree with you except under the circumstances of this case.  These news articles weren't really commentary about the suit.  They had minimal wording.  They showed the two logos side by side.  And then ABC says, "What do you think?"  That's all there was to it.  I didn't see the -- I don't remember the actual news commentary either.  But they basically just reported on the existence of a lawsuit --

THE COURT:  Who's "they" who reported on it?

MR. HANOR:  ABC 13.

THE COURT:  And where does that show?

MR. HANOR:  It's Houston.

THE COURT:  Houston.

MR. HANOR:  Houston.

THE COURT:  Not San Antonio?  Here in Houston.

MR. HANOR:  No, it's Houston area.  And then in the Houston Chronicle there was an article.  San Antonio Express News, Austin American-Statesman, and then Tex-Ag, there were articles on it.  And all it did is report the lawsuit.  And my expert will say that that should be -- have been controlled.  Because one of the people in the survey said, Yeah, I think -- I know they're associated because they -- I saw the article in the newspaper.

Because remember, the question they asked, "Who

do you associate this with," pretty broad question, that's it, Who do you associate this with." And, so, yeah, we were associated with them, if they saw that article. And, so, that's the reason my expert will say that tainted the survey. That's what he's going to testify to. And he put a rebuttal report in on that, too. So, there is -- he did --

THE COURT: I understand both sides' argument. How do we thread this needle?

MR. BERGHAMMER: And, Your Honor, I would again propose that we could have a stipulation that says the NBC 13 put out an article --

THE COURT: ABC.

MR. BERGHAMMER: Thank you. I'm sorry, Your Honor. The Austin Statesman put out an article, and so there could be a stipulation that there was this publicity. It's our -- our position is that the fact that -- we don't think the publicity tainted the survey at all. And, A, we think Your Honor has already ruled on that. But when it comes in, the fact that a respondent said, "Oh, I associate this because of the news article," okay. We caught that. So, that was properly caught with the survey, and it was discounted then. The survey numbers would be higher if that had been included.

So, I don't have a problem saying there was some publicity. And we'll say the publicity was either perfectly accounted for or had no impact on the survey, and defendants'

expert can say, "I disagree.  I think the publicity was not appropriately accounted for."  And the jury will decide whether they think the publicity was appropriately accounted for --

THE COURT:  In your scenario, all of this is without seeing the actual articles?

MR. BERGHAMMER:  It would be a stipulation that the *Austin Statesman* said X.  You know, if we have to, Your Honor, the biggest issue I have with the articles is the comments. I'm not as concerned about the articles themselves.

THE COURT:  Comments, what?  Of other folks, you mean?

MR. BERGHAMMER:  No, no.  No, I'm sorry, Your Honor. So, the article appears on the Internet.

THE COURT:  Okay.

MR. BERGHAMMER:  Then there's 300 comments from whoever wants to comment on the article also on the Internet.

THE COURT:  Yeah.

MR. BERGHAMMER:  And those comments saying, "Buc-ee's is ridiculous," "Tracy Richardson is a buffoon," I'm quoting, those comments cause me the most issue, because they're just going to smear Buc-ee's.  So, if you just put in the articles, I'm less concerned about just putting in the articles, because the articles, especially the ones that really say, "What do you think?  Are you confused," I'm less concerned with if all we're going to say about that is there was publicity.

MR. HANOR:  Your Honor, if my expert can testify as to

what he's saying there, I'm happy.

THE COURT: Okay. All right. We don't need those articles then. Okay. All right.

One of the more curious motions we have concerns this person, Lorraine, L-o-r-r-a-i-n-e, I guess. We don't even know who she is. I thought that was a real Keystone Cops kind of element to this. How can it possibly be true that we don't have an employee record about Lorraine? I mean, don't companies keep records of their employees?

MR. HANOR: At that time our stuff was outsourced, and because they waited three and a half years to sue us, she had been gone more than three years, so we had no records on her. She had been gone more than three and a half -- three years, and so we didn't have the records. We did try to seek those from the company and we did do that and so that's the reason why. You know, my client has hundreds of employees.

THE COURT: I'm sure he does. I'm sure he does.

MR. HANOR: And an example is, is that we had a -- and there's a motion pending regarding this, but we had these employees at the store. There were like 75 of them that were at the store in January, February of 2015. And of that 75 employees, there are 10 left. And, so, it's not surprising that, you know, when we opened that door in January, February 2000 -- I'm sorry. When we opened it in May and June of 2012, they wouldn't have been there very long. That's a

long time ago.  And, so, we had a lot of turnover.  And, so, we outsourced the records.  And, you know, we had hundreds of employees go through there.

THE COURT:  Okay.

MR. HANOR:  And perhaps we benefit from it as much as anybody --

THE COURT:  No, I don't know who -- which way it cuts.  I just think it's odd.

MR. BERGHAMMER:  So, Your Honor, on those points, we consider -- we think it's beyond Keystone Cops.  We actually think it's -- we've strongly considered filing a motion for an adverse inference, because Texas Workforce Commission required defendants to keep their records for four years.  ERISA and HIPAA require them to keep their records for six years.  IRS requires them to keep their records for four years.  And we filed this suit within a little more than three years of Lorraine leaving.  So, we actually think defendants acted improperly in not having the records.

We are not filing a motion for an adverse inference, because we did not find any intent.  And our view of the law was to get an adverse inference, we had to find some intent that they intentionally destroy records.  And we didn't find it in any of the depositions.  So, but we think it goes beyond Keystone Cops.  We think they're hiding something, but we haven't found any intent.

Now, Lorraine -- intent to hide things. Every person involved in creation of the Choke Canyon logo says that Lorraine was involved. And they're now trying to prevent us from letting the jury know that. And, Your Honor, it's -- I wrote them down, so I wouldn't forget them. Mr. Panjwani says that --

THE COURT: Spell that for the court reporter.

MR. BERGHAMMER: Sure. P-a-n-j-w-a-n-i. So, Mr. Panjwani owns all the defendant stores, oversees all the defendant stores. He said in his deposition that Lorraine proposed the idea to him for creating a logo for Choke Canyon. He told her to go ahead and develop the logo. And he talked to her one or two times about it, and she's the only person at Choke Canyon that knows about development of the logo.

Then Jerrett Pfeil, a Ben E. Keith -- and Jerrett is J-e-r-r-e-t-t. Pfeil, I think it's P-f-e-i-l, but I'll let you know if I have that wrong. So, Ben E. Keith assisted in developing the logo. Jerrett Pfeil was the salesman for defendants. He saw the initial version, this, on her desk. He testified that he saw this on her desk. And he testified that she said to him that she was working on it. So, somehow this logo turns into this logo and eventually turns into this logo. It goes through this whole evolution. And we strongly think that shows defendants' intent to make their logo look like Buc-ee's. And Lorraine was involved in that.

Gerald Bowden, the graphic designer --

THE COURT:  Spell that, please.

MR. BERGHAMMER:  Sure.  Thank you, Your Honor.  Gerald is --

THE COURT:  Yeah, she can spell Gerald.

MR. BERGHAMMER:  I get it wrong.

THE COURT:  Okay.

MR. BERGHAMMER:  Bowden is B-o-w-d-e-n.  He testified that the development of the logo was a group effort, that included him, Ray Gibson from Ben E. Keith, and someone from Choke Canyon.  He couldn't remember who, but someone from Choke Canyon.  Amjad Panjwani said the only person involved was Lorraine, had to be Lorraine.

Mr. Bowden also says that the changes that were made to the logo after the initial one, such as making the alligator a friendly cartoon, adding a yellow background, adding a red tongue, adding a hat, having the alligator stand up, they were all given to Bowden by someone from Choke Canyon or by Mr. Gibson.  Well, that someone from Choke Canyon would be Lorraine.

Mr. Gibson testified as well, and he said that people at Choke Canyon made comments on the logo and based on those comments, Ben E. Keith made adjustments to the logo.

So, we want to present to the jury that Choke Canyon changed the logo from this original one to make it look

much more like Buc-ee's logo, and that is intent of Choke Canyon wanting to create confusion. And that intent, it's one of the eight listed factors for likelihood of confusion. And some courts have said it's a critical factor, because if you establish that intent, that by itself can show likelihood of confusion. And intent is often established circumstantially.

THE COURT: Are we to assume that Lorraine, in particular, had this intent?

MR. BERGHAMMER: Yes, that Lorraine wanted to make the logo look more like --

THE COURT: Why did Lorraine have so much authority? What was her position?

MR. BERGHAMMER: She was the manager of the Whitsett store where the logo went in, and she had this authority because Amjad Panjwani gave it to her. He said, "Go ahead and make the logo, make the changes."

She showed him the final logo, and he said, "Great." When we asked Mr. Panjwani at his deposition if he had seen early versions of the logo, he couldn't remember. He said, "I think I've seen this one. I know I haven't seen that one." So, Mr. Panjwani may have been involved in the development. And we're going to put that in front of the jury. But he's going -- he most said, "I don't know." So, it's this big gaping hole of who at Choke Canyon was involved in developing this logo, who had the intent to make it look like

Buc-ee's. And the best person to point to is Lorraine, who's not here, and we would love to depose her. If they had the records, we would have been able to.

THE COURT: All right. Mr. Hanor, you look like you want to say something.

MR. HANOR: Now, the real story. Choke Canyon has no capability for any logos whatsoever, never had any, never had any --

THE COURT: What are the services that Ben Keith offer?

MR. HANOR: Ben E. Keith is a -- I don't know, they got ten billion dollars a year plus in sales.

THE COURT: It's a big company, yeah.

MR. HANOR: They're a huge company. And they provide these services free. They solicited us. They said, "Let's help you with your logo."

THE COURT: Okay.

MR. HANOR: And the two people at Ben E. Keith that dealt with it, Raymond Gibson and Gerald Bowden testified that they never heard of Lorraine. They don't know anything -- they never heard the name before. They don't know who it is. They never had any input from Choke Canyon other than, well, you can use an alligator. That's it. That's the input they got, is use an alligator. And the reason being is because Choke Canyon Reservoir is known for its alligators.

We had no talent -- no capability whatsoever, least of all Lorraine, on picking a logo.  We relied one hundred percent on Ben E. Keith, because that's what they do.  They have a branding department.  They gave us this service for free.  It wasn't completely altruistic.  They wanted to sell us goods.

THE COURT:  Yeah, I know.  I understand.

MR. HANOR:  And, so, that's how it really happened.  And he's trying to infer that we had some evil intent.  We had no capability of doing a logo.  This Lorraine person, I don't -- I can't imagine she would have any authority or knowledge over anything to say that Ben E. Keith offered us to do us a logo.  Can we do it?  Yeah, sure.  Go ahead.  It's free, what the heck.  That's how it really happened.

THE COURT:  But you don't have any idea of anybody at Canyon who had anything to do with suggesting what the logo would look like?  I mean, it does seem like --

MR. HANOR:  They said -- I think Pfeil said that definitely you guys would use an alligator, because everybody knew the alligators were associated with that.  That's it, period.

THE COURT:  You knew alligators were associated with what?

MR. HANOR:  Choke Canyon.

THE COURT:  Oh, okay.

*MR. HANOR:* Because of Choke Canyon Reservoir. It's known for its big alligators.

The funny part is, the guy Bowden -- his name is Gerard. It may be spelled a little different. It's G-e-r-a-l-d?

*MR. FINLEY:* G-e-r-a-r-d.

*MR. HANOR:* G-e-r-a-r-d. All right. He's from New Zealand. He played on the New Zealand basketball team. He'd never seen an alligator before. He'd never been to Buc-ee's before when he designed the logo. He had never even seen Buc-ee's before.

*THE COURT:* Alligators are all over Australia.

*MR. HANOR:* Crocodiles.

*THE COURT:* Crocodiles. Oh, I see.

*MR. HANOR:* Yeah, I said the same thing, too. But then I realized that they're a little -- they look different.

*THE COURT:* I see. Okay.

*MR. HANOR:* And, so, he has to go -- he'll testify he went to the Internet to see what an alligator looked like. And he pulled an alligator in some grass. And he apparently showed that to the real design person who does the marketing was Raymond Gibson there, that was one of his jobs at Ben E. Keith, to help with stuff like that. And, so, if anybody -- he testified that he didn't get any input from us on the deal. So, Lorraine is just --

THE COURT: We have two different versions. So, we --

MR. HANOR: Yeah, we have two different versions, but there's not a document one --

THE COURT: -- let the jury decide --

MR. HANOR: -- but not a document one nor not a person that will testify that she gave that input to them.

THE COURT: Well, the fact there's no documents is partly -- partly within your clients' control, I mean.

MR. HANOR: We never had it. They said they sent that. We don't know anything about that. We don't have it.

THE COURT: But Lorraine was your employee.

MR. HANOR: She was an employee. She was a store manager there, one of the store managers at the store. There are more than one.

MR. BERGHAMMER: Your Honor, I'm happy to go through the deposition testimony where Mr. Bowden and Mr. Gibson say that Choke Canyon was involved, that it was a group effort, and that Choke Canyon gave them suggestions and they made changes. If this was the logo that Choke Canyon was using, there would not be a lawsuit. This logo was on Lorraine's desk, and then it was changed with her input. She wanted it to look like the beaver logo. Did she have input from Panjwani? She might have. He may have said make it look like the beaver logo.

I actually agree that Gerard Bowden, not knowing about Buc-ee's, he came with up this logo that doesn't look

like Buc-ee's logo.

THE COURT:  This is the New Zealander?

MR. BERGHAMMER:  This is the New Zealander.  But then Lorraine told him, let's make it look different.  This isn't going to be good enough.  Let's put a yellow background.  Let's make it a cartoon.  Let's put out a red tongue.  Let's put a hat on it.  So, the testimony -- and I'm happy to go through the testimony, but the testimony is different from what Mr. Hanor is saying.  The testimony by both Mr. Gibson and Mr. Bowden says that Choke Canyon was involved.

THE COURT:  Well, we have a competing version of facts -- competing versions of fact.  And I just need -- I can't keep out Lorraine.  We just put it in front of the jury and let them make a decision.  It's almost like trying to put on a production of Hamlet without including the prince.  I mean, what are we to -- I mean, I'm very uncomfortable with a witness at least one side believes is key and we don't even know the last name.

MR. HANOR:  Your Honor, it's unimaginable that you could have a key witness and we don't even know their name.  They're grasping at straws because they've got nothing.  That's the problem.  They've got nothing on intent.  Because Mr. Gibson and Mr. Bowden will testify distinctly different than that.  So, they can try to twist it and twist it however they want to, but you'll hear their testimony.  It will come

out.

THE COURT:  Well, for now I'm not going to grant defendants' motion to exclude references to Lorraine.  I may feel differently at trial.

Okay.  Then defendants' motion in limine on the Coach lawsuit, the Coach lawsuit seems to me totally irrelevant, unless we can show that there was knowledge that this employee was selling Coach merchandise.  I think the fact that one rogue employee was selling Coach merchandise is very odd, but I don't think it goes to the intent of the owner, does it?

MR. BERGHAMMER:  So, two points, Your Honor.  One is it wasn't just a rogue employee with a separate stand that he had outside.  This was being sold out of Mr. Panjwani's store.  So, Mr. Panjwani --

THE COURT:  One store, right?

MR. BERGHAMMER:  It was one store.  So, Mr. Panjwani had a store that had a bunch of counterfeit Coach products in it.  So, somebody had ordered the counterfeit Coach products and somebody was selling them.  And the fact that Mr. Panjwani said, "I didn't know about it and then when it -- when I did find out about it, I stopped it.  I fired the employee," that still all goes to his intent, the absence of him saying that there was a mistake.  You know, he knows that trademark infringement is wrong.  He knows that it's viewed as dishonest,

he said as much.  And he's now saying we didn't intend to make a mark that looked like Choke Canyon's mark.  And to the extent it does look like Choke Canyon's mark -- I mean, Buc-ee's mark, that's just a mistake.  And this evidence goes against that.

Now, I'm going to admit, Your Honor, that this is one of our weaker arguments.  That I do think defendants' argument that this shows prejudice to Mr. Panjwani that he was in a previous lawsuit, yeah, I agree that defendants have some points there.  I think our argument is stronger though, that we should be able to show it, to show Mr. Panjwani's intent.

THE COURT:  Well, I normally am very reluctant to get into another lawsuit, because we end up trying that lawsuit rather than trying our own lawsuit.  I've had very unhappy experiences with that.  So, the only reason I would let it come in is if I really thought it showed absence of mistake and a pattern and practice.  And your evidence to that is simply that you find it inconceivable that he wouldn't have known?

MR. BERGHAMMER:  That's right, Your Honor, that it's at his store.  He didn't have a lot of stores at that point. And there's testimony from Mr. Munoz, who is Mr. Panjwani's kind of number two person.  Munoz is M-u-n-o-z, I'm going to say, but I'll correct it if I'm wrong.  It might be easy, but I'll correct it --

MR. HANOR:  Munoz.  He's correct.

MR. BERGHAMMER:  Thank you.  That Mr. Panjwani is

involved in all aspects of the store.  So, we think that does show his intent and absence of a mistake.  It also shows a motive.  He's making money off of this.  He made money off of the Coach products.  That money went into Mr. Panjwani's pockets in the end.

THE COURT:  The whole -- I mean, I'm not all that familiar with Coach product, but it seems like totally antithetical to Buc-ee's or Canyon.  I mean, it's a different kind of product altogether, isn't it?

MR. BERGHAMMER:  Coach is a luxury item.

THE COURT:  Yeah.

MR. BERGHAMMER:  And, so, I mean, you could argue that a person walking into a convenience store seeing a product from Coach would think it's a counterfeit.  You could definitely argue that.  Coach wasn't happy about it.

THE COURT:  I bet they weren't.

MR. BERGHAMMER:  Yeah.

THE COURT:  It just seems such a -- it seems like such a harebrained scheme.  I would think a responsible businessman wouldn't want anything to do with it.

MR. HANOR:  Your Honor, there were hundreds of those suits at the time.  People -- traveling salesmen went around Texas and they went to these stores and they offered these products for sale through the stores.  And we -- our store manager has a small amount of money they can buy.  I think they

paid less than a thousand dollars for the products. And you know I can tell you, the suit cost them $50,000. It's not like it's not a lesson learning thing, that anybody in their right mind would do this knowing it. It just doesn't make any sense.

We were excluded -- we were excluded from bringing up anything about the lawsuits involving this mark that were filed within the last three years and we can't bring up those lawsuits and now they want to bring this up just to smear him. I mean, he paid dearly for that mistake that the man has made.

*THE COURT:* No, I'm not going to be able -- I'm not going to be able to let this in.

On the issue of these lawsuits, Mr. Hanor, I know you have at various times taken the position that you think the lawsuits ought to go in that show that Buc-ee's is a bully and Buc-ee's is trying to put you out of business. But you've also made the argument that plaintiff waited too late to file this lawsuit, which is kind of the opposite argument. I mean, it can't be both.

*MR. HANOR:* Well, it is in this sense: On all those other lawsuits, they sued them -- they even sued Chicks before they even opened. They sued them immediately. They sued them quickly. They didn't sue us until we bought the 40 acres at the Luling exit on I-10. And they stated that in their original complaint. So, there's a reason they waited three and

a half years.

They're trying to exclude -- keep out our sales, which I don't understand. My client has -- at the time of the lawsuit had over a hundred million dollars in sales, a hundred million dollars. And they say, Well, you're David. Well, maybe David compared to them, but not so much so.

But our point is, we were out there notoriously selling stuff and didn't hear hide nor hair of them. Whereas in every one of those other lawsuits, they sued them just like that, immediately. They sued Bucky's here. Buc-ee's sued Bucky's before they even opened. They sued all those other people before they ever --

THE COURT: So, your theory is that you didn't get sued until you were successful?

MR. HANOR: No, we didn't get sued until we bought the 40 acres on I-10 at the Luling exit. That's what got us sued. They state it in their complaint.

MR. RICHARDSON: Judge, outside the original pleadings in this case --

THE COURT REPORTER: Can he get to a microphone, Judge?

MR. RICHARDSON: Sure, that's fine.

THE COURT: Okay.

MR. RICHARDSON: Tracy Richardson here for Buc-ee's.

Judge, that's not in the original form for this

complaint.  And at the time that we filed this lawsuit, I can stand before this Court and say I had no personal knowledge that there were 40 acres bought in the Luling area by the defendant.  What we had in front of us was an article that Mr. Mayo had said that they were building Buc-ee's in other locations.  And in the complaint I put that they were building Buc-ee's near our location.  Yes, I don't consider -- when you have San Antonio -- and we talk about their store, which is the Whitsett store, I think, the one that's south, they're all in the San Antonio area.  And that's what I was referring to.

I had no personal knowledge of 40 acres. Mr. Hanor has continued to bring this up.  I don't know if he even asked that question of any of the deponents, but I know what the answer is, because I know how we found out about this store.

THE COURT:  Why didn't you sue after three years?

MR. RICHARDSON:  Well, we didn't know about it.  As soon as we found out about it, because one of our owners found out --

THE COURT:  About what?

MR. RICHARDSON:  About the -- about their logo and about their store, Judge.  What happened was, Don Wasek, one of our owners, it was brought to his attention.  And he testified to this in his deposition --

THE COURT:  Well, the use of the trademark was

noticeable, wasn't it?  I mean, it wouldn't be the kind of thing that somebody would have to bring to your attention.  You could have seen that, couldn't you?

MR. RICHARDSON:  If you were in that area.  We just -- I'd never been in the area, and Mr. Wasek hadn't either.  And someone brought it to his attention.  One of his friends said, Hey, I was in this area of Texas, south of San Antonio, and I saw this store and it -- you know, I saw their logo.  It looked like your beaver logo.

And so that weekend, Mr. Wasek went to that store, came back to the office, bringing one of their cups, and that's how we found out about it.

THE COURT:  Okay.

MR. HANOR:  Your Honor, that store, that puts -- it opened January of 2015.  They filed suit December 23rd, 2015. In their original complaint they stated, "That, moreover, a convenience store defendants plan to open is within close proximity of a Buc-ee's store located in New Braunfels, Texas, and Luling, Texas, and" --

THE COURT:  Going too fast.  And Luling, Texas --

MR. HANOR:  -- "and Luling and will share the same client base leading to further confusion."

I welcome them to making that argument at the trial, because I don't believe anybody will believe them, because it makes no sense.  The store had been open over a

year.  So, it wasn't a store we planned to open.

And like I say, my client had billboards on the interstate highways.  They had highway signs up 50, 65 feet in the air.  They were on Yelp.  They were on other sources.  By the time they sued us, we had two stand-alone restaurants and two travel centers.  And all of those had been open more than a year -- or a year or more.  So, it just makes no sense what they're saying now.  What they don't want to admit is they mistakenly put this in their complaint.

*MR. RICHARDSON:*  Judge --

*MR. HANOR:*  But that's neither here nor there.  We'll deal with that when the time comes.  We'll let the jury decide that issue.

*MR. RICHARDSON:*  -- one last comment.  I wrote it.  It was a mistake.  I'm telling the Court where it came from.  It came from the article by Mr. Mayo who said that they were going to build, I think, five to six locations in the San Antonio area.  New Braunfels and Luling are in the San Antonio area. In the meantime, we're looking at property in Boerne.  We're going to build in Boerne.  That's in the San Antonio area. That's what that's referring.  Now, that's a fact, because I'm the one that drafted the pleading and I know what I meant.

*THE COURT:*  Okay.  We next have a defendants' motion in limine to separate the evidence contained in plaintiff's trial exhibit PTX 053 into exhibits by date and to exclude all

duplicative material contained within. That seems like something y'all could work out.

MR. HANOR: I'm willing to work on that, Your Honor. Our concern is this: First of all, let's talk about advertising. The only advertising that Buc-ee's does, the only advertising are billboards. They spend roughly a million a year on billboards. And that is a pittance of money. Their sales are probably over a billion. I don't know exactly what they are, but certainly by this point in time they're probably over a billion. And they spend a million a year on advertising, billboards. That's it, 100 percent. That's all they do for advertising. There's really nothing else that's done in that regard. So, that's really all that we're talking about here as far as that's concerned, is just their billboards.

And really all the advertising my client has done is billboards pretty much. Because that's -- we rely upon one primary thing, location, location, location. Because it's on the interstate highways. Ours is on the interstate highways. We're on I-35 south and I-37 south. And if -- how they could not know about us -- we had a hundred million in sales and they sued everybody else before they even opened and yet they couldn't detect us? That's beyond belief. I mean, I don't think the jury will believe them on that. I'm pretty confident they won't.

THE COURT: So, you -- okay. I'm trying to understand you. Your theory is that when they became a geographic competitor, that's when they try to come up with a reason to sue you?

MR. HANOR: That's correct.

THE COURT: Yes, sir.

MR. BERGHAMMER: Your Honor, I just want to add one point to this whole geographic issue, which doesn't seem to address the motions in limine. But just to make sure the Court's aware, defendants started with one restaurant in Whitsett. It wasn't a travel center. It was a restaurant. And then they added their logo to the gas station that was connected to the restaurant. So, for years defendants had one, then two or three small filling stations in a very concentrated area. Then defendants created their one travel center in Atascosa. And it's when they created that travel center that they got publicity about the travel center that Buc-ee's noticed them. So, it was when defendants changed the scale of their operation that Buc-ee's noticed and said, Whoa, this has got to stop. Buc-ee's hadn't known that it had been happening in the isolated location where it had been. So, I just wanted to add some color there.

Regarding the motion in limine, Ms. Mitrius is going to address that.

THE COURT: Okay.

MS. MITRIUS: Right. And, again, I'm not quite sure what the motion in limine has to do with splitting up PTX 53.

THE COURT: I'm confused about this, too.

MS. MITRIUS: And, so, you know, that exhibit is a collection, it's a composite exhibit of photographs of billboards from different angles. Like some are a hundred feet away and then some are 20 feet away, so you get the perspective of what the billboards are. And others, we -- Buc-ee's purchases digital electronic billboards in addition to the ones that are just stand-alone don't change billboards. And, so, there's -- in addition to photographs of the actual billboards, there are also records from the billboard companies showing what the digital billboards looked like and the location and the dates that the digital -- that it would flash up the digital, because the digital boards change. You'll have Buc-ee's and you'll have another store that may be advertising, but they're not stationary. They change. So, that -- this composite exhibit is a collection of Buc-ee's billboards.

And so the defendants, what they're asking us to do is to organize this composite exhibit of Buc-ee's billboards in the manner that defendants want so that it satisfies the arguments that defendants want to make. That they want to say that nothing post-2012 from an advertising perspective is relevant. But that, as Mr. Berghammer said previously, we disagree with that 2012 date. Not only is evidence post-2012

relevant to whether there's fame, not all of the defendants started using the mark in 2012.  All -- only one defendant, the Whitsett location started using that mark in 2012.  All of the other defendants didn't start using the mark until 2015.  So, there's different time periods for different defendants.  And, so, there's -- you know, if defendants want to cross-examine the witnesses about the billboards that are shown in the exhibit, if, you know, defendants want to put in, you know, exhibits of their own, organizing the billboards in the manner that they want to, they're perfectly free to do that.  But we just don't think that they should be allowed to dictate how we put in our evidence.

*MR. HANOR:*  And we feel they shouldn't be able to confuse the jury by putting in a hundred plus post-2012 billboards in the same lot that -- with a handful pre-2012.  And that's what they're really doing, is they're trying to bootstrap up their weak case of showing the standard use prior to 2012, because they only had three stores at that point in time.

And regarding the limited use, they sued us because they claim our stand-alone restaurant, including our stand-alone bar-b-que restaurant in San Antonio, is an infringer because it says "Choke Canyon Bar-B-Que" and it has the alligator on it.  So, they did that so that -- and they did it down in Whitsett so they could make sure they could stick

jurisdiction in this court.  So they can have something in the Western District of the Texas and --

THE COURT:  Southern.

MR. HANOR:  Southern District of Texas.  But they made that decision to bring in the restaurant to be part of this suit.  They made it part of this suit.  And I'll take issue with them.  We took down the Exxon sign and put up this sign 65 feet up in the air on May 4th, 2012.  And, so, when they say we didn't have a convenience store use then, we have a federal registration on convenience store services that we got in 2013, which is the issue of another one, and they haven't challenged that registration.  There's no counterclaim, no nothing, even though it's a compulsory counterclaim.

But all -- on these exhibits, all I ask is this: I don't want them lumping them all together, including probably 90 percent post-2012 into the same one big 200-page exhibit, which we can't make heads or tails out of.  It's hard -- the jury will be confused.  They won't know which is pre and which is afterwards.  And I ought to be able to make that distinction of pre-May 4th, 2012, and post-May 4th, 2012.  That's all we ask for.

MS. MITRIUS:  Your Honor, once again, 2012 is a date that they're deciding is important.  All but one of the defendants didn't start using the logo until 2014.

And I want to correct a couple of things.

Mr. Hanor said that Buc-ee's only had three stores in 2012. That is completely untrue.  In 2012, Buc-ee's had 26 stores. And today Buc-ee's has 33 stories.  So, you know, Mr. Hanor is saying that Buc-ee's only had three stores.  That's just not true.  Mr. Hanor will say that Buc-ee's only had three large stores and that's all that mattered.  None of the other stores -- none of the other 23 stores that Buc-ee's had in 2012 had anything to do with whether or not Buc-ee's was famous.  It was only the three large travel centers.

First of all, that isn't true.  And, second, Buc-ee's had six travel centers in 2012, not three.  So, I would disagree with the facts that Mr. Hanor was giving you on that.

And, additionally, Mr. Hanor raised the issue of their federal trademark registration and said that we haven't challenged it, which is, again, completely false.  Buc-ee's filed a cancellation proceeding at the Trademark Office and that cancellation proceeding is directed to both of defendants' registrations.  So, there is a proceeding against the registration.

*THE COURT:*  I thought there was, yeah.

*MS. MITRIUS:*  Pardon me?

*THE COURT:*  I thought there was.

*MS. MITRIUS:*  Yes, there was.  And Buc-ee's didn't file it as a counterclaim in this case, but it's not a

compulsory counterclaim. The validity of their registration is not compulsory to the claims that we brought. It's not a compulsory counterclaim to the claims that we brought. So, I wanted to address that. Because that is -- it's just simply not true.

And, you know, again, Mr. Hanor is free to put in his evidence the way that he wants to, but he shouldn't be able to dictate us putting in a composite exhibit of our billboards.

*MR. HANOR:* Again, I'll just say they shouldn't be able to put a misleading composite exhibit in, because that's what they're trying to do. They're trying to bootstrap themselves up. 20 convenience stores is famous? That's laughable. The big convenience store chains have thousands of stores, many thousands of stores. They were no more famous than anybody was at that point in time. If they gained any fame, it was because of those 12 big travel centers they have.

And, you know, it's interesting, if you look at their Web site, they list 12 of the so-called travel centers, not more than that. They list them on the Web site, on their Web site. So, we'll go at that at trial.

But, again, it's getting far afield from what we're talking about. I don't want to try to lump in all of those pre-2012 exhibits with -- all the post-2012 exhibits with the pre-May 4th, 2012, exhibits, because it's intended to confuse the jury so they can't differentiate between dates.

And I can't tell from that exhibit what it is.  It will be difficult for me to ascertain which are pre and which are post.

THE COURT:  Okay.  Then we have some smaller motions in limine.  On the trade dress, we're going to have to keep that out from both sides, aren't we?  I mean, I know Buc-ee's originally pled trade dress, but we're going to -- that's out of the case now, isn't it?

MR. HANOR:  It is, but, for instance, their original trade dress, Your Honor, was the beaver was part of their trade dress.  So, it's hard to separate out completely.  I don't see how you can separate it out totally.  I'm not saying -- I'm not making it a big issue in the case, but you can't keep it out completely.  It's going to -- I mean, when we talk about the Paragraph 24 in the original complaint, that mentions trade dress.  I don't know how I can keep it out completely. Obviously they want to keep out that admission, and I can understand they do, because it definitely is not favorable to them.  But I don't -- I'm not sure we disagree completely on the trade dress issue other than I don't see how you can just say, you absolutely can't mention trade dress, because it's going to get mentioned.  I don't see how you can keep from it.

MR. RICHARDSON:  Judge, in my mind, and I guess -- I'm a litigator.  I'm not an IP attorney.  But the way I look at this is that you have a logo.  It is a logo, and there's an infringement on that logo.  Then you have trade dress, which is

the store and the way you build the store and the design of the store, maybe how many pumps you have, how many stalls you have in the rest room, the type of bricks you use.

So, when we filed the original complaint, we had both an infringement on the logo and we had trade dress claims. Now, when we had our conference here and we ended up on a fast track to end up for trial, we sat down and evaluated those matters and thought, look, we just need to go forward with the infringement on the logo, not the trade dress of the stores, because we just didn't feel we had the time to get both worked up and ready to go for this Court under that short time period.

So, we asked for leave to file the amended complaint -- the amended complaint, and we did.  Now, when an amended complaint comes in, we all know from the first year of civil procedure, the amended complaint relates back to the initial filing.  So, there is no trade dress claim for the building itself or the bricks or the bathroom or the pumps.

THE COURT:  Okay.

MR. RICHARDSON:  All we're left with is that logo. Now, Mr. Hanor may want to say that's part of a trade dress.  I say it's really an infringement, because what we're talking about is the logo.

MR. HANOR:  Your Honor, one of the factors in a likelihood of confusion is the physical appearances of the business in which the marks in question are used that may be

considered when examining the identity of retail outlets and purchases --

THE COURT:  You're going too fast.  You're going too fast.

MR. HANOR:  Yes.  Okay.  One of the likelihood of confusion factors is the physical appearance of the businesses in which the marks in question are used may be considered when examining the identity of retail outlets and purchases.

So, the trade dress -- we're going to contend our trade dress is totally different in this case; and so to that extent, we're going to be bringing in trade dress.

The other one is, in their original complaint, they stated in Docket 13, that the trade dress included use of a logo including an animal with human-like characteristics throughout the store; two, use of a logo including an animal inside a yellow circle throughout the store; three, use of a logo including an animal with human-like characteristics and a red tongue throughout the store; and, four, use of a logo including an animal with human-like characteristics and wearing a hat throughout the store.

So, that was their trade dress.  So, to say it's totally unrelated is not right.  But, again, the most important thing is that's a factor in determining likelihood of confusion.  We're going to be arguing that our trade dress, the look of our store is just totally different than theirs, and

that no one could possibly be confused.  That's a factor we're entitled to bring up in the likelihood of confusion thing.  So, that's what they're trying to knock out.

MR. RICHARDSON:  Judge, I might can shorten this, because I think what our motion in limine says is we don't want defendant being able to talk about the fact that we had a trade dress claim that we decided not to pursue.  That's all we're asking.

THE COURT:  Yeah.  Well, you don't -- you don't agree with that?

MR. HANOR:  I agree with that.

THE COURT:  Okay.

MR. HANOR:  I don't care.  But I can't keep out trade dress, because we're going to be arguing it.

THE COURT:  Okay.  Okay.  We next have the issue of whether defendants can argue that Buc-ee's is a bully.  I generally don't like those kinds of epithets at trial.  I understand -- I think the issue is a narrow one, and I think the prejudice exceeds the probative value.  So, we're not going to talk about the plaintiff being a bully.  And, likewise, we're not going to talk about David versus Goliath.

In terms of either side arguing that the other side is frivolous or baseless, that's not going to be allowed.

And plaintiffs ask that defendants not argue that Buc-ee's believes it has sole right to use a smiling cartoon

animal for a logo.  I don't think you're arguing that, are you?

MR. HANOR:  No, Your Honor.  In fact, they're the ones that bring that up.  If you look at their -- what motion is that?

MR. RICHARDSON:  Judge, the only reason we bring it up --

MR. HANOR:  It's in the complaint, where they argued it.  They argue it in the complaint.

MR. RICHARDSON:  No, I think we -- it's brought up because at various times within this courtroom or at depositions, that's a question that has been asked.  Of course, the answer by them was no, that we don't think we have that.  So, like -- nor would we ever.  So, we're just asking that it not be something that's said out front to the jurors, that this is Buc-ee's belief, that they have a right to have the only cartoon character.  Of course, we think -- you know, it's not the character.  It's all the attributes of the logo that we take into consideration.

MR. HANOR:  Well, Paragraph 29 of their complaint, "Specifically besides defendants' improper use of a friendly, smilingly cartoon animal similarly oriented within a circle and wear" --

THE COURT:  You're going too fast.  Start over again.

MR. HANOR:  Yes, sir.  "Specifically besides defendants' improper use of a friendly, smiling cartoon animal

similarly oriented within a circle and wearing a hat to the right, defendants have gone on -- they copied the other things."

So, they make the statement themselves, that defendants' improper use of a friendly, smiling cartoon animal.

*MR. RICHARDSON:* Along with everything else, Judge. I mean, it wasn't -- it's not a stand-alone comment. It's taken into consideration with all the other factors, too.

*THE COURT:* Okay. We're not going to talk about plaintiff thinking that it has the sole right to use a friendly face, a friendly animal face.

And then the issue of whether we get into the federally registered mark, it seems to me that this lawsuit will determine in large part whether the federal registration is valid or not. Am I wrong about that?

*MS. MITRIUS:* No, that's absolutely correct, Your Honor. That the determination of likelihood of confusion -- so, the jury's determination of likelihood of confusion will -- that will then -- if they find likelihood of confusion, then the Trademark Office will take that and it will cancel the registrations. If no likelihood of confusion is found, the Trademark Office will also take that as the finding, and it will not cancel the registration.

So, the registrations themselves, there's -- nothing will happen with the registrations in this lawsuit. It

will all be a determination based on likelihood of confusion. And, additionally, once likelihood of confusion is found is -- if it's not found, meaning the Trademark Office doesn't cancel the registrations, that's when the statutory defense comes into play and Your Honor will determine the scope and applicability of that defense that requires it to be the, you know, exact mark for the goods and services that are listed in the registration so that -- and who and by the owner of the registration.

So, once likelihood of confusion is decided at the liability trial, then either the Trademark Office will take action based on that determination with respect to defendants' registrations; and if there is no likelihood of confusion, then Your Honor will take it up as a legal matter as to the applicability of the defense under 1125(c).

*MR. HANOR:*  117 F.Supp.2d 1078 at 1082, District Court Kansas, 2000, "Motion in limine to exclude defendant's registration is disallowed because it shows good faith on the part of the defendant.  An intentional infringer would be a fool to file for a registration."

It shows that we had no intent to copy their mark, because you would have to be a fool to file for registrations and get them if there was, in fact, intentional infringement.  It's like waving a flag, red flag to a bull. There are cases where they have found that these things are

evidence of lack of intent.

They keep going on and on about our intent. My client filed an application to register in 2013. It got registered. Nobody opposed it. It filed another application to register in 2015. It got registered in 2016. Nobody opposed it. They are desperate to sweep these under the rug. And they did this to -- as a ploy, of not putting in their compulsory counterclaims so they can try to keep them out with that funky case that's out in California. They elected not to follow the U.S. Patent and Trademark Office rule, that it's an absolute bar. But that's why they're so desperate to keep them out.

And there are cases that find that they are allowed in. In other words, they are evidence of lack of intent to copy. And that's why we're entitled -- we should be entitled to put those into evidence. They are a fact in this case. They show my client's intent. Why would he file for applications to register when it's so easy to oppose them and to knock them out. It doesn't make any sense. And, so, they are evidence of our lack of intent and our good faith.

And they're going to have to be put into evidence because they're evidence of our dilution offense. It's our position that if they find no likelihood of confusion, it's all over with. They can stop. It's done. Because then we have our two federal registrations, which are a complete bar. So, I

don't see how you can keep them out entirely, because they're critical to our defense and they -- also, they've been found by other courts to show lack of intent.

*MS. MITRIUS:* Your Honor, I want to just say a couple of things. First of all, with respect to intent, the intent that we're talking about is in the time period of when defendants created the logo, which would have been 2012. It would have been mid-2012 that they were working on creating the logo. That's the intent that matters, in the creation of the logo.

The filing of the registration, as Mr. Hanor just said, that happened in 2013, a year later, a year after it was created and in 2015, over two years after it was created. So, the fact that they filed for registration doesn't go to their intent of when they developed and adopted the mark.

I also want to point out that Mr. Hanor keeps saying that there's a compulsory counterclaim, which just -- there's no support for the fact that there's a compulsory counterclaim. As I said, we have a cancellation proceeding pending at the Trademark Office, and that is the perfectly appropriate venue to determine cancellation.

Mr. Hanor also said that he needs to show the registrations, because if the jury decides that there's no likelihood of confusion, that those registrations will provide a bar to Buc-ee's dilution claims. Now, he said a complete

bar, and we disagree with that.  But that statement alone said that it's not something that's relevant for the jury to hear.  Because the jury has to first decide likelihood of confusion before the statutory defense comes into play.  And that statutory defense --

*THE COURT:*  He says it's relevant to the intent.  They wouldn't have filed such a registration if they knew they were infringing.

*MS. MITRIUS:*  The --

*THE COURT:*  If they knew they were just copying Buc-ee's mark, they wouldn't have filed a registration with the federal government, because that would have been provocation to produce from Buc-ee's spirited opposition.

*MS. MITRIUS:*  And at the -- Buc-ee's was not aware of their registration or their filing.  Buc-ee's had no knowledge of the defendants until 2015.

*MR. HANOR:*  Your Honor, the second mark was published in 2016.

*THE COURT:*  The what was?

*MR. HANOR:*  The second registration was published in 2016.  They knew about it.  They made a deliberate -- they deliberately did not counterclaim, because they -- they're desperately trying to keep those out.  It's a ploy to keep them out of registration and cancel them from the back door.

Notice how they want to pay homage to the

Trademark Trial and Appeal Board except when it comes to the Trademark Trial and Appeal Board's expert law on what is the effect of a registration on a state dilution claim.  Now, that one, no, they don't want to follow the Trademark Trial and Appeal Board, but they want to pay it great homage.

But they are offering all kinds of evidence post-2012 of our intent.  They are offering Arthur Mayo. They're offering Kai Neumann.  In other words, they're offering all kinds of evidence after 2012 to show our intent.  Yet they say we have to show it as of that date.  And it makes no sense. And I understand why they're trying to keep the registrations out, but there's a court that's already ruled on this --

*THE COURT:*  But doesn't the statutory defense kick in only if the jury finds there was no intentional confusion?

*MR. HANOR:*  The Fifth Circuit or the Supreme Court is going to have to decide that, because there's a split on the -- decide whether you follow the U.S. Patent and Trademark Office or you follow the District Courts in California.  So, there's a split on those circuits is how that's going to go.  That's going to have to be decided by the Fifth Circuit or the Supreme Court.

So, I would disagree with that, because the statute is pretty plain.  Complete bar is complete bar.  But we haven't decided to go that route, because you didn't want to take that route, and I understand that, because of the split

among them.  But at the same time, the registrations are evidence of our lack of intent to be an infringer.  You would have to be a fool to file for a registration if you're as deliberate infringer as they say we are.  They talk about how our infringer was -- our infringement was willful and deliberate and intentional.  Nobody in their right mind would file for registrations and particularly one of them was pending during this lawsuit and they didn't even oppose it.  Because they knew that if they -- and why they did it, I don't know.  Because I guess -- I have no idea.  I guess they thought they could hang their hat on those decisions out in California and use it as a ploy to keep them out.

But it's a fact of life.  We did do this.  We did it.  And, you know, they say they didn't know about it.  Well, I hate to tell you this, they knew about it in 2013, because they had constructive notice of it.  Because the registration charges them with constructive knowledge.  And, Your Honor, it is absolutely unbelievable that they didn't know about us.  They monitor trademarks with a vengeance, as you've seen with all their lawsuits and the way they do it.  And they were saying a company like us that had federal registrations, over a hundred million in sales, and they didn't know about us and they're saying we're right next door to them on interstate highways?  I understand why they're trying to keep them out, but remember courts have found them to be admissible.  So, it's

extraordinary what they're asking here in that regard, because they are relevant regarding our intent, which they are making the key point of their whole case.

*MS. MITRIUS:*  A couple of things.  I just want to go back to, there is no split in the circuits with respect to the statutory defense and its application.  The courts uniformly have found that if there is a -- that you have to first determine whether there's -- whether or not there's a valid registration, which is determined as to whether there's likelihood of confusion.  So, there is no split in the circuits with respect to when the statutory defense applies.

I also want to respond to, we're talking about intent.  And, again, it's the intent at the time of the adoption of the mark.  And the evidence that we're pointing to with respect to Mr. Pfeil, with respect to Mr. Bowden, with respect to Mr. Gibson, all of that is in that time period of 2012 when the mark was being -- when the logo -- defendants were developing the alligator logo that they're using now.  So, we're not pointing to other intent with respect to the adoption of the mark.

And the registrations themselves, in addition to not being relevant, there is a danger of unfair prejudice to the plaintiffs, that somehow the jury will think that having a registration somehow means something with respect to whether there's likelihood of confusion in this case.  And that is a

significant issue, because the Trademark Office did not do any analysis with respect to whether or not the Choke Canyon logo is likely to cause confusion with or be associated with the Buc-ee's logo.  If you look at the trademark file history, there's no reference at all in that trademark history with respect to that the trademark examiner that allowed the Choke Canyon registration, that they ever reviewed the Buc-ee's logo. And, in fact, the search criteria that the examiner did when examining that mark, the search criteria that was done would have expressly excluded finding Buc-ee's registration to do such a comparison.

So, in addition to the registrations of the defendant not being relevant until after the jury makes a determination of likelihood of confusion, letting in those registrations is going to pose a significant undue and unfair prejudice to Buc-ee's, in that jurors may think that because the Trademark Office issued the registration, that that has some impact on whether there's likelihood of confusion here, and there just isn't.

*MR. HANOR:*  Other courts have disagreed with that. And I would like to read something from the trademark statute. 15 U.S.C. 1057(b).  "Certificate as prima facie evidence.  A certificate of registration of a mark upon the principal register provided by this chapter shall be prima facie evidence of the validity of the registered mark and of the registration

of the mark, of the owner's ownership of the mark, and of the owner's exclusive right to use the mark in -- use the registered mark in commerce on or in connection with the goods or services specified in the certificate, subject to any conditions or limitations stated in the certificate."

They want to throw our registrations in the trash like they don't exist, and that's simply unfair. Other courts have allowed them in. They're routinely allowed in. They're not routinely excluded, like they want to do. So, it's just unfair for them to create a virtual reality that's not the real one. My client -- they're accusing him of having all this intent.

THE COURT: Yeah, but tell me how letting in the registration impacts the question of likelihood of confusion.

MR. HANOR: It probably doesn't in that regard. It probably doesn't on the impacting likelihood. But it does show our intent. It has nothing on regarding likelihood of confusion.

My client will testify that he registered the marks shortly after he used it, that he assumed he was doing everything okay. He never had any intent. He never had any reason to believe he was infringing Buc-ee's. He did it twice. And, you know, he did that based on his belief. And yet they're trying to show that he had some nefarious intent to copy their mark. Yet they want to keep out anything that shows

he didn't have that intent.  It's just not fair to do it that way.

THE COURT:  Okay.  We'll take a short break.  Nobody need rise.

(Recessed at 3:25 p.m. to 3:40 p.m.)

MR. HANOR:  Your Honor, I misspoke on that, when you asked me whether it affected likelihood of confusion.

THE COURT:  Yeah.

MR. HANOR:  And the answer is, it definitely does, because one of the reasons -- or one of the factors in determining likelihood of confusion is intent, and we think that it definitely affects likelihood of confusion, because it shows our intent.

The other thing is, there's another court that's admitted registrations, and that's Sam's Wines and Liquors, Inc. v. Walmart Stores, Inc., 192 U.S. District, Lexis 13725, Northern District of Illinois, 1994.  It's another case that admitted trademark registrations in an infringement case.

THE COURT:  I'm confused about the argument on intent.  I mean, if you assume, hypothetically, if you have an infringer, why not try to register the mark and hope that the feds don't pick up any similar marks, you get your registration, and then you use it in a defense when you're sued?

MR. HANOR:  Well, there's a couple of reasons for

that. Number one, I haven't always been quite that successful on getting by the trademark examiners and I don't think trademark examiners are known for being easy.

THE COURT: How do you get a search? You just do a search for cartoon characters or how do you --

MR. HANOR: Well, you would do a design search. But you've got to remember, we're talking about a class here of convenience store services. There's a relatively small number of design marks for convenience store services. Design marks aren't that common. In other words, lots of -- I mean, people tend to use them. They just don't factor into a whole lot.

For instance, in our case, you know, I don't know, we're not exactly known as the alligator store. And, so, for our case, it's not hit. But they do a search just like anybody else does and they -- to find it. But the other thing, importantly, it exposes you to an opposition. So, you become a public record. And, you know, I follow these things. I have watch services that report to me. And I find it absolutely unbelievable that Buc-ee's doesn't have a watch service. I'm confident they do. So, they follow registrations to see if there's any there, because they oppose it.

THE COURT: Why wouldn't they have opposed yours then?

MR. HANOR: Why didn't they oppose it? Because they didn't care us about us. They didn't -- they could care less about us, even though we had a hundred million in sales, until

we bought the 40 acres.

THE COURT:  But the pattern that you wanted to introduce evidence on is that they've gone after some very small stores.

MR. HANOR:  They have, and they sue immediately.

THE COURT:  So, why didn't they go after you when you were still very small?

MR. HANOR:  Because they didn't care about us.  They didn't think we were irrelevant.

THE COURT:  Well, why did they care about other small stores then?

MR. HANOR:  Because --

THE COURT:  It doesn't make sense.  Either sue all the small stores or they sue none of them.

MR. HANOR:  You know, I don't know if I can explain that entirely.  Everybody else they've sued.  They sued --

THE COURT:  Yeah.

MR. HANOR:  -- them very fast and very quickly.

THE COURT:  Yeah, yeah.

MR. HANOR:  And to say they didn't know about us, you know, we opened our -- we put up the billboards and the sign in 2012.  And you're right, we registered in 2013.  We built a new restaurant in 2014.  January 2015, we opened a new travel store.  They're all open for an entire year, and we're talking about their bailiwick.

*THE COURT:* That's why it doesn't make any sense to me that you tell me that they're aggressive about suing other stores.

*MR. HANOR:* Well, they are when it matters to them. We didn't matter to them. They didn't care about us until we bought that 40 acres. They could care -- if we hadn't of bought the 40 acres, we wouldn't be standing here now, Your Honor. We wouldn't be here.

But let's get back to our point. There's at least two courts that have held these registrations admissible. They didn't find them unduly prejudicial, and they found them relevant to intent. So, it's not like this is coming out of the blue. Show me a court that's rejecting them for that.

*MS. MITRIUS:* I'd just like to point out that the case that he's citing is very different. The -- I think it's state -- yes, it's *First Savings Bank*. In *First Savings Bank*, the plaintiff did not have a federal registration for its mark, and the defendants had a registration that predated the plaintiff's mark. And in that instance the court said that the registration is relevant. That's not the case here.

There is absolutely no dispute that Buc-ee's mark, that they started using in 1982, came before Choke Canyon's mark. So, the case that they're citing with *First Savings Bank* is very different from this case.

And just -- Your Honor had asked previously about

the -- what the Trademark Office searched; and in our briefing, in our reply on page 7, we specifically identified what the examiner searched for when it was reviewing the registration of Choke Canyon. And it used design codes directed to alligators, costumed reptiles, cowboy hats, multiple stars or three or other concentric circles. And there's exhibits showing the searches that were done. And doing searches with those design codes would not produce a Buc-ee's logo.

*MR. HANOR:* We don't know that, Your Honor. But I disagree with her interpretation of the Kansas case. But how about the other Illinois case? How do they explain that one away, where they held that --

*THE COURT:* I'll take a look at it.

*MR. HANOR:* -- registrations were admissible.

And I disagree with her interpretation of the Kansas case.

*THE COURT:* Okay. On the defendants' motion to separate the evidence contained in Plaintiff's Trial Exhibit 53, I do think we need to separate the photographs to the images by year at least. I don't know whether timing is going to be relevant in this lawsuit, but I think we ought to at least be prepared that it might be, it might be.

On plaintiff's motion concerning precluding defendants from arguing or suggesting it was a back button on a survey, that seems to me it -- it seems to me that goes to

weight, not admissibility.  I'm not enough of a maven when it comes to surveys to know whether that's a legitimate criticism of the survey or not.  Do you want to give me some more detail on this?

MS. MITRIUS:  Yes, Your Honor.  So, I think it will help, Your Honor, if -- I have a copy for you.  I have a copy of the program notes to just give you the background of where to start.

THE COURT:  Give them to Mr. Rivera.

MS. MITRIUS:  I have two copies.

THE COURT:  Thank you.

MS. MITRIUS:  I just think about two minutes on the background of this would be very helpful for Your Honor on how this started.

This is an exhibit that in our expert's report that provides the programming notes for how the survey was conducted, how the survey company actually implemented the survey.  And the survey company that we used is -- this is common of how experts do things and what they include in their report.  It's similar to what defendants' expert did for his survey.  In fact, the experts used the same exact company to perform the survey.

And if you look at page -- it's the second to last page that says "main page 1" on the bottom.  Do you see that, Your Honor?

THE COURT: Yeah, I see it.

MS. MITRIUS: Okay. So, if you look at Q 1A, this is a question before the question appears, it says "new screen." And there's "Q 1A" that appears. It says: "Does or doesn't the appearance of this logo cause you to think" --

THE COURT: Slow down.

MS. MITRIUS: I'm sorry. "Does or doesn't the appearance of this logo cause you to think of any company or companies, brand or brands, logo or logos?" And then it lists three separate answers.

And the instructions -- so, the answers that provide -- that appeared on the screen were the three that were on the left. Does, does not, and not sure. And, so, the programming instructions here were if the respondent answers "does," Question 1B gets asked. If "does not" or "not sure," the program skips to Question 2.

THE COURT: Okay.

MS. MITRIUS: Those are the instructions. Now, at the end of that question, there is not -- as you see above, there's a bold where it says "new screen."

THE COURT: Yeah.

MS. MITRIUS: It doesn't appear on this programming note.

THE COURT: Okay.

MS. MITRIUS: Our expert testified that there was a

new screen here.

THE COURT:  Okay.

MS. MITRIUS:  And, so, during the deposition, Mr. Hanor was saying that he didn't believe -- that why didn't it say "new screen," if it wasn't a new screen.  And, so, our expert said, I reviewed it.  I know it was on a new screen, but I can give you screen shots of the actual survey, or I can give you a link to a test survey so that you can flip through the pages and you can see how they -- how respondents would have seen the survey.  So, Mr. Hanor said, "I want screen shots."

THE COURT:  Okay.

MS. MITRIUS:  So, we produced them to him.  We produced him screen shots of the test link.  And what I mean by that is, in any survey, defendants' would have been the same as ours, in order to -- you -- it's Internet based.  So, they send out e-mails.  And they need to get certain quotas of people. You can't just -- you know, you can't have everyone who's male and 35 that lives in a specific area.  There's quotas, so that you have the correct universe that you're testing for the survey.

So, the wide survey, you can only take it once. And if you don't meet the quota requirements, meaning you don't answer the age, the gender, the other specific screening questions right, it terminates the survey and you can't get through.  But in the test link, you're able to go backwards and

forwards and be able to look at every screen.

THE COURT:  Okay.

MS. MITRIUS:  So, in the test link screen shots that we have given, there was a button that said "back."  Because in order to be able to move around in the survey without having to have live links every time --

THE COURT:  Okay.  All right.

MS. MITRIUS:  -- they meet the quotas.

THE COURT:  All right.

MS. MITRIUS:  So, once we produced that, then Mr. Hanor was complaining that, well, your -- you allowed survey -- the survey respondents to go backward and forward within the survey.  And we said, No, this is test links.  And, so, Mr. Hanor moved to compel to get additional information. We produced live links.  We produced five live links, and we gave him the credentials for the quotas, so that he could see it like an actual respondent and take the -- take the survey. And he -- Mr. Hanor actually used some of those live links, because we -- the survey company said that some of the live links were used.  So, he actually saw the live links.  And now what he wants to do is he wants to introduce into evidence the screen shots that we provided of the test survey.

THE COURT:  Okay.

MR. HANOR:  Your Honor, at the deposition of Dr. Simonson, he came out and said, I want to point out a

mistake in my report.  There is an error in my report, and it should have had new screen, new screen, new screen after that, to show that, and it didn't have it.  He said, "My report is in error."  All right?

And I agree, sometimes people make typographic errors.  But let's make one thing clear.  He may have given these instructions, but Dr. Simonson didn't design the survey, didn't conduct the survey.  He had a company do that.  We all do that.  I mean, that's nothing wrong with that.

THE COURT:  Okay.  All right.

MR. HANOR:  So, I would have thought that all I would have had is from that company some evidence that that's what they did, but I never got it.  I would have thought they would have put an affidavit in there from the company, something saying this was not done.  The survey was not conducted as set forth in his expert report.  We conducted it differently than his expert report.  So, that's just simple proof that they could have provided, which they never ever did, and which I had no -- if they can't provide that simple proof, I have reason to believe the survey wasn't -- that it was conducted in fact, as set forth in his expert report, and not differently as he tries to say now.

THE COURT:  Well, see if y'all can resolve that.  It's just a question of producing something.  I mean, I hate to get into all of this with the jury.  They're going to be so

confused by it.

MR. HANOR:  Honestly, he doesn't even know, because he didn't -- he didn't actually design the survey for the software that did it.  He didn't conduct it, because you have a survey company do that.  Everybody does it that way.  He didn't do it.

THE COURT:  He didn't do what?

MR. HANOR:  He did not do the actual survey.

THE COURT:  That's right.  You said everybody does it that way.

MR. HANOR:  Yeah, but he's trying to say, Well, this is how it was done.  They're the ones that should be saying how it's done.  They're the ones that did it, not him.  I can see why he's willing to say it now, because his survey is fatally in error, if he didn't do it that way.  He's got a problem.  But they're the ones that should be giving -- all I ask for is the evidence, that it had been done that way.

THE COURT:  See if y'all can't work that out before trial.  That really --

MR. HANOR:  I'll try, Your Honor.

MS. MITRIUS:  Because defendants' expert used the exact same survey company, and we don't have an affidavit from defendants with respect to how the survey was conducted either.  We have only have the notes that are in the report and the testimony of the expert.

MR. HANOR:  But there was no error in our expert's

report to raise any question regarding that.

MS. MITRIUS: And, Your Honor, I don't believe Mr. Simonson testified that he had made a mistake. And, in fact, if you look at the questions and you look at the screener, the instructions were if they answered "does," you ask Question 1B. If Question 1B was already on the screen, it would make no sense that you would be telling the programming that the instructions were if the respondent answers "does," ask Question 1B; and if they respond "does not," skip to Question 2. Those are not notes that go -- those are the programming notes. They're not notes that are on the screen that the respondents see.

THE COURT: Okay. This final one by Mr. Panjwani's income statements, I'm not used to income statements coming in. Why are we talking about that?

MR. HANOR: I just want to put in his gross sales, to show his gross sales. They claim that, you know, they didn't know about us and they had no idea we were around and we had over a hundred million in gross sales. That's all I want to put it in. They want to keep it out, because it makes them look bad. And the David and Goliath, you know, where I come from, a hundred million is a lot of money. Maybe not as much as they are, but we're not exactly David.

THE COURT: Well --

MS. MITRIUS: Can I say one thing, Your Honor?

THE COURT:  Yeah.

MS. MITRIUS:  I don't mean to interrupt you.

The issue that they're saying that they want to put in the sales because it's to show that we actually knew about them, that goes to laches, which is a damages defense and doesn't have any relevance to the liability trial.  Laches is an issue for damages, not liability.  So, to the extent that they're looking to put the income statements in to show that they were large so that it's unbelievable that Buc-ee's didn't know about them when all the testimony points to the contrary, that's laches.  It's not relevant to whether there's a likelihood of confusion or likelihood of dilution.

MR. HANOR:  It is relevant to likelihood of confusion, because we've had over $200 million in sales and there's been no actual confusion.

MS. MITRIUS:  And whether there's no -- I'm sorry, I'm saying this wrong.  The likelihood of confusion -- whether there's actually no instances of actual confusion or not, the sale doesn't have anything to do with that and it doesn't show whether there's a likelihood of confusion.

MR. HANOR:  Sure, it does.  If you have that many -- if this is as bad as I said -- they say it is in their complaint -- and I had it here a moment ago, because I had it in my notes.  How did they refer to us, as a --

THE COURT:  Well, leaving aside how many sales your

client has, why does just a delay help your position any?  As I say, you've argued the other side of that many times, too, arguing that the plaintiff immediately sues competitors.  Now, you're arguing that the plaintiff should have immediately sued your client?

MR. HANOR:  If they had any reason to think that we were a deliberative infringer and an intentional infringer as they thought we were, they should have sued us.  And they would have sued us had they thought that.  It's unbelievable that they would wait three and a half years to do that.

THE COURT:  Okay.  Well, it's --

MS. MITRIUS:  Again, that goes to laches.

MR. HANOR:  No, it doesn't go to laches.

MS. MITRIUS:  Or even if it goes to willfulness, willfulness is an issue for damages as well.  Laches and willfulness are damages issues, and this trial is limited to the liability --

THE COURT:  No, I think what Mr. Hanor is saying is that the fact of the delay suggests that Buc-ee's didn't really think that there was any evidence of infringement or confusion. I think that's what he's saying.  And I'm just not sure about that.  I'm not sure if that's what it means or --

MR. HANOR:  That is what I'm saying, Your Honor.

MS. MITRIUS:  But we did sue them.

THE COURT:  Sorry?

MS. MITRIUS:  We did sue them.

MR. HANOR:  Three and a half years later.

THE COURT:  He's saying that you would have sued a lot earlier if there really was any intent, if there really was any evidence of confusion.

MS. MITRIUS:  Okay.  And as soon as we were made aware of them, Buc-ee's did sue them and that's what the evidence --

THE COURT:  See, that -- then we're going to get into a whole lengthy sideshow about whether Buc-ee's knew or should have known about the existence of Canyon, and that's -- I'm very concerned this is going to turn into a six-week trial, including trying issues that are only marginally relevant to anything else.

Is there anything else we can usefully do today?  I'm not going to let the income statements in.

MR. RICHARDSON:  Judge --

MR. HANOR:  Your Honor, that's -- we can't even mention what our sales are?

THE COURT:  Why do you want to?  That's going to hurt you more than help you.

MR. HANOR:  How is it going to hurt us?  We don't think it does.

THE COURT:  Because you'll be considered a judgment worthy defendant who could pay millions of dollars in damages.

MR. HANOR:  Well, then that's the risk I'm willing to

take.

MR. RICHARDSON: Judge, in regard to the motion in limine, there was one that you skipped over, No. 6.  It's a lot like the others.  I don't know if you presumed to just kind of lump that one in --

THE COURT: I thought we've been going through those one by one.

MR. RICHARDSON: Yeah, but we skipped No. 6.  It's corporate espionage and spying.

THE COURT: Oh, no, we're not going to get into that. We're not going to get into that.

MR. RICHARDSON: I just wanted to get that clarified. And then Ms. Mitrius has an issue that you may or may not want to address, so I'll let her --

MS. MITRIUS: Right.  I don't know if it would make sense to -- if you want to talk about this at another time. There's an issue that came up from last Friday and yesterday with respect to the parties have been trying to work out trial witnesses and exhibits and objections in order to be able to file the final pretrial order and have our meet and confer, and the plaintiffs have identified three witnesses on their trial witness list that have not previously been disclosed, were not on their initial disclosures and two witnesses that were identified as relating to damages issues that we haven't -- that, you know, we haven't deposed or didn't have knowledge

were going to be witnesses previously.  So, we wanted to talk to you.  And I just -- I'm giving you just a high overview.

And then there's the defendants identified over -- about 230 new exhibits on Friday that they're identifying as trial exhibits that are documents that they've never produced before and, in fact, just produced them yesterday.  And, so, we wanted to raise this with Your Honor, because this is -- it's going to have a big impact on trial if we need to now take depositions, do additional discovery.  We haven't had a chance to review the document -- the 200 plus documents that they've produced, because we just got them last night.  But we may need to take additional depositions with respect to those depositions.  We may need to produce additional documents with respect to that.  So, we wanted to raise this with Your Honor to -- I don't know if you want to talk about it now or if you want to push this and set a time sometime next week, but we just thought it made sense to raise with you, because we don't think we could wait to the final pretrial conference in view of these new witnesses and new documents.

*MR. HANOR:*  Your Honor, I can make it short.  I'm holding here the plaintiff's notice of deposition of Roselyn Kim, dated October 31st, 2016.  This is the plaintiff's notice of deposition of Fred Perez dated November 25th, 2016.  I have the e-mail here where we have scheduled the depositions.  And

they for whatever reason, I don't know, they just said, "We don't want to take them." So, they declined to take them. And they say we didn't notice them as witnesses? They noticed their depositions. Here's copies of the notices. I don't know what they're talking about.

THE COURT: How can you guys disagree so much? I mean, why wasn't this discussed before coming to court?

MS. MITRIUS: Well, we had sent an e-mail to Mr. Hanor asking these questions and raising it, but we did not get a response.

MR. HANOR: It's throughout the e-mails here. And they're in our initial disclosures. Here they are in our disclosures.

THE COURT: One side says it's not in the disclosure. The other says it is.

MS. MITRIUS: Nichole Mallett and Steve Buchanan are not in the initial disclosures.

MR. HANOR: That's Bucky's, and that issue hasn't been decided. They're just corporate representatives. And if that's decided one way or the other, we'll determine that. Obviously it won't be an issue.

MS. MITRIUS: Well, you have admitted to us and the Court, that Buck's -- that Buck's is refusing to bring a witness, but now you have them on your witness list.

MR. HANOR: Oh, they're not refusing anymore.

MS. MITRIUS:  Well, if they're not refusing, then we need to be able to take their deposition.

MR. HANOR:  I don't care.  Take them.

MS. MITRIUS:  Well, we would need the leave of Court in order to be able to do that since discovery is closed.

THE COURT:  What do these guys do?

MS. MITRIUS:  They're the principals of Buck's, who is opening the Bucky's, with a "y," chain of gas stations that we have suits pending in the Southern District of Texas, in a different court, before Judge Hittner, and in the District of Nebraska.

THE COURT:  Okay.

MR. RICHARDSON:  Judge, this is the matter you took under advisement at the last hearing, as to whether or not you were going to address the admissibility of the Buck's -- Buc-ee's versus Buck's lawsuit.

THE COURT:  Yeah, I generally wanted to keep out all reference of other lawsuits because I -- for the reasons I've already stated.  Why are we getting into this lawsuit?

MS. MITRIUS:  Well, if Your Honor is going to preclude this lawsuit, then it resolves the issue with respect to these two witnesses.

THE COURT:  What do you need them for?

MR. HANOR:  Well, if -- there's a motion for summary judgment pending in that case; and as soon as that motion is

granted, then that will pour them out of that case. What I want them for is that they agreed to let Bucky's -- they agreed to let Buck's use Bucky's anywhere. And if Bucky's -- Buck's can use Bucky's anywhere, I don't see how the alligator and the beaver could make any difference.

THE COURT: But then we have to get into all sorts of what the deal was. Maybe they licensed Bucky's for a stiff fee, I don't know.

MR. HANOR: No, we know what it is, because we have the settlement agreement that's the subject of the enforcement. The settlement agreement is one they signed -- that Buc-ee's Texas signed, saying, You can use Bucky's anywhere, and let them have a federal registration. And now they're trying to renege on that agreement, and that's the case that's pending in Nebraska and part of it is pending here. This is a scorched earth litigation again from them, where they're trying to desperately keep it out of this case and trying to stop Buck's.

But, again, the Court doesn't need to decide this right now because you could wait till -- to see what the Nebraska court does. They haven't ruled on it yet. And they may not rule on it, so that may answer the question right there.

MR. RICHARDSON: Judge, a few things. Number one, you want to make it a six-week trial, when we start getting into this Buc-ee's versus Buck's issue, how we interpreted the

agreement, how they interpreted the agreement at Buck's, it's going to open a whole can of worms.

Number two, it will be a while before any motions are decided in Nebraska. As of yesterday, Judge Bataillon recused himself in the case. So right now we don't even --

THE COURT: Spell the judge's name, please.

MR. RICHARDSON: Bataillon. It's B-a-t-t-a-l-i-o-n (sic). Is that right?

THE COURT: That's fine.

MR. RICHARDSON: So, we don't even have a judge right now hearing the case. This whole issue boils down to how you -- whether this is going to come in or not. If it's going to come in, then we need to take these depositions. If it's not going to come in, then we really don't need these depositions.

THE COURT: I thought I had already ruled that we weren't getting into other enforcement litigation brought by Buc-ee's. Hadn't I already decided that?

MR. RICHARDSON: You did, but you held this one issue, you held it out and said that you would rule on this one later. All the other cases, you -- that's correct, Judge, you did so write, this is not going to be admissible.

MR. HANOR: We just ask you wait until up to the time of trial and if nothing has happened, then it will make it easy for you to rule.

*THE COURT:* Then if I do admit a decision on the motion for summary judgment, what does that have to do with our case?

*MR. HANOR:* It shows that the -- if Bucky's -- if Bucky's can use Bucky's and Buck's can use Bucky's in Texas, how is the alligator going to make a difference.

*THE COURT:* That's such a reach in terms of probative values.

*MR. HANOR:* Wait until the court rules on it, Your Honor; and if they don't rule on it, then it will make it easy for you to decide.

*THE COURT:* For right now no other litigation is coming into this case.

Thank you all very much.

*(Concluded at 4:09 p.m.)*

* * *

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled cause, to the best of my ability.

/s/ *Kathy L. Metzger*                              *1-2-2018*
Kathy L. Metzger                                    Date
Official Court Reporter