# EXHIBIT 26

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

BUC-EE'S, Ltd.                    *       4:15-CV-3704
                                  *       Houston, Texas
VS.                               *
                                  *       2:02 p.m.
AMJAD PANJWANI, et al             *       September 13, 2017

**MOTION HEARING**


**BEFORE THE HONORABLE KEITH P. ELLISON**
**UNITED STATES DISTRICT JUDGE**

**APPEARANCES:**

**FOR BUC-EE'S, LTD:**
Joseph J. Berghammer, Janice V. Mitrius
BANNER & WITCOFF, Ltd.
10 S. Wacker Drive, Suite 3000
Chicago, Illinois 60606
312.463.5000

Harry Tracy Richardson, III.
Buc-ee's Ltd
327 FM 2004 Rd.
Lake Jackson, Texas 77566
979.230.2968


**FOR AMJAD PANJWANI, ET AL:**
Charles W Hanor
HANOR LAW FIRM, PC
750 Rittiman Rd.
San Antonio, Texas 78209
210.829.2002

Court Reporter:
Johnny C. Sanchez, RPR, RMR, CRR
515 Rusk, #8004
Houston, Texas 77002
713.250.5581

Proceedings recorded by mechanical stenography.  Transcript
produced by computer-assisted transcription.

THE COURT:  Okay.  Good afternoon and welcome to everybody.  You've probably just been through it with Mr. Sanchez, but let's do appearances of counsel, beginning with plaintiffs.

MR. RICHARDSON:  Tracy Richardson here for Buc-ee's, Your Honor.

MR. BERGHAMMER:  Joe Berghammer as well on behalf of Buc-ee's.

MS. MITRIUS:  And Janice Mitrius on behalf of Buc-ee's.

MR. HANOR:  Charles Hanor on behalf of the defendants.

THE COURT:  Okay.  We've got quite a few pending motions.  I wasn't going to rule or even discuss the objections to the report and recommendation.  We are working on that.  And we have some other motions in limine that are not ripe yet.  We weren't going to discuss those either.  We do need to discuss the ones that are ripe.  Have you discussed among yourselves how you wish to proceed?

MR. RICHARDSON:  Not with Mr. Hanor, I haven't, Judge.  But I have a list of what I think the Court wants to hear today.  And we kind of broke up.  We separated it, but the attorneys will be arguing each motion so we're not jostling around at different times.

So if the Court doesn't have an order and Charlie won't agree to it, I kind of have a recommendation.

THE COURT:  Okay.  What's your recommendation?

MR. RICHARDSON:  The motions I know that we have before us today are Buc-ee's motion to preclude the Robertson survey.

THE COURT:  Right.

MR. RICHARDSON:  Defendants' motion to preclude the Simonson survey.

THE COURT:  Right.

MR. RICHARDSON:  Both of those will be argued by Mr. Berghammer.  So I propose that we do those first.

And third one is Buc-ee's motion to preclude reference to alleged prior failed surveys.

THE COURT:  Right.

MR. RICHARDSON:  Ms. Mitrius is going to argue that.

And then Buc-ee's motion to preclude reference to Buc's.  Buc-ee's motion to preclude reference to prior enforcement, Buc-ee's motion to preclude reference to Buc-cee's selling branded fuel I will handle. And I think those are all the motions that were before the Court today.

THE COURT:  Okay.  So you propose to start with plaintiff's motion to exclude Dr. Robertson's testimony?

MR. RICHARDSON:  Correct, Judge.

THE COURT:  Is that agreeable?

MR. HANOR:  That's agreeable.

THE COURT:  Okay.  Why don't you go ahead.

MR. BERGHAMMER:  And I apologize, Your Honor.  I have a bit of cold today.

THE COURT:  I'm sorry.

MR. BERGHAMMER:  I'm not sharing food with anybody, but I apologize if I come off a little rough.

Regarding Dr. Robertson's survey, it is impossible for the jury to determine whether his survey has any relevance at all because of the people that he asked the questions to.  And that's why we're seeking to exclude the survey.

The parties are very much in agreement, Your Honor, that selecting the relevant people who are going to be asked the question is critical.  And that relevant universe of people is the people most likely to use Choke Canyon's goods and services.  Dr. Robertson himself agrees with this, that the relevant universe of people, is people most likely to use Choke Canyon's goods and services.  Defendants' other expert, Mr. Jacoby,

agrees with this.

THE COURT:  Spell that for the court reporter, if you would.

MR. BERGHAMMER:  J-a-c-o-b-y.  And defendants don't refute that both Dr. Robertson and Mr. Jacoby agree that the most relevant set of consumers, or the relevant set of consumers, is people most likely to use Choke Canyon's goods and services.

THE COURT:  I think that's right.  I think that's right.  I think that is the law.  And the survey that was done by Dr. Robertson included, what, 205 respondents; is that right?

MR. BERGHAMMER:  That's about right.

THE COURT:  And you think it is the wrong 205?

MR. BERGHAMMER:  Yes, Your Honor.  And I think Dr. Robertson could have easily done things to make it the right 205.  And I think he made choices that led us to the wrong universe.  And I think he did two things: One, he didn't ask a qualifying question to determine if those 205 people were likely to pass through the San Antonio area in the past six months or the next six months, and were likely to stop at a gas station/convenience store.  He did not ask that question. It would have been very easy to ask.

The only question he asked was:  Did they have a valid driver's license.  That doesn't mean they drive; that doesn't mean they get gas at a gas station/convenience store; it doesn't mean that they're ever in the vicinity of San Antonio, which is where all of defendant stores are located.  Dr. Robertson easily could have asked that question, and he chose not to.

And, so, therefore, the jury has no idea what the relevance of this survey is because they don't -- they can't tell if people in Dallas or people in Houston that were actually surveyed would have passed through San Antonio if they drive, et cetera.

So that's problem number one, is that he didn't ask qualifying questions.

THE COURT:  Okay.

MR. BERGHAMMER:  The second problem, Your Honor, is that for reasons that we don't understand, he specifically chose areas that did not include defendants, the principal amount of defendant stores.

And I've got a demonstrative that I'd like to show Your Honor, if I may?

THE COURT:  Okay.  Show it to the other side.

MR. BERGHAMMER:  Of course.  May I approach, Your Honor?

THE COURT: Hand it to my law clerk, if you would.

MR. BERGHAMMER: Thank you.

THE COURT: Do you have an extra for her?

MR. BERGHAMMER: Yes. Sorry, Your Honor. And I guess before I go to this survey, picking the wrong group, Your Honor, Dr. Robertson admitted in a deposition that he has no idea if the people that he surveyed were likely to go to defendant stores in the past, or are likely to go to defendant stores in the future.

That is just a threshold issue that makes this survey inadmissible, because the jury can't determine the relevance. So now, Your Honor, going to this map in front of you, what you see in the first page is taken directly from Dr. Robertson's report. And that has State of Texas divided into six different areas.

THE COURT: Right.

MR. BERGHAMMER: And then on the second page, we have overlaid from Dr. Robertson's report the specific locations where each of the respondents was.

Page 3 shows you where Choke Canyon's various facilities are.

And then Page 4 overlays both where the respondents are, and where Choke Canyon's facilities are. And you can see on that Page 4 that six of the 10 Choke

Canyon facilities were outside the area surveyed.

THE COURT:  That doesn't mean they didn't drive to the relevant area; right?

MR. BERGHAMMER:  Doesn't mean they didn't drive to the relevant area, but it doesn't mean they did.  And the jury can't know whether they did or they didn't.  The jury is the ones that are going to have to determine is this survey relevant in the first place.  And what the jury is going to hear is they had driver's licenses, they were in Dallas, and maybe they drove all the way down to Atascosa, maybe they didn't.  We don't know.

And defendants in their brief, they make a big comment that the highways to Laredo -- that's the last page -- the highway to Laredo and highway to Corpus Christi, defendants' customers drive along those highways.  Well, then why didn't you include the people that reside in those areas as people you could ask the questions to?  They specifically excluded The Valley, South Texas area.  And we think they specifically excluded it because it would have shown more confusion.

So we think that if people were -- the more people that are near Choke Canyon store, the more likely it is that they would come across it in passing, and that they would be confused.  And we think that's why they purposely kept it out.

Now, we can say that to the jury, and defendants may say:  Well, this all goes to the weight to put on the survey.  And, so, we can say that to the jury, but the problem is this isn't a case where we know half of the people went by, drove to defendants' stores, or were likely to, and half weren't.  This is a case where we don't know at all what percentage of people were likely to either go across defendants during the past, or to go across it in the future.  There was no qualifying question.

And because Dr. Jacoby, had -- he had -- he full agency of himself.  He was the one that chose which questions to ask.  He needed to do it the right way, and he didn't, and the jury can't weigh this because they --

THE COURT:  Okay.  I think I understand your argument.

MR. BERGHAMMER:  Right.  Your Honor, there are a couple of cases that are directly on point here.  The Amstar case.  It's a case from the Fifth Circuit, 1980.

In that case, the defendants surveyed ten cities, and eight of the ten cities did not have defendant stores, and the Court found that that was one of the reasons to exclude the survey.

In another case, the Trouble case, Southern District of New York, 2001, the Court found that several of the survey locations were more than 20 miles from defendants' closest stores, and that was one of the reasons the Court gave for excluding the survey. Not say to the jury you can weigh this, but excluding the survey.

Thank you, Your Honor.

THE COURT: Thank you very much. Mr. Hanor?

MR. HANOR: Your Honor, I have one exhibit I'd like to mark.

THE COURT: Okay. If you can hand it to Mr. Rivera.

MR. HANOR: The exhibit I handed you is a survey that Buc-ee's did, study survey, whatever you want to call it. And I'll summarize it in very short terms.

Of the people that bought products at these stores paid with a debit card, 80 percent of them had zip codes over a hundred miles away. And of people that bought products in their stores with a credit card, over 70 percent of them had zip codes more than a hundred miles away.

When I was driving in to Houston today, I was really setback a little when I was a hundred miles from Katy, I saw billboards "Buc-ee's 100 miles." I then thought about the billboards that my client has, "Choke

Canyon 50 miles."

We're not talking about a local little store here that just has local clients. The clients are people traveling on the interstate highways. And San Antonio is the gateway to Mexico and The Coast. It's I-37 and I-35. And that's where -- you can't go -- if you live in San Antonio -- and I have lots of friends that go to The Coast, or at least they used to -- it may be awhile before they go back -- but you're going to go through either Whitsett, or if you want to go to Laredo and go to Mexico and go to The Valley, you've got to go through the Atascosa store. And so those people are the very people that you would do.

And, also, it overlaps here with the fact that what this suit is all about is my client bought 40 acres of land in Luling, Texas, on Interstate 10. And if you look at paragraph 24 of their original complaint, that's why they say they sued us, because there's this likelihood of confusion that's going to happen in the future.

So it isn't just present day confusion, it's expansion we have to deal with. But I don't even think we're dealing with expansion. I think we're talking about people driving down the interstate highway. When we will know about this? If you have a current driver's

license, you're not blind.  The only way we advertise, either one of us advertise, is billboards and social media.  There's no other advertisements.  No newspaper, no TV, no radio.  So we -- and, really, billboards is it.  Recent times we have social media.  But as far as finding stores, both of us rely solely on billboards, because we're traveling on the interstate.

So how do I pick the universe?  Do I pick people that only travel down the universe?  Who doesn't end up going to The Coast from San Antonio going down to Laredo?  I mean, you're talking about somebody that does it.

The ones we did in South Texas, we interviewed 150 people.  That, in itself, from the South Texas portion of it, would be enough to be statistically significant.  And while we came up with this survey is zero, I've never seen a case like this where it's zero.  But it's not surprising at all because the two marks don't look anything alike.  They have nothing whatsoever to do with each other.  They're not even remotely dissimilar.  So there's a reason --

THE COURT:  So among the 205, zero confusion?

MR. HANOR:  Zero.  Zero.  And in a way, that's validated.  If you look at those articles in the

*Houston Chronicle* in July of 2016, it was reprinted in the *San Antonio Express News*, it was aired on ABC News, it was refitted in *TexAg*, and hundreds of people responded with to those articles.  Hundreds.  And you know what -- well, I don't want to -- their comments are the subject of one of their motions in limine that we can't put in all the statements of the people said this is a stupid lawsuit. And it may be.  But that was what validated -- I mean, you know that's the situation.  So we didn't use the wrong universe.

First of all, one thing he said was telling.  The cases that excluded them, in addition to this, they excluded them in addition to other reasons.  I don't think he picked the wrong universe.  I think when you talk about these people here, we're talking about 80 percent of the people in Texas, for one thing.  We're talking about covering 80 percent of the people.  We're supposed to --

THE COURT:  I'm sorry.  How do you get to 80 percent?

MR. HANOR:  The people that he surveyed in his survey, covered 80 percent of the population in Texas.

THE COURT:  At least one representative from that much of the country?

MR. HANOR:  Well, no.  80 percent of the

population in Texas is found in the areas he surveyed.

THE COURT:  I see.  Okay.

MR. HANOR:  And, so, it's not like we didn't survey people that wouldn't likely come in contact with one or the other.

And one of the issues they consider in these cases is expansion.  And expansion is what this case is about, because my client bought the 40 acres in Luling which got him sued.  I've had a lot of people say:  Well, gosh, you were asking for a lawsuit trying to challenge Buc-ee's on the interstate.  I thought we had a right to do that.  I'm just not sure.

THE COURT:  Okay.  I think I understand your point.

MR. HANOR:  What we're dealing here is with the travel traffic centers and the stuff, and they're going to come in contact with those.  The travel center in Atascosa on I-37 is 20 miles from San Antonio.

THE COURT:  I think what you're calling Atascosa I call Atascosita, but we're talking about the same one?

MR. HANOR:  Yeah.  It's 20 miles southwest of San Antonio.  You may be right.

THE COURT:  If it's an Indian name, I'm not sure of the correct pronunciation.

MR. HANOR: I don't know. I just pronounce --

THE COURT: As long as we're talking about the same place.

MR. HANOR: Yeah. We're talking about the same place. It's 20 miles from San Antonio. It's right outside of San Antonio. So it's not --

THE COURT: Atascosita that I'm talking about is not right outside of San Antonio.

MR. HANOR: This is right outside of 10 --

THE COURT: Okay. I'm confused.

MR. HANOR: It's 20 miles on 1-37 southwest. I'm sorry. It's on I-35, southwest of San Antonio, 20 miles.

THE COURT: That's different from the Atascosita I know about.

MR. HANOR: Okay. No, it's 20 miles southwest on I-35.

THE COURT: I'll take your word for it.

MR. HANOR: It is. You can look on the map. Where are you going to buy gas, except when you're traveling the interstate highways except at one of these convenience stores? There aren't any gas stations anymore like we used to have. They've been gone for decades. So everybody buys gas at a convenience store.

THE COURT:  C stores; right?

MR. HANOR:  Yes, sir, C stores.  And I can tell you, my client ran out of gas.  He was out of gas for five days.

THE COURT:  Well, I'm now confused.  Are you talking about after the floods?

MR. HANOR:  Yes.  In other words, that's -- their big business is gas.

THE COURT:  I'm sure it is.

MR. HANOR:  Volume, I mean, that's it.  So who doesn't buy gas, and when they say, "We didn't interview people that stopped at a convenience store," I don't know if I've ever met anybody that hasn't.  And I can tell you, if you go to Corpus, we got about the only show in town going down there.  And if you go to Laredo, we got about the only show in town.  If you want a nice travel center, we're about the only show in town, and that's one of the reasons my client is down there by himself.

THE COURT:  I-35 going to Laredo?

MR. HANOR:  To Laredo.  And I-37 going to Corpus.  We've got the nice -- the only big nice travel centers.  Now, I think there's some Loves or things like that.  But Loves tends to attract the trucks.  They're usually -- they cater them.  We don't because we don't

have the land to handle it.  If you want to handle trucks, you have to have a much bigger property for the trucks to maneuver and turn around.  So we don't handle trucks; they do.

THE COURT:  I got you.  Okay.

MR. HANOR:  I just don't see how -- is it perfect?  How could you do it perfect?  The truth of the matter is we're both very geographically separated, except San Antonio is a convergent point there where all those people north of San Antonio they come down through -- if they want to go to The Coast and go to Mexico, they're going to come through San Antonio and they're going to pass one of our stores.

THE COURT:  I think I understand your point.

MR. HANOR:  And, remember, the stores, they have highway signs that are up 65 feet in the air, in addition to billboards.

I don't think he did the wrong universe. I don't think he could have done better, but at the very least it's not objectionable and can't be excluded.

THE COURT:  Okay.  Thank you.

MR. BERGHAMMER:  May I, Your Honor?

THE COURT:  Yes, you may.

MR. BERGHAMMER:  Thank you.

THE COURT:  Let's wait just a minute for

Mr. Hanor.

MR. BERGHAMMER:  Sorry.

THE COURT:  Please proceed.

MR. BERGHAMMER:  First, Your Honor, I want to correct one thing.  Mr. Hanor said that Dr. Robertson had no confusion at all.  And I want to quote from Dr. Robertson's report.  So survey respondent Number 67 when asked whether the Choke Canyon logo looked like -- when asked whether the Choke Canyon logo was associated with any other store, he said, "Looks like a rip off of the beaver.  Why do you say that?  Just look at it."

Respondent Number 97, who is the logo associated with?  The Choke Canyon logo.  It's associated with Buc-ee's.

Why do you say that?

It looks the same.

Survey respondent 274.  Who sponsors or approves the store with defendants' logo?

Buc-ee's.

Why do you say that?

Because it's got an alligator.

Buc-ee's doesn't have an alligator.  This person was confused.

Respondent 117.  Who sponsors or approves defendants' store?

Buc-ee's.

Why do you say that?

Same setup with an animal and food.

So Dr. Robertson actually found people that were actually confused, where Dr. Robertson's report actually includes actual confusion evidence.

One of the things that I object to in Mr. Hanor's argument is that he puts forth alleged fact that there's no support for. So, for example, Mr. Hanor just said that on a 150-mile stretch of highway to Corpus Christi, there's no other gas stations; or we're the only game in town. On 170-mile stretch on the way to Laredo, there's no other gas stations; or we're the only game in town. Is just not true. There's lots of gas stations. We don't have any evidence that way.

But, most significantly, there was no test for: Are these the type of people that will run across defendants' mark? Mr. Hanor just gave you several different possible pools of people, and he said all of them would have been fine for Dr. Robertson's likelihood of confusion survey.

The first group of people he gave you is the population of Texas. He said they surveyed 80 percent of the population of Texas. And, therefore, this survey universe is fine. It's absolutely wrong. To survey a

general population, that can go to the fame of a mark. And that's why Dr. Simonson tested the overall population of Texas to prove the fame of Buc-ee's throughout Texas.

If you want to prove likelihood of confusion the authorities are uniform.  You have to look at the people that are most likely to see the defendants' goods.

Mr. Hanor also gave you their test and gave you a document saying, "If Buc-ee's customers go all over the place," again, that's not the right universe. The right universe is defendants' customers.  And is it -- was there any likelihood that of these 200-some people that were tested, that they would likely come in contact with defendants' store.

And I harp on this, Your Honor, because plaintiffs also harp on this.  From one of their briefs they say, and I quote, "Selecting the proper universe is one of the most important aspects of a survey."  That's defendants.  I said plaintiffs.  I meant defendants.

So defendants agree with us that selecting the proper universe is one of the most important aspects. Dr. Robertson agrees, Dr. Simonson agrees, Dr. Jacoby agrees, and they also all agree that the right universe is the people likely to come across defendants' marks.

Dr. Robertson easily could have done this.

He easily could have included a few questions.  He didn't.  And it's not a no harm, no foul.  By not including those people he skewed his results.  And, so, he's going to say in front of the jury:  Zero confusion.  Sure, there were these four people, but when they factor out for noise, zero confusion.  And the jury is go going to hear a PHD saying zero confusion, and they're going to hear us argue:  Well, he picked the wrong universe; the case law says you're supposed to pick this universe; and he picked the wrong universe.

Well, the jury can't figure out the law.  That's for Your Honor.  And I know it's a tough choice, but this is one of those gateway issues where it was all in their hands, and this is going to a jury.  So rather than just say:  Mr. Berghammer, you can go ahead and you can cross-examine and you can contest the weight of it, I don't think the jury's going to get it.  And, so, I think it should be excluded.

THE COURT:  Okay.  Thank you very much.

MR. HANOR:  One other point.  You indicated there were 205 people surveyed.  There were actually 450.  There were 450 people that were surveyed.  And while this covered 80 percent of the State of Texas, it only did those people over 18 with a valid driver's license.  So there were actually 450 people that were surveyed.  And

he's correct.  But you factor out that noise, because when we show them a totally different logo that had nothing to do with it, you still get confusion.  So you have to factor those things out to effectively get zero confusion. And everybody does that.  They do it; all surveys do it. There were a lot of people surveyed, 450.  You get three or four people out of 450, I can get three or four people out of 450 that will say anything.

THE COURT:  But I thought you said there was zero, there was zero likelihood of confusion.

MR. HANOR:  He's correct.  It will take the case down to zero, but you take the controlled group and you take the people in that that say they were confused, and you subtract them out.  And the controlled group is so you can get an idea of what the margin of error would be. In other words, you show the controlled group a totally different logo, nothing even close to it, and they still find it confusing.  And that's how you do every single survey.  In fact, you have to do a controlled group to validate.  Otherwise, you don't -- it's not admissible.

So he does a controlled group, and he subtracts out the people in the controlled group that says it's confusing, there's obviously, there's a certain percentage of people that are going to say it's confusing, regardless.  Even if it's nothing alike.

THE COURT: Okay. Thank you. Let's turn to defendants' --

MR. BERGHAMMER: Your Honor, could I just take 12 seconds, perhaps?

THE COURT: Yes.

MR. BERGHAMMER: Thank you, Your Honor.

I just want to point out for Your Honor that -- this is from Dr. Robertson's survey. Mr. Hanor says that Dr. Robertson picked a logo that was totally unlike Buc-ee's logo for the control. And I just want to point out for Your Honor that the logo that Dr. Robertson picked is this rabbit logo which has a dark line around the outside, is purposely on a yellow background and shows an animal. So I just wanted to correct that point.

THE COURT: Okay.

MR. BERGHAMMER: Thank you, Your Honor.

THE COURT: Okay. Let's turn to defendants' motion to exclude Dr. Simonson's survey evidence.

The 205 figure I was quoting belonged to the other expert. I apologize.

MR. HANOR: Well, I am not finding my sheet. Fortunately, I have it on my iPad.

THE COURT: Take your time.

MR. RICHARDSON: Mr. Hanor, you got a bunch of sheets there also.

MR. HANOR:  Dr. Robertson did two surveys: One of them was on fame.  And my --

THE COURT:  We're talking about Dr. --

MR. HANOR:  I'm sorry.  Dr. Simonson. Dr. Simonson did two surveys, and one of them was on fame. And the fame survey was done in September of 2016.  In order for that to be relevant, we have to translate that back to May of 2012.

THE COURT:  Doesn't the case law say that surveys are often taken during the litigation?

MR. HANOR:  Yes, that's true.  But Dr. Simonson himself said that it's incumbent upon parties to do baseline surveys along the way so you can show that it's diminished.  It's not enough that they're just associated because that's not what the statute says.  It's associated so that it diminishes the value.  And Dr. Simonson himself says the only way you can ascertain that is with baselines.

And there's another reason why the 2016 survey doesn't show it, because there was a dramatic change from 2012 to 2013.  Prior to 2012, the only stores they had that were of any consequence were Luling, Wharton and Madisonville.  And these were, I'd judge, medium size stores.

Between 2012 and 2016, they built eight

megastores, starting with New Braunfels, which opened in May of 2012, and was the largest 65,000 square feet, 120 gas pumps. So they had incredible growth between 2012 and 2016.

Now, they point to some of the gas sales that were involved in that, but you got to remember, the price of gas went drastically down during that period of time. In fact, I understand it was very expensive back then, and the price of gas went down then. So, yeah, the gas sales were high then only because the price was so high. And you've got to remember -- and this is the subject of another motion -- those gas sales were Shell gas.

Now, they're trying to exclude out that I can't point out to the jury that these were Shell gas, but those were Shell gas that they were selling back then.

THE COURT: That's another motion; right?

MR. HANOR: Yes, that's another motion that we're talking about.

Simonson said it was critical to show a baseline. He failed to include a baseline of his thesis, which renders his survey irrelevant, baseless, and unreliable. To establish dilution by blurring -- and that's what we have -- you must show distinctive of the mark was impaired. How does a survey in 2016 show that

when we have no baseline to base it on, which he says you really need, and we -- the situation drastically changed.

The jury is going to see that survey in 2016 and say:  Yeah, they must be famous.  They're famous in 2016.  And it's just going to fly right over them.  And I know it's a tough thing to prove, fame four years earlier, but I didn't write the statute.  That's just the way it is.  And they could have anticipated that because they could have had surveys of sorts.  And they don't -- that's another issue.

They told me they didn't do surveys, but obviously I handed you one.  They did other survey -- that's a survey to see who their customers were, and I'm sure they've got lots of others.  They're a billion dollar a year company.  They can afford lots of surveys.  They didn't produce them, but I'm sure they've got them.  I just don't see how you can let in the 2016 survey.  It has no baseline, and it's dramatically changed since then.

Now, the other survey he has is the association survey.  And here's my problems with the association survey.  He failed to present the marks as they're predominately shown in the marketplace.  What he did was he only showed the alligator without the words "Choke Canyon" around it, and he only showed the beaver without any words around it.

In order to get in one of my client's stores, you see a billboard and it's associated with Choke Canyon.  In order -- and you see the great big highway signs that say "Choke Canyon Travel Center."  Same thing on social media.  You come up to the store like Atascosa.  You'll see a big Choke Canyon travel center sign, or Choke Canyon barbecue sign.  You see that Choke Canyon with it.  You don't see it an isolation.  But he didn't survey that.  He just cherry picked it and took the little alligator, which we use on a few things.  But predominately it's got the words around it.  You can't buy anything in any of our stores without seeing the words around it.

Even the little stores, you go inside, my client takes advantage of the little stores and puts a big Choke Canyon barbecue sign in them.  He advertises in there.  All the cups that we have in all the stores have Choke Canyon Travel Center or Choke Canyon barbecue on them.  He only shows the alligator alone.  He didn't show it as it appears in the real world, because he was trying to make it as close as he could.

In fact, for his control, he took an alligator -- well, he took our alligator and changed it considerably to where it looked like I guess a lizard because a large number of the people in the survey said, "This is GEICO.  This is Lacoste, or the alligator

shirts."  In other words, he worked it into a totally different mark, and that's the mark they got from the control on that.

There's an issue about when I took Dr. Simonson's deposition.  The first thing he admitted was, "There's an error in my report."  On three of the questions, I don't show page breaks like I did on all the other questions, that they should have had page breaks in there.  And that's -- no one will dispute it, should have had page breaks.  What that means was, when you answer the first question and you go to the next, you can't go back. When you answer the second question and go to the third, you can't go back to the second or the first.  But when he showed it in his report, he didn't have that in it. That's not how it showed it was presented.  And I can understand you make, even a serious typographical error in your report.

So at the deposition, they said, "Well, we'll provide you with the survey."  They provided me a survey a survey that had back buttons on it.  And I said, "What's this for?  This is not what they did."  "Well, we did that just for you."  I said, "Why would you do it for me with back buttons?  That makes no sense at all."

I don't think Dr. Simonson did his own survey.  He had people do that.  Anything -- he says --

and this is hearsay. Why couldn't he just come up with an affidavit from somebody that did the survey and said, "This is the code that we used for the survey," because he didn't write the code for it because they code that in to make the -- amount of pages that they have that you go from page to page when you do the computer survey. Why couldn't he just hand me a affidavit that said, "Someone that did it. This is it. This is the code. This is the actual page breaks in there." They never produced anything to do that. I would have thought it would have been easy to do, but they never did. They never produced a thing regarding that.

They did the survey in September of 2016. In July of 2016, this case garnered significant publicity in Texas. It was reported in the *Houston Chronicle*. There were hundreds of people that responded to the article. It got reported in the *San Antonio Express News*. It got reported on ABC News, it got reported in *TexAgs*, and *TexAgs* is a Texas A&M magazine. So a lot of people had seen this and they'd seen the big logo side-by-side. And, so, they could just have as easily associated the two because of the lawsuit, but they never asked any question about the lawsuit. They never asked anything about it.

We know that one of the people that was surveyed said -- said that, "I saw these in the

newspaper."  So they had seen it in the newspaper, but they never screened out those people that had done that. And by asking them a broad question, "Who do you associate the beaver with?"  Or, "Who do you associate the alligator with?"  Well, hundreds of thousands, if not millions, of people that just seen that article in the papers and in the news, showing the two people side-by-side.  So, yeah, they're associated with each other.  But even then, even then, they got, what he said was 7.8 percent association. That's so low it's beyond reckoning.

I don't think you could consider anything less than 15 to 20 that would even be relevant.  Here's how he tries to get around that.  He said, "But it was 18 percent in Houston."  With 30 people out of how many people in Houston?  4 million?  They surveyed 30 people?  You can't make the survey on 30 people or anything.  At the very least, he shouldn't be allowed to say that there were 18 percent in Houston, because that's only 30 people.

In Houston, according to them, it should have been 98 percent, not 18.  But that's only out of 30 people in Houston.  Thirty people.  That's not statistically significant, and it shouldn't be allowed in a survey.

And I think that's all I have, sir.

THE COURT: Okay. Thank you. Yes?

MR. BERGHAMMER: Thank you, Your Honor. I'll address Mr. Hanor's arguments in series.

First, his argument regarding timing. You're right, Your Honor, that courts are uniform, that surveys taken before the litigation began regarding fame have been admitted, and defendants have failed to cite a single case that said a survey that was taken before the litigation is inadmissible to show the state of fame. And I may have said that improperly, Your Honor. Defendants failed to cite a single case that shows that a survey that was undertaken during the litigation --

THE COURT: During the litigation, yes.

MR. BERGHAMMER: Right. And there's a reason for that, Your Honor. And the reason is that Buc-ee's fame in 2016 is relevant to Buc-ee's fame in 2012. There is Buc-ee's that's famous now, that is relevant that Buc-ee's was likely famous in 2012. And under defendants' model, it's just simply unworkable because the rule wouldn't apply just to plaintiffs; it would also apply to defendants. So if defendants wanted to put in a fame survey to show that Buc-ee's wasn't famous, defendants would have had to take that survey before they started doing business.

So defendants would have to think anybody

whose marks we might possibly be confused with, we're going to have to do a full litigation survey, spend 50- -- $60,000 for each one of these surveys before we even open business.

Now, that can't be the rule in order to avail yourself of the benefits of the dilution statute. It can't be the rule that you have to do fame surveys. For Buc-ee's, we'd have to do one every month in order to catch every potential defendant, and when they might be beginning, and every defendant has to do a survey for everyone they might potentially infringe before they begin business. It's simply not workable. And that's why there are no cases that exclude surveys for allegedly being too late. That's point number one regarding timing.

Also, regarding timing, defendants tried to make a big deal that Buc-ee's opened additional stores after May 1, 2012. On May 1st, Buc-ee's had 27 stores, May 1, 2012. Since then, Buc-ee's has opened -- it was eight, now it's nine stores, because Buc-ee's opened in Katy as well. But in May 1, Buc-ee's had 27 stores.

Next, defendants complain about the mark that Dr. Simonson chose, that Dr. Simonson chose the mark used by defendants as black circle, yellow background, alligator. Well, A, that's the only portion of all of defendants' logos. That's common. All of their logos,

whatever words they put in or don't put in, that's the part that's common.

Second, defendants themselves have admitted that there is no material difference between the marks that they use. And I'm going to quote from some of their briefs. In their reply as a part of their motion for partial summary judgment, defendants state, and I quote, "As stated in defendants' motion for partial summary judgment, there is no material difference between the different variations of the Choke Canyon marks."

In defendants' objection to the recommendation of denial for defendants' motion for partial summary judgment, defendants state again, and I quote, "There is no material difference between the marks."

So defendants themselves are admitting that there's no material difference.

Next, Mr. Hanor complains that Dr. Simonson did not show respondents' billboards first. I will note that neither did Mr. Robertson. In trying to prove likelihood of confusion, Mr. Robertson did not show billboards. He showed the front of the store, but he didn't show any billboards. So defendants are trying to apply a standard to Dr. Simonson that did not apply to their own expert.

Next, Your Honor, regarding the alleged back buttons.  This is a case where I feel like no good deed goes unpunished.  This is a case where we bent over backwards to give defendants what they wanted in discovery.  And defendants were constantly changing what they wanted in discovery.  And, so, we constantly agreed to give them whatever they wanted, including live links to the survey.

So -- and, so, we gave defendants the ability to take the survey exactly as the respondents had done.  We know that they took the survey because we know that they accessed it through the software.  They have presented nothing to Your Honor from them taking the survey live that shows a back button, or that shows a lack of page breaks.  And we also know from the coding instructions that are included in Dr. Simonson's report, that there was no back button.

So all of that is just red herrings, Your Honor.

I think that's all.

THE COURT:  Thank you.

MR. HANOR:  Your Honor, regarding the cases -- and we cite a case in our brief which is -- it's a Westlaw 2006, Westlaw 511, 1112 (4).  And what it states is, "Many courts have admitted secondary meaning --"

THE COURT:  You're going to too fast.  Start the quote over again.  "Many courts..."

MR. HANOR:  "Many courts -- other courts have admitted secondary meaning surveys after the introduction of the alleged product, 'where the time difference was insubstantial,' or the marketplace was unchanged."

He talks about the 27 stores in.  2012 only three of them counted.

THE COURT:  Only three of them what?

MR. HANOR:  Only three of them counted. That they weren't famous because of their little convenience stores around the small towns of Texas.  If they had any fame, any fame -- and you don't -- usually you don't need to do a survey to tell if someone is famous.  You know.  There's a difference between being well-known and famous, because the dilution statutes is a different statute.

It allows you to enjoy somebody from using a mark when your goods and services are totally different. And it was designed for a mark that was almost the same and the good and services very, very different.  And it was designed to help very famous marks to let people like they can't use Microsoft perfume, they can't use -- sell Buick tennis shoes, they can't use marks that you know

famous on very, very different goods.  And this case is upside down.  The marks are very, very different.  And, yeah, admittedly the goods and services are identical.  Dilution wasn't even intended for that.  It wasn't -- that's why the likelihood of confusion is for.  They can't compare our surveys to theirs, because ours is likelihood of confusion.  There's a big difference in those types of surveys.  So it's just not fair to make that comparison regarding that.

But dilution is very different.  There's an exception to likelihood of confusion, and dilution statues shouldn't be liberally interpreted because they're taking people out of competition that are in totally different markets.  And there's a reason why the dilution statutes are very strict.  That he had to show an association such as to cause dilution of the mark.  It isn't enough to show association.  You have to show that you have lessened the recognition of the mark.  And I agree, it's very, very difficult to do.

But, usually, in a real dilution case, which this is not one, you know it when someone comes up with Microsoft perfume.  You know that if Microsoft is a famous mark, you don't have to do a survey to do that.  And you've got to remember, in this case here, they don't qualify for the federal statute.

THE COURT:  This isn't my Microsoft perfume because we're talking about the same industry; right?

MR. HANOR:  That's right.  Because it's not a dilution case.  It wasn't -- dilution law wasn't designed for this type of case.  I'm not sure I can find a case where the marks are totally different.  But one of the -- the first criteria that you have in a dilution is case is similarity of the marks.

THE COURT:  That's the heart of this case, isn't it?

MR. HANOR:  Yeah.  But usually dilution cases, there's a series of cases --

THE COURT:  You're going too fast.

MR. HANOR:  There are dilution cases which state that the mark had to be identical, or substantially the same.  In other words, you don't have a deal like likelihood of confusion.  In other words, the mark had to be almost identical as to a dilution case.  That's what the statute was designed for, to keep people from eroding very famous marks using, identical mark --

THE COURT:  I think that's what this whole case centers on that, and the parties obviously disagree.  But that's what this case is about.

MR. HANOR:  This is a Texas dilution, though.  So they're going to have to -- and this is going

to be another issue we're going to have decide in this case, because they're not -- I don't think they could prove they were famous in Texas in 2012. I don't recall that they were. I mean, they just didn't have the stores there to do that. They weren't there at all. And, you know, they added these stores.

THE COURT: I think that's what he's claiming. I think that's what he's claiming. I think he was claiming he had 27 stores in 2012.

MR. HANOR: I don't know of 27 stores, but only three of them counted. Little tiny stores, 3,000-square foot stores had nothing to do with any fame. That's for sure. They say they had 27 stores. Valero has 3,000. Valero -- or 3500. Is it 3500, I believe Valero? The famous, same people have thousands of convenience stores, corner store, Valero.

THE COURT: I understand.

MR. HANOR: The 27 is nothing, least of all to make them fame. If they were famous for anything in 2016 and it's shown in their bathrooms, there's only one thing they're famous for. In fact, there's two reasons to stop at Buc-ee's. They put on the billboards: number 1 and number 2.

THE COURT: Okay.

MR. HANOR: And, so, I don't agree with him

on that, as far as we're talking about dilution.  The other issue is that I don't see how you can have dilution when the territories don't overlap.  So how -- they're going to enjoin us from using a mark in a territory when they're not?  I don't think dilution even applies.

THE COURT:  Okay.  Let me ask.  Are you here on my 3:00 o'clock docket?

UNIDENTIFIED:  Yes, Judge.

THE COURT:  How long is this case going to take?

UNIDENTIFIED:  5, 10 minutes.

THE COURT:  Let me interrupt, do that, and I'll be back with the rest of you.  Let me just get my notes.

**(Recessed at 2:54 p.m.)**

THE COURT:  Okay, gentlemen.  I'm sorry for the interruption, gentlemen, ladies.  Excuse me.  I'm sorry.  Okay.  Where were we?

MR. BERGHAMMER:  We were still arguing about Dr. Simonson's report.  And we had filed --

THE COURT:  Do you want another turn at bat?

MR. BERGHAMMER:  Can I have one more turn at bat, and I'll keep it short?

THE COURT:  Yes.

MR. BERGHAMMER:  Thank you, Your Honor.

First of all, Your Honor, Mr. Hanor argued that the dilution statute does not cover instances where the marks are the same or maybe he -- I mean, where the products are similar.  Or at least I'm interpreting him as saying that, and I want to make sure that Your Honor knows that that's incorrect as a matter of law, that the dilution statute, both the Texas dilution statute and the federal dilution statute say that dilution applies -- it can occur in the presence or absence of competition between the parties.  So even if the parties are competing regarding the same products, dilution can apply.

There's also several cases that have found that where it's the exact same products and defendants are using the diluting mark, that that causes dilution.  One of the cases the Michael Kors case out of the Southern District of Texas, another case is the Emerald City case out of the Eastern District of Texas.

Second, Your Honor, defendants are arguing that the marks have to be identical in order for dilution to apply, or almost identical.  And Your Honor pressed defendants on this, but I want to emphasize that the Texas dilution statute does not give factors for, to show dilution.  It does give factors for fame, but not dilution.  But the Texas statute says it was written to comport with the federal statute.

The federal statute gives six factors for proving when there's dilution by blurring. Only one of the factors is the degree of similarity between the mark or trade name in the famous mark. And there's five additional factors.

So the marks don't have to be identical, and the similarities of the marks is only one factor that goes into the dilution analysis.

Your Honor, I also want to point out that defendants have admitted that Buc-ee's mark is famous today. And Judge Palermo in her report states, and I'm quoting, "Defendants acknowledge that Buc-ee's marks are currently famous, thereby suggesting that they were famous in 2012, a few years prior."

Finally, Your Honor, defendants brought up Microsoft several times that Microsoft is clearly a famous mark. And that's interesting because of Dr. Simonson's survey, he found that in Texas, Buc-ee's logo has more recognition than Microsoft. So Buc-ee's is more recognized by people in Texas than Microsoft, whom defendants claim is famous.

THE COURT: Okay.

MR. BERGHAMMER: Thank you, Your Honor.

THE COURT: Mr. Hanor? Nothing more?

Okay. We have plaintiff's motion to

exclude any reference to alleged fail surveys or other surveys.  Is that next?

MS. MITRIUS:  Yes, Your Honor.

THE COURT:  Are you going to do that next.

MS. MITRIUS:  I will.

THE COURT:  Okay.

MS. MITRIUS:  Your Honor, Buc-ee's has filed this motion because in several of defendants' motion, defendants have speculated that Buc-ee's performed surveys prior to Dr. Simonson's survey that were failed, and that they plan to argue and ask a question and insinuate that there were some alleged failed surveys that were done before Dr. Simonson's survey, and that they were either provided to him or somehow used to influence his survey.

And our motion is that he should be precluded from making those speculative arguments and insinuations because there's simply no support at all that there were any alleged surveys to begin with prior to Dr. Simonson, or that they failed.

THE COURT:  I think I'm on your side on this one.

MS. MITRIUS:  Okay.

THE COURT:  I hate to cut you off.

MS. MITRIUS:  No.  That's okay.  I don't want to give you more than you need.

THE COURT:  In Texas, when you strike oil, you quit drilling.

Let me hear from Mr. Hanor.

MS. MITRIUS:  Okay.

MR. HANOR:  I'm going to question if there were additional surveys were conducted.

THE COURT:  The reason I don't want to get into that is whenever -- this anticipates the other issue of other lawsuits -- we start arguing about something that is not part of this lawsuit at all, and there's no logical end to it.

MR. HANOR:  But there is in this case.

THE COURT:  We try another lawsuit besides this one.

MR. HANOR:  There is in this case, because as we pointed out in our question of Dr. Simonson's report, we'll certainly ask him, "Were any other surveys conducted?"  "Were there any baseline surveys conducted?"

And we know that they conducted on other surveys because I showed you one just a little bit earlier.  When I tried to depose their head of marketing about this, they refused to let him answer any questions about surveys.  But I, honestly, going to ask Dr. Simonson, "Did you or anyone else at Buc-ee's conduct any surveys prior to 2016 to show the baseline?"

THE COURT:  But plaintiff says that the answer is no.  And do you have reason to controvert that answer.

MR. HANOR:  No.  But I get to bring it up to the jury, don't I?  Don't I get to put that into evidence?  I know the other survey was conducted was the one that you talked about that I showed you earlier.  They've done market studies.  They didn't produce it.  But I don't know why they brought this motion.  I don't know -- how can I infer anything that's not there?  I can ask them if they did any other surveys, and if they say no, that's going to be it.

THE COURT:  Why are we doing all this heavy breathing over something that doesn't exist?

MR. HANOR:  I don't understand myself.  I don't understand.

THE COURT:  I'm missing something.

MR. HANOR:  They're trying to block me from asking anything about any surveys.  And I'm going to ask him, obviously.  I'll ask several of the witnesses:  Did you conduct any surveys regarding fame prior to that time --

THE COURT:  Okay.

MR. HANOR:  Because I want to put it in evidence.

THE COURT:  Okay.  At one point defendants moved to compel production of prior surveys, Judge Palermo ordered Buc-ee's to provide more specificity regarding whether the surveys exist.  Buc-ee's amended discovery responses say, "No prior surveys exist."  Defendants still believe -- if we're going to --

MR. HANOR:  I showed you --

THE COURT:  If we're going to have a fight about this, let's have it now and not take up the jury's time.  I don't understand why we're fighting about this.

MR. HANOR:  I don't either.  I'm going to ask Dr. Simonson:  Did you conduct any baseline surveys?

MS. MITRIUS:  And, Your Honor --

MR. HANOR:  He's going to say no, and that'll be it.  I can't say:  Well, did you conduct a survey and it failed.  I'm just going to ask him:  Did you conduct a survey?

MS. MITRIUS:  And, Your Honor, that would -- if that is all that he wanted to ask, that -- to ask Dr. Simonson:  Did you conduct any surveys prior to the one that is in your report?  And he says no, and that's all he wants to ask, we're perfectly fine with that.  But as pointed out in our brief on Pages 5 and 6, that's not the way that he intends to use it.  I mean, he has statements, "Companies that can afford it like Buc-ee's

don't --"

THE COURT:  No.  You're going too fast.  No. No.  No.  You're going to fast.  Start the quote over again.

MS. MITRIUS:  I'm sorry.  He says, "Companies that can afford it like Buc-ee's do not fly by the seat of their pants and rely solely on intuition," insinuating that there were some surveys that were provided.

Plaintiff's counsel would have steered him clear of any mistakes made by the earlier researcher, talking about us talking to Dr. Simonson.  If plaintiff had not conducted any surveys, prior to those of Dr. Simonson, it would have used that opportunity to explicitly say so.  His briefing is unreal -- excuse me. "Is it realistic that a billion-dollar a year company like plaintiff never did any market study or survey of its own for anything?"  Those are the kinds of comments that Buc-ee's is trying to prevent.

THE COURT:  Those are closing argument comments.  We're not going to be able to get that in question and answer; right?

MS. MITRIUS:  That's what we want to preclude.  We want to preclude that our marketing director is on the stand and a question is posed to him, you know:

Buc-ee's is a billion dollar company.  You seriously want us to believe that it doesn't conduct surveys?  We're trying to prevent those kinds of surveys.

THE COURT:  You're trying to prevent comment, not question.

MS. MITRIUS:  Correct.

MR. HANOR:  I may want to argue to the jury that a billion-dollar company like -- and they were a big company in 2012.  They could have afforded to do a baseline survey.  I should be able to ask -- tell the jury they didn't do those surveys then --

THE COURT:  Well --

MR. HANOR:  -- in closing argument.  I don't understand what they're trying to do.  I have a right to say these things.

THE COURT:  Well, but they didn't do a survey.  Let's assume that's a fact.  So what are you going to make of that in a closing argument?

MR. HANOR:  Probably nothing.  Probably nothing.  Unless -- it depends on what the evidence is at trial.  I don't know what is going to come out at trial. I tried to -- when I tried to take his deposition, they asserted attorney-client privilege and wouldn't let me question him on that.

MS. MITRIUS:  Your Honor, all --

MR. HANOR:  But all I'm -- he's not going to take -- she's not going to assert attorney-client privilege at trial when he gets on there and I ask him whether he's conducted any surveys.  It's not privileged.

MS. MITRIUS:  To the extent that there is information in surveys that he's talking -- that he only has knowledge of it through communications with counsel, those communications are privileged.  And we're fine with Mr. Hanor talking about, in closing argument, saying Buc-ee's didn't perform a survey.  We're fine with that. What the problem is the insinuation that somehow there were these surveys and that they were failed surveys is the -- is what we are trying to prevent.

MR. HANOR:  And that depends upon the evidence that comes out at trial.  If nothing comes out at trial, I'm not going to be arguing it at closing.

THE COURT:  I just hate to postpone an argument about this because presumably you served discovery request to the other side.

MR. HANOR:  I did.

THE COURT:  And their response was there were no such surveys?

MR. HANOR:  Well, I know that's wrong because I handed you one.  There obviously were surveys.

MS. MITRIUS:  And, Your Honor, that's not a

survey.  But the -- that was a reporting of where customers of Buc-ee's from their credit card, where they live.  It wasn't a survey regarding the Buc-ee's logo.

MR. HANOR:  Your Honor, that's a survey.  And the interrogatory was survey, studies, there's broader than just surveys.  It's surveys and studies, and that was a study.  And that should have been produced and should have been responded to in the interrogatory.

MS. MITRIUS:  It was surveys regarding logo, Your Honor.  This is where customers -- this is regarding customers that -- customers of Buc-ee's and where from a geographical perspective what zip codes their credit cards come from.  And that shows what the customer base of Buc-ee's is.  That's not what his -- that's not what his interrogatory was asking for.

MR. HANOR:  I think it's a nonexistent problem.

THE COURT:  Well, we're sure arguing about it a lot.

MR. HANOR:  Well, I don't want to be hamstrung because I don't know what evidence is going to come out.  I'll represent to the Court, if no one says anything that they did any surveys, they all deny they did any surveys, I'm not going to talk about failed surveys.  It's that simple.

MS. MITRIUS:  Your Honor, we're willing to stipulate that we didn't do any surveys relating to defendants' or Buc-ee's logo prior to Dr. Simonson's survey.  We're happy to stipulate to that.

MR. HANOR:  That's not what the interrogatory was.  There was a request to produce any study regarding their marks.  And how could you not -- any study they do on their marketing is regarding their mark, recognition.  It was much broader than that.  But, again, it's not an issue.  It's just one of the 17 motions to, in limine that they filed.  I'm deluged with motions in limine.  I feel like there's a straightjacket on me.

THE COURT:  There are a lot of motions filed.  I agree.

MR. HANOR:  I've never seen anything like it in my life.  They've got to keep out the facts.  They can't let in the true facts.

MS. MITRIUS:  We're just trying to keep out the facts where there's no support.

THE COURT:  Okay.  I will carry this motion along with the trial.  I will say a lot of motions in limine are better handled in the context in which the evidence is being offered than in an abstract, like we're doing today.  Maybe the trial will give the survey -- maybe the trial will give some content to the survey

issue.  But if we don't have any evidence of other survey, I'm not going to allow reference to it in closing arguments.

MR. HANOR:  I don't dispute that, Your Honor.

THE COURT:  Okay.  What's next?

MR. RICHARDSON:  Judge the next motion is the to exclude the material regarding Buc-ee's with a "Y."

THE COURT:  Buc's, yes.

MR. RICHARDSON:  Couple of things, Judge.  In regard to this motion.  Of course, what this seeks to do is prevent any discussion regarding another lawsuit.  A lawsuit that occurred in 2008 resulted in a settlement, and then we recently re-sued Buc's.  And Mr. Hanor can express as to why he thinks we did, but in that agreement was a paragraph that talked about confusion.  And if there was confusion, the parties would do their best to eliminate that confusion.  Our position was that Buc-ee's with a "Y" came into Texas, they created some confusion, yet they didn't take any steps to fix that confusion.  They continued to go on.  So we ended up suing them.

Interesting fact in that case is that Judge Hittner had that case initially.  He retained a portion of it.  He sent a portion back to Nebraska because the agreement had a venue clause in it.  So it's still

ongoing.  There are basically two cases now:  One here and one in Nebraska.

It's our position that that's not relevant at all to this case.  This case is about the beaver logo and the Choke Canyon logo, and the similarity between those two logos.  The Buc's case was about the word Buc-ee's.  It was a word mark.  Had nothing to do with our logos.  Therefore, it's just not relevant.

Interesting fact that the hearing in that case, every time defense counsel would talk about Buc-ee's, he would told up a piece of paper.  Buc-ee's with a "E" when he talked about it, Buc-ee's with a "Y" when he talked about that.  Had nothing to do with the logo.  Had to do with the wording.  So we just don't think that it's relevant to this case at all.

And we included for you, Judge, the exhibits that deal with that topic.

The defense attempts to show the relevance in three areas.  Two of them I want to discuss and knock out real fast.  One is the laches defense.

THE COURT:  The what defense?

MR. RICHARDSON:  Laches.

THE COURT:  Laches.

MR. RICHARDSON:  And, Judge, laches is a defense.  And in this case, it's not a liability issue.

It goes more to the damages. But what's important here, too, is that's an equitable defense that's decided by the Court, not by the jury. Therefore, the information is irrelevant. And, in fact, the Buc-ee's with a "Y" has no founding or grounds to even address the beaver logo and how that would apply.

In addition, we also feel that the defense is invalid in and of itself. And the reason being is under Texas law, you find the most comparable statute to the, here the Lanham Act would apply. So you find the most comparable statute to the Lanham Act, which is fraud, and in Texas, the statute of limitations is four years.

Then you go look at when did they start using the mark. The plaintiffs themselves say 2012, I think May of 2012. But that was just one of the defendants, Live Oak. All the others are different.

When it's said and done, there's a four-year statute. We filed the lawsuit in three and a half. So we meet met the criteria anyway. But the majority of them it's even greater than that. So we don't feel that the statute, that laches would apply here.

The other --

THE COURT: Okay. Let me hear from the other side. I think I'm with --

MR. RICHARDSON: Judge, one thing I do want

to address if you don't mind.

So, defense -- defendants throughout the arguments today have brought up the fact that we weren't famous in 2012.  And but yet I find it interesting that he says, "Wow, in 2012 they were a big company.  They sold billions of dollars."  Well, Judge, we all know that sales volumes, articles, things of that nature can go to fame.

So, Judge, just for purposes to address some of these matters, I did bring with me today some articles from as early as October 2008 with comments filled like almost cult-like fans, became a reach out category all of its own.  They took a product with zero excitement -- and this came from a professor from the University of Houston and made it into an institution.  And this is in 2008.  And it's in the *Houston Chronicle* article.  So I brought one of those for you, Judge.

THE COURT:  Okay.  You've got one for the side, too?

MR. RICHARDSON:  Yes, sir.

THE COURT:  Hand it to Mr. Rivera, please.

MR. RICHARDSON:  And, Judge, that's just one article.  I have a whole stack of them.  I have stacks from May of 2012 where the economic development director in New Braunfels talks about the economic impact in how 5,000 vehicles a day will be there, and 8,000 a year in

tax revenue.  It just goes on and on.  We have a whole litany of articles to address that.  2011 from Brian.  2012 from Seguin.

So I just want the Court to be aware that while they want to argue that we weren't famous, articles show otherwise, sales show otherwise.  And counsel themselves have admitted that we were a big company.  So that show otherwise, too.

THE COURT:  Thank you.

MR. HANOR:  Your Honor, last time I looked at these articles like this are hearsay.  They're not going to be admitted in evidence.  But I want to say something about Buc's, and why I think that is relevant.

They did a survey in this case on their fame.  And what they did was show the beaver and say, "What does this remind you of?"  And they're claiming that they had a higher recognition than Microsoft.  That people, when they saw the beaver, they wrote down "Buc-ee's."  One thing they didn't tell you is that 39 people wrote down B-u-c-k-y-'s of the people they surveyed.

What he's talking about is when they did the 2009 lawsuit in Nebraska, they entered into a consent to use register agreement.  That type of agreement has been entered into tens of thousands of times.  And it's a

common technique they use, because it's the only way that Buc-ee's could get their trademark registrations, because they had a consent to use register agreement. And all hundred, tens of thousands of those agreements have a provision in them that says in case of any confusion, you will take steps to avoid confusion. And they said that they took steps when confusion occurred. Buc-ee's or Buc's hasn't even built a store in Texas. How in the world could confusion occur? This is a new history of confusion in the trademark as occurring when they're, I don't know, thousand miles away? I don't know how far St. Louis from Houston. It's a long way away. There couldn't possibly be anything -- any reason for that.

Buc-ee's and the beaver are synonymous. Buc-ee's is the name of the beaver. Obviously, if somebody can come in here and use Bucky's, B-u-c-k-y-'-s, which that's what the settlement agreement says, they gave them a right to do that, then obviously it can't be as distinctive as it is for the other.

And I'm not sure that laches would be limited to the damages phase, because why couldn't the jury -- someone's got to find a fact that they unduly delayed and also for estoppel. I agree the Judge makes the determination, but someone has to make a determination that they unduly delayed.

Let's look at a couple of things here. They sued Chicks before they even opened. They sued Buc's before they even opened. We had been in operation for three and a half years. They didn't sue us until we bought that property next to Luling, Texas. They let us -- my client built -- they built a restaurant and used -- took away the big Exxon sign and put up a Choke Canyon sign in 2012 down in Whitsett.

THE COURT: Down where?

MR. HANOR: Down in Whitsett, Texas. And what did Buc-ee's say? Nothing.

In 2013, my client filed a U.S. Trademark application. That mark was examined, Trademark Office -- U.S. Patent and Trademark Office found no confusion. They published it. And believe me, Buc-ee's knew about trademarks then. And they did nothing and the mark got registered.

My client continued expanding. And in 2014, built a restaurant in San Antonio, a standalone restaurant. And they opened that. Didn't hear anything from Buc-ee's.

In 2014, it begins constructing its big store in what I call Atascosa 20 miles southwest of San Antonio on I-35, and he spent over $10 million building that store. And that was in January of 2015.

And he didn't file suit -- they didn't file suit until December 2015.

They talk about statute of limitations. You don't have to have the statute of limitations run to have estoppel. They can't set their -- they'd had to have been in solitary confinement not to know that we were there. There's no way they could have not known that. And, yet, here's the telling thing: When they produced their documents, not a single document they produced referred to us. Not a single document. In all their files, there are probably millions of pages of documents. You won't find us in those documents.

Now, maybe it's because they didn't think we existed or anything, but it's hard to believe that we didn't. And, so, these that's something that's going to have to be determined. Did they unduly delay bringing this case? Why don't I wait for the damages phase to do that? If there's laches, I don't get to damages. I don't get to it. Or if there's estoppel, I don't get to it.

I don't see how that it's not relevant that somebody here is using Bucky's, B-u-c-k-y-'-s, or going to be. The reason they filed that suit, which I think they know they're going to lose, is that they didn't want this evidence in this case. And they're using that in this case to try to keep it out.

THE COURT:  Once again, my hesitation on these matters is anytime we start talking about another lawsuit, we end up trying that lawsuit, too.  And there's litigation pending, I guess there's it's litigation pending in two federal courts.  I just see potential for enormous delay and confusion if we start getting into this other lawsuit, or these other lawsuits.

MR. HANOR:  What happens when the Nebraska judge pours them out?

THE COURT:  I don't know what happens.  I don't know the case, but I don't think it bears on this case.

MR. HANOR:  It does when the market is Buc-ee's because that's the name of the beaver.  And there's going to be people down here using Bucky's, B-u-c-k-y-'-s.

THE COURT:  I understand your argument.  Okay.  Thank you.

MR. HANOR:  It's the name of the beaver.  They tried to prove that with their survey.

THE COURT:  I think we have people line for 3:30.  Please be patient.  We'll get to you as soon as I can.

MR. RICHARDSON:  Judge, one last comment, and I'll move, so we can get to the next motion because I

think I know how Your Honor feels. This survey was not about how to spell Buc-ee's. The survey was what do you associate the logo with the beaver? And people put Buc-ee's. Some people put it with a "Y," some people put it with a "E." And just to show if the State of Texas can't get it right, then how would anyone else get it right? And for Your Honor I brought an exhibit, which is a TP2 document attached to a billboard out on Highway 6 with a Buc-ee's store. And if you notice, it's spelled Buc-ee's with an "E" express. So the State of Texas can't get it right.

You know if you look in the newspapers a lot of times when people spell Buc-ee's, they say it's spelled like Buc-ee's with a "Y." So that's a common occurrence. It's in all of our websites -- I mean, it's in all of our comments. People always write Bucky with a "Y." So nothing new there.

And, Judge, also, we don't agree that, I mean, ours is an association. We say that the beaver logo is associated with the name Buc-ee's. It's not synonymous. And that's a big difference.

And then, finally, on the survey itself, Judge, even if you took out those people that put Bucky's with a "Y," that's only 7.5 percent. It still shows that 71.7 percent recognize the beaver logo.

THE COURT:  Okay.

MR. RICHARDSON:  Judge, the next motion we have is just about the other lawsuits.  All the other cases that we filed against other people that we think infringed.  There again, relevance I think I know the Court's position on prior lawsuits.  You expressed it.  So with that said, if I need to rebut, I will, but I'll turn it over to Mr. Hanor on that topic.

THE COURT:  Okay.  Yes, sir?

MR. HANOR:  Your Honor, we are honored to have this as the first case in history where a plaintiff tried to block the fact of other lawsuits for the identical mark, for the identical goods and services, for the identical claims.

Those other lawsuits were for the identical mark.  They were the Buc-ee's beaver, with the identical mark, the identical goods and services, and they had the identical claims.  In fact, if you look at the other suite, it's identical to our suit.  They're absolutely identical.  And I'll tell you why those are relevant.

The other lawsuits are about the beaver logo, they claim that their mark is distinctive, filing lawsuits to protect the mark affects the strength of the mark, failure to place a mark against infringers weakens

the mark.  Filing suits that lack merit shows that the mark is not really distinctive.  It's up for the jury to decide what the lawsuits mean.  I should be able to bring in the fact that they sued Chicks with their logo.  I should be able to bring that in.  I should be able to bring in the other suits they have.  The identical lawsuit --

THE COURT:  Are we going to get into the outcome of those lawsuits, or just the facts suites?

MR. HANOR:  They all settled.  I don't care. I'll just bring in that they sued them.  They all settled. They settled instantly.  They settled almost instantaneously.

And I'll tell you one reason I want to bring in the Chicks suit.

THE COURT:  How does that help you?

MR. HANOR:  Because it shows how they used their suites.  I'm going to ask for my attorney's fees in this case.  And at the end of this case, before we get into any damages, if I'm successful, I'm going to ask for my attorney's fees.

THE COURT:  I understand that.

MR. HANOR:  And I'm going to bring in the fact that these cases were not brought in good faith.  How am I going --

THE COURT:  How does the fact they settled show they're not brought in good faith?

MR. HANOR:  Look at the marks, the Chicks mark.  It's like our mark.  It looks nothing like the beaver.

THE COURT:  That's what we're going to get into.  We'll get into another lawsuit that's not pending here, and whether those marks are similar.  We're going to have lawsuits within lawsuits.

MR. HANOR:  All I care is that I bring in the fact that they sued these other people.  They should bring that in, and that they agreed to quit using the mark.  Why wouldn't they bring it in?  This is the first case in history where a plaintiff is desperately trying to keep out their own lawsuits.  Are they ashamed of them?  I mean, do they think the jury is going to hate them because they see the lawsuit?  I don't know why they would, if -- they shouldn't.  It's their own lawsuits.

THE COURT:  Okay.  Thank you very much.

MR. RICHARDSON:  Judge, just a couple comments for rebuttal.

Number one, I've never been in a case where I was able to talk about prior lawsuits anyway.  I mean, because you are right.  It opens up Pandora's box.  It turns a three-day trial into a two-week circus.  And

that's what's going to happen if these things come in, because we're going to have to address every one of them.

And in those cases, you made a point, and the point was:  What was the resolution?  Well, not just what was the resolution, but along the way, what happened with these.  What did the courts say?  So, for example, I know in the Chicks case what the judge had to say about that logo.  And he let that case go forward.  So that should tell you he felt that it probably infringed.

I remember early on in this case, Your Honor -- the comment was made about this is a summary judgment case for Hanor.  And you said, "No.  I disagree. I think this is a question for the jury."

In all those other cases, same deal. Question for the jury.  Naturally what happened.  All we asked in those cases that, "Hey, you change your signs and we're happy."  We did the same thing in this case.  And they did, and it went away.

In this case they chose not to, so here we are further down the road handling these matters.  It's irrelevant to this case.

THE COURT:  I understand the argument.

Let's talk about finally the sales of branded fuels, plaintiff's motion to exclude.

MR. RICHARDSON:  Judge, on this one,

naturally, they're wanting to introduce evidence that we sold branded fuels, and that that should be taken out, and initially to potentially down the road for damages they're going to argue:  Well, because it's excluded, then ours are excluded.  Therefore it's not part of damages.  That is not the case.

Two things:  Number one, we sold and we had both branded and unbranded stations.  So you can't say that Buc-ee's fame is related to Shell.  Plaintiff wants you to believe that Shell plus gas equals Buc-ee's fame. Well, that's not what brought us fame at all.  What brought us fame were all the things that we do:  Clean restrooms, our size, the amount of people we serve, the articles that I talked about that talk about why people like Buc-ee's, they don't mention Shell, and they sure don't mention:  Oh, they have the best gas in the world. Talks about all the other reasons.

To top it off, the Courts have been quite clear that sales are relevant and that you can have a product with more than one mark on it.  And in this case there are two cases, Toys-R-Us and the NASDAQ case where they were selling products with other marks, but it was included in there.

So we don't think that the branded fuel should be an issue in this case.  It is something that we

sold.  And if you let a branded fuel come in, where do you stop?  Do you have to go to Icie's, do you have to go to Coca-Cola, et cetera?

THE COURT:  I understand.

MR. HANOR:  May I approach the Court with these exhibits?

THE COURT:  You may.  Hand them to Mr. Rivera.

MR. HANOR:  They are going to offer their gasoline sales as evidence of their fame.  They're go going to say that these large gasoline sales were evidence of their fame.  That's one of their key points in this case because that's all they got in 2012:  The sales in the store and the sales of their gasoline.

This is what Luling looked like in 2012.  And I'm not entitled to show them what their stores actually look like?  This is absurd.  I can argue that here's what their stores look like, this is what their signs look like.

THE COURT:  Okay.  Thank you very much.

Okay.  I reserve the right to change my mind, but for now, defendants' motion to exclude the survey evidence of Dr. Simonson is denied.

Plaintiff's motion to exclude the survey evidence of Dr. Robertson is denied.

Plaintiff's motion to exclude references to alleged failed surveys, I'm going to carry that along to trial.

Plaintiff's motion to preclude defendants from presenting, referencing or introducing any argument, regarding to Buc-ee's proceedings involving Buc's will also be carried along with the trial.

Plaintiff's motion to exclude evidence of prior enforcement matters, for now I'll grant that.

And then on plaintiff's motion to exclude evidence of argument or arguments asserting Buc-ee's sales of branded fuel were not sold under the Buc-ee's logo, I'm going to deny that.

Thank you very much.

MR. BERGHAMMER:  Thank you, Your Honor.

**(Recessed at 3:42 p.m.)**

**COURT REPORTER'S CERTIFICATE**

I, Johnny C. Sanchez, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/s/_____
Johnny C. Sanchez, CRR, RMR

| $ | | A |
|---|---|---|

**$10** [1] - 58:24
**$60,000** [1] - 33:3

| ' |
|---|

**'where** [1] - 36:5

| / |
|---|

**/s** [1] - 68:22

| 1 |
|---|

**1** [4] - 33:17, 33:18, 33:20, 39:22
**1-37** [1] - 16:12
**10** [4] - 8:25, 12:16, 16:10, 40:11
**100** [1] - 11:24
**1112** [1] - 35:24
**117** [1] - 19:24
**12** [1] - 24:4
**120** [1] - 26:2
**15** [1] - 31:12
**150** [1] - 13:14
**150-mile** [1] - 20:10
**17** [1] - 51:10
**170-mile** [1] - 20:12
**18** [4] - 22:24, 31:14, 31:18, 31:21
**1980** [1] - 10:21
**1st** [1] - 33:17

| 2 |
|---|

**2** [1] - 39:23
**20** [9] - 11:3, 15:18, 15:22, 16:6, 16:12, 16:13, 16:17, 31:12, 58:23
**200-some** [1] - 21:12
**2001** [1] - 11:2
**2006** [1] - 35:24
**2008** [3] - 52:13, 55:10, 55:15
**2009** [1] - 56:23
**2011** [1] - 56:2
**2012** [24] - 25:8, 25:21, 25:25, 26:2, 26:3, 32:17, 32:18, 33:17, 33:18, 36:8, 39:3, 39:9, 42:14, 48:9, 54:14, 54:15, 55:4, 55:5, 55:23, 56:3, 58:8, 67:13, 67:15
**2013** [2] - 25:21, 58:12
**2014** [2] - 58:19, 58:22
**2015** [2] - 58:25, 59:2
**2016** [14] - 14:1, 25:6, 25:19, 25:25, 26:4, 26:25, 27:4, 27:5, 27:17, 30:13, 30:14, 32:16, 39:20, 44:25
**205** [7] - 6:11, 6:15, 6:18, 6:21, 13:22, 22:21, 24:19
**24** [1] - 12:17
**27** [7] - 33:17, 33:20, 36:8, 39:9, 39:10, 39:13, 39:18

**274** [1] - 19:17
**2:54** [1] - 40:15

| 3 |
|---|

**3** [1] - 8:21
**3,000** [1] - 39:14
**3,000-square** [1] - 39:12
**30** [5] - 31:14, 31:15, 31:16, 31:19, 31:21
**3500** [2] - 39:14
**39** [1] - 56:19
**3:00** [1] - 40:7
**3:30** [1] - 60:22
**3:42** [1] - 68:16

| 4 |
|---|

**4** [3] - 8:23, 8:25, 31:15
**4)** [1] - 35:24
**40** [2] - 12:16, 15:8
**450** [6] - 22:21, 22:22, 22:25, 23:6, 23:7, 23:8

| 5 |
|---|

**5** [2] - 40:11, 46:23
**5,000** [1] - 55:25
**50** [2] - 12:1, 33:2
**511** [1] - 35:24

| 6 |
|---|

**6** [2] - 46:23, 61:8
**65** [1] - 18:16
**65,000** [1] - 26:2
**67** [1] - 19:7

| 7 |
|---|

**7.5** [1] - 61:24
**7.8** [1] - 31:9
**70** [1] - 11:20
**71.7** [1] - 61:25

| 8 |
|---|

**8,000** [1] - 55:25
**80** [8] - 11:17, 14:16, 14:17, 14:20, 14:22, 14:25, 20:23, 22:23

| 9 |
|---|

**97** [1] - 19:12
**98** [1] - 31:21

**A&M** [1] - 30:19
**ABC** [2] - 14:2, 30:18
**ability** [1] - 35:10
**able** [6] - 47:21, 48:10, 63:3, 63:5, 64:23
**above-entitled** [1] - 68:21
**absence** [1] - 41:9
**absolutely** [2] - 20:25, 62:20
**abstract** [1] - 51:23
**absurd** [1] - 67:17
**accessed** [1] - 35:12
**according** [1] - 31:20
**acknowledge** [1] - 42:12
**acres** [2] - 12:16, 15:8
**Act** [2] - 54:10, 54:11
**actual** [2] - 20:6, 30:9
**added** [1] - 39:6
**addition** [4] - 14:12, 14:13, 18:17, 54:7
**additional** [3] - 33:16, 42:5, 44:6
**address** [6] - 32:3, 54:5, 55:1, 55:8, 56:2, 65:2
**admissible** [1] - 23:20
**admitted** [9] - 8:7, 29:5, 32:7, 34:4, 35:25, 36:4, 42:10, 56:7, 56:12
**admittedly** [1] - 37:3
**admitting** [1] - 34:16
**advantage** [1] - 28:14
**advertise** [2] - 13:1, 13:2
**advertisements** [1] - 13:3
**advertises** [1] - 28:15
**affects** [1] - 62:24
**affidavit** [2] - 30:2, 30:7
**afford** [3] - 27:15, 46:25, 47:6
**afforded** [1] - 48:9
**agency** [1] - 10:12
**agree** [9] - 4:2, 6:6, 21:20, 21:23, 37:19, 39:25, 51:14, 57:23, 61:18
**agreeable** [2] - 5:5, 5:6
**agreed** [2] - 35:6, 64:12
**agreement** [7] - 5:18, 52:15, 52:25, 56:24, 57:3, 57:17
**agreements** [1] - 57:4
**agrees** [5] - 5:23, 6:1, 21:22, 21:23
**ahead** [2] - 5:7, 22:15
**air** [1] - 18:16
**aired** [1] - 14:2
**alike** [2] - 13:19, 23:25
**alleged** [8] - 4:16, 20:8, 35:1, 36:5, 43:1, 43:12, 43:18, 68:2
**allegedly** [1] - 33:13
**alligator** [10] - 19:21, 19:22, 27:23, 28:9, 28:18, 28:22, 28:25, 31:4, 33:24
**allow** [1] - 52:2
**allowed** [2] - 31:17, 31:23
**allows** [1] - 36:19
**almost** [5] - 36:21, 38:18, 41:20, 55:11, 63:12
**alone** [1] - 28:18
**amended** [1] - 46:4

**amount** [3] - 7:19, 30:5, 66:13
**Amstar** [1] - 10:20
**analysis** [1] - 42:8
**animal** [2] - 20:3, 24:14
**answer** [6] - 29:10, 29:12, 44:22, 45:2, 45:3, 47:22
**anticipated** [1] - 27:8
**anticipates** [1] - 44:8
**Antonio** [19] - 6:22, 7:5, 7:12, 12:5, 12:7, 13:10, 14:2, 15:18, 15:23, 16:6, 16:7, 16:9, 16:13, 18:9, 18:10, 18:12, 30:17, 58:19, 58:24
**anytime** [1] - 60:2
**anyway** [2] - 54:19, 64:23
**apologize** [3] - 5:8, 5:12, 24:20
**application** [1] - 58:13
**applies** [2] - 40:5, 41:8
**apply** [9] - 32:20, 32:21, 34:24, 41:11, 41:20, 54:6, 54:10, 54:21
**approach** [2] - 7:24, 67:5
**approves** [2] - 19:18, 19:24
**area** [5] - 6:22, 9:1, 9:3, 9:5, 9:19
**areas** [5] - 7:18, 8:16, 9:17, 15:1, 53:19
**argue** [7] - 4:19, 22:7, 43:11, 48:7, 56:5, 66:4, 67:17
**argued** [2] - 4:13, 41:1
**arguing** [5] - 40:19, 41:18, 44:9, 49:16, 50:18
**argument** [12] - 10:17, 20:8, 32:4, 47:20, 48:13, 48:18, 49:9, 49:18, 60:17, 65:22, 68:5, 68:11
**arguments** [5] - 32:3, 43:16, 52:3, 55:3, 68:11
**article** [4] - 30:17, 31:6, 55:16, 55:22
**articles** [8] - 13:25, 14:4, 55:7, 55:10, 56:2, 56:5, 56:11, 66:14
**ascertain** [1] - 25:17
**ashamed** [1] - 64:15
**aspects** [2] - 21:18, 21:21
**assert** [1] - 49:2
**asserted** [1] - 48:23
**asserting** [1] - 68:11
**associate** [3] - 31:3, 31:4, 61:3
**associated** [9] - 19:9, 19:13, 25:15, 25:16, 28:2, 30:21, 31:8, 61:20
**association** [6] - 27:20, 27:21, 31:9, 37:16, 37:17, 61:19
**assume** [1] - 48:17
**Atascosa** [6] - 9:11, 12:12, 15:18, 15:20, 28:5, 58:23
**Atascosita** [3] - 15:20, 16:8, 16:16
**attached** [1] - 61:8
**attempts** [1] - 53:18
**attorney** [2] - 48:23, 49:2
**attorney's** [2] - 63:18, 63:21
**attorney-client** [2] - 48:23, 49:2
**attract** [1] - 17:24
**authorities** [1] - 21:5
**avail** [1] - 33:6
**avoid** [1] - 57:6
**aware** [1] - 56:4
**awhile** [1] - 12:8

**B**

**B-u-c-k-y-'-s** [3] - 57:16, 59:21, 60:16
**B-u-c-k-y-'s** [1] - 56:20
**background** [2] - 24:13, 33:23
**backwards** [1] - 35:4
**barbecue** [3] - 28:7, 28:15, 28:17
**base** [2] - 27:1, 50:13
**baseless** [1] - 26:22
**baseline** [9] - 25:13, 26:21, 27:1, 27:18, 44:18, 44:25, 46:12, 48:10
**baselines** [1] - 25:18
**bat** [2] - 40:21, 40:23
**bathrooms** [1] - 39:20
**bears** [1] - 60:11
**beaver** [17] - 19:11, 27:24, 31:4, 53:4, 54:5, 56:15, 56:18, 57:14, 57:15, 60:14, 60:19, 61:3, 61:19, 61:25, 62:16, 62:22, 64:5
**became** [1] - 55:11
**began** [1] - 32:6
**begin** [2] - 33:11, 43:18
**beginning** [1] - 33:10
**begins** [1] - 58:22
**belonged** [1] - 24:19
**benefits** [1] - 33:6
**bent** [1] - 35:3
**Berghammer** [2] - 4:13, 22:15
**BERGHAMMER** [26] - 5:8, 5:11, 6:4, 6:13, 6:16, 7:16, 7:24, 8:3, 8:5, 8:18, 9:4, 10:18, 18:22, 18:24, 19:2, 19:4, 24:3, 24:6, 24:16, 32:2, 32:14, 40:19, 40:22, 40:25, 42:23, 68:15
**best** [2] - 52:17, 66:16
**better** [2] - 18:19, 51:22
**between** [9] - 25:25, 26:3, 34:4, 34:9, 34:14, 36:16, 41:10, 42:3, 53:5
**beyond** [1] - 31:10
**big** [15] - 9:13, 17:8, 17:22, 28:3, 28:6, 28:14, 30:20, 33:16, 37:7, 48:8, 55:5, 56:7, 58:7, 58:22, 61:21
**bigger** [1] - 18:2
**billboard** [2] - 28:2, 61:8
**billboards** [10] - 11:24, 11:25, 13:2, 13:4, 13:6, 18:17, 34:19, 34:22, 34:23, 39:22
**billion** [4] - 27:14, 47:16, 48:1, 48:8
**billion-dollar** [2] - 47:16, 48:8
**billions** [1] - 55:6
**bit** [2] - 5:9, 44:20
**black** [1] - 33:23
**blind** [1] - 13:1
**block** [2] - 45:18, 62:12
**blurring** [2] - 26:23, 42:2
**bought** [5] - 11:16, 11:19, 12:15, 15:8, 58:5
**box** [1] - 64:24
**branded** [7] - 4:23, 65:24, 66:2, 66:8, 66:24, 67:1, 68:12
**Braunfels** [2] - 26:1, 55:24
**breaks** [5] - 29:7, 29:8, 29:10, 30:9, 35:15
**breathing** [1] - 45:14
**Brian** [1] - 56:2
**brief** [3] - 9:12, 35:23, 46:23
**briefing** [1] - 47:15
**briefs** [2] - 21:16, 34:6
**bring** [11] - 45:4, 55:9, 63:3, 63:5, 63:6, 63:11, 63:15, 63:23, 64:10, 64:12, 64:13
**bringing** [1] - 59:16
**broad** [1] - 31:3
**broader** [2] - 50:5, 51:9
**brought** [9] - 42:15, 45:9, 55:3, 55:16, 61:7, 63:24, 64:2, 66:11, 66:12
**Buc** [77] - 4:6, 4:15, 4:20, 4:21, 4:22, 4:23, 11:14, 11:24, 15:11, 19:14, 19:19, 19:22, 20:1, 21:3, 21:9, 24:10, 32:16, 32:17, 32:18, 32:22, 33:8, 33:16, 33:17, 33:18, 33:19, 33:20, 39:22, 42:10, 42:12, 42:18, 42:19, 43:7, 43:9, 44:24, 46:3, 46:4, 46:25, 47:6, 47:19, 48:1, 49:10, 50:2, 50:3, 50:11, 50:14, 51:3, 52:8, 52:18, 53:7, 53:11, 53:12, 54:4, 56:19, 57:2, 57:7, 57:14, 57:15, 58:11, 58:15, 58:21, 60:14, 61:2, 61:4, 61:9, 61:10, 61:13, 61:14, 61:20, 62:16, 66:9, 66:10, 66:15, 68:6, 68:11, 68:12
**Buc's** [8] - 4:21, 52:9, 52:14, 53:6, 56:13, 57:8, 58:2, 68:6
**Buc-cee's** [1] - 4:23
**Buc-ee's** [76] - 4:6, 4:15, 4:20, 4:21, 4:22, 11:14, 11:24, 15:11, 19:14, 19:19, 19:22, 20:1, 21:3, 21:9, 24:10, 32:16, 32:17, 32:18, 32:22, 33:8, 33:16, 33:17, 33:18, 33:19, 33:20, 39:22, 42:10, 42:12, 42:18, 42:19, 43:7, 43:9, 44:24, 46:3, 46:4, 46:25, 47:6, 47:19, 48:1, 49:10, 50:2, 50:3, 50:11, 50:14, 51:3, 52:8, 52:18, 53:7, 53:11, 53:12, 54:4, 56:19, 57:2, 57:7, 57:14, 57:15, 58:11, 58:15, 58:21, 60:14, 61:2, 61:4, 61:9, 61:10, 61:13, 61:14, 61:20, 62:16, 66:9, 66:10, 66:15, 68:6, 68:11, 68:12
**Bucky** [1] - 61:16
**Bucky's** [4] - 57:16, 59:21, 60:15, 61:23
**Buick** [1] - 36:25
**building** [1] - 58:25
**built** [5] - 25:25, 57:8, 58:6, 58:19
**bunch** [1] - 24:24
**business** [4] - 17:8, 32:24, 33:4, 33:12
**button** [2] - 35:14, 35:17
**buttons** [3] - 29:20, 29:23, 35:2
**buy** [3] - 16:21, 17:11, 28:11
**buys** [1] - 16:25

**C**

**Canyon** [18] - 9:1, 9:22, 12:1, 19:8, 19:9, 19:13, 27:24, 28:3, 28:4, 28:6, 28:7, 28:15, 28:17, 34:10, 53:5, 58:8
**Canyon's** [5] - 5:22, 5:24, 6:8, 8:21, 35:15

8:24
 **card** [3] - 11:17, 11:19, 50:2
 **cards** [1] - 50:12
 **care** [2] - 63:10, 64:10
 **carried** [1] - 68:7
 **carry** [2] - 51:20, 68:2
 **case** [68] - 10:4, 10:6, 10:20, 10:22, 11:1, 13:17, 15:7, 22:8, 23:12, 25:9, 30:14, 32:8, 32:11, 35:2, 35:3, 35:23, 37:1, 37:20, 37:24, 38:4, 38:5, 38:6, 38:8, 38:9, 38:18, 38:22, 38:23, 39:2, 40:9, 41:15, 41:16, 44:12, 44:15, 52:22, 52:23, 53:4, 53:6, 53:10, 53:15, 53:25, 56:14, 57:5, 59:17, 59:24, 59:25, 60:11, 60:12, 62:11, 63:19, 64:14, 64:22, 65:7, 65:8, 65:10, 65:12, 65:17, 65:19, 65:21, 66:6, 66:20, 66:21, 66:25, 67:13
 **cases** [17] - 10:19, 14:12, 15:7, 33:13, 35:23, 38:12, 38:14, 41:12, 41:15, 53:1, 62:4, 63:24, 65:3, 65:14, 65:16, 66:21
 **catch** [1] - 33:9
 **category** [1] - 55:12
 **cater** [1] - 17:25
 **causes** [1] - 41:14
 **cee's** [1] - 4:23
 **center** [3] - 15:17, 17:17, 28:6
 **Center** [2] - 28:4, 28:17
 **centers** [3] - 15:16, 17:23, 38:22
 **certain** [1] - 23:23
 **certainly** [1] - 44:17
 **CERTIFICATE** [1] - 68:17
 **certify** [1] - 68:19
 **cetera** [2] - 7:12, 67:3
 **challenge** [1] - 15:10
 **change** [3] - 25:21, 65:16, 67:21
 **changed** [3] - 27:2, 27:18, 28:22
 **changing** [1] - 35:5
 **Charlie** [1] - 4:1
 **cherry** [1] - 28:9
 **Chicks** [5] - 58:2, 63:4, 63:15, 64:3, 65:7
 **choice** [1] - 22:12
 **choices** [1] - 6:18
 **Choke** [23] - 5:22, 5:24, 6:8, 8:21, 8:24, 8:25, 9:22, 11:25, 19:8, 19:9, 19:13, 27:24, 28:2, 28:4, 28:6, 28:7, 28:15, 28:17, 34:10, 53:5, 58:7
 **chose** [6] - 7:7, 7:18, 10:12, 33:22, 65:19
 **Christi** [2] - 9:15, 20:11
 **Chronicle** [3] - 14:1, 30:15, 55:15
 **circle** [1] - 33:23
 **Circuit** [1] - 10:20
 **circus** [1] - 64:25
 **cite** [3] - 32:7, 32:11, 35:23
 **cities** [2] - 10:23
 **City** [1] - 41:16
 **claim** [2] - 42:21, 62:23
 **claiming** [4] - 39:8, 39:9, 56:16
 **claims** [2] - 62:14, 62:18
 **clause** [1] - 52:25
 **clean** [1] - 66:12

 **clear** [2] - 47:11, 66:19
 **clearly** [1] - 42:16
 **clerk** [1] - 8:1
 **client** [11] - 11:25, 12:15, 15:8, 17:3, 17:18, 28:14, 48:23, 49:2, 58:6, 58:12, 58:18
 **client's** [1] - 28:1
 **clients** [2] - 12:3
 **close** [2] - 23:17, 28:20
 **closest** [1] - 11:4
 **closing** [6] - 47:20, 48:13, 48:18, 49:9, 49:16, 52:2
 **Coast** [4] - 12:5, 12:8, 13:10, 18:11
 **Coca** [1] - 67:3
 **Coca-Cola** [1] - 67:3
 **code** [4] - 30:3, 30:4, 30:8
 **codes** [3] - 11:18, 11:20, 50:12
 **coding** [1] - 35:15
 **Cola** [1] - 67:3
 **cold** [1] - 5:9
 **comment** [4] - 9:13, 48:5, 60:24, 65:11
 **comments** [6] - 14:5, 47:18, 47:21, 55:10, 61:16, 64:21
 **common** [4] - 33:25, 34:2, 57:1, 61:14
 **communications** [2] - 49:7, 49:8
 **Companies** [2] - 46:25, 47:6
 **company** [7] - 27:15, 47:16, 48:1, 48:8, 48:9, 55:5, 56:7
 **comparable** [2] - 54:9, 54:11
 **compare** [1] - 37:6
 **comparison** [1] - 37:8
 **compel** [1] - 46:2
 **competing** [1] - 41:10
 **competition** [2] - 37:13, 41:9
 **complain** [1] - 33:21
 **complains** [1] - 34:18
 **complaint** [1] - 12:17
 **comport** [1] - 41:25
 **computer** [1] - 30:6
 **conduct** [7] - 44:24, 45:21, 46:12, 46:15, 46:17, 46:20, 48:2
 **conducted** [7] - 44:6, 44:18, 44:19, 45:6, 47:13, 49:4
 **confinement** [1] - 59:6
 **confused** [7] - 9:24, 16:11, 17:5, 19:23, 20:5, 23:13, 33:1
 **confusing** [3] - 23:18, 23:23, 23:24
 **confusion** [31] - 9:20, 12:19, 12:21, 13:23, 19:6, 20:6, 20:21, 21:5, 22:4, 22:6, 22:7, 23:3, 23:4, 23:10, 34:21, 37:5, 37:7, 37:11, 38:17, 52:16, 52:17, 52:18, 52:19, 52:20, 57:5, 57:6, 57:7, 57:9, 57:10, 58:14, 60:6
 **consent** [2] - 56:23, 57:3
 **consequence** [1] - 25:22
 **consider** [2] - 15:6, 31:11
 **considerably** [1] - 28:23
 **constantly** [2] - 35:5, 35:6
 **constructing** [1] - 58:22
 **consumers** [2] - 6:6, 6:7
 **contact** [3] - 15:4, 15:17, 21:13
 **content** [1] - 51:25

 **contest** [1] - 22:16
 **context** [1] - 51:22
 **continued** [2] - 52:21, 58:18
 **control** [3] - 24:10, 28:21, 29:3
 **controlled** [6] - 23:12, 23:14, 23:16, 23:19, 23:21, 23:22
 **controvert** [1] - 45:2
 **convenience** [5] - 16:23, 16:25, 17:12, 36:13, 39:15
 **convergent** [1] - 18:9
 **corner** [1] - 39:16
 **Corpus** [4] - 9:15, 17:14, 17:22, 20:11
 **correct** [8] - 5:4, 15:25, 19:5, 23:1, 23:11, 24:14, 48:6, 68:20
 **counsel** [4] - 47:10, 49:7, 53:10, 56:6
 **counted** [3] - 36:9, 36:11, 39:11
 **country** [1] - 14:24
 **couple** [4] - 10:19, 52:10, 58:1, 64:20
 **course** [2] - 7:24, 52:11
 **Court** [9] - 4:1, 4:25, 10:24, 11:2, 11:5, 50:22, 54:3, 56:4, 67:5
 **court** [1] - 6:2
 **COURT** [121] - 4:3, 4:8, 4:11, 4:17, 5:1, 5:5, 5:7, 5:10, 6:2, 6:9, 6:14, 7:15, 7:22, 8:1, 8:4, 8:17, 9:2, 10:16, 11:8, 11:11, 13:22, 14:19, 14:23, 15:2, 15:13, 15:19, 15:24, 16:3, 16:8, 16:11, 16:15, 16:19, 17:1, 17:5, 17:9, 17:20, 18:5, 18:14, 18:21, 18:23, 18:25, 19:3, 22:19, 23:9, 24:1, 24:5, 24:15, 24:17, 24:23, 25:3, 25:9, 26:17, 32:1, 32:13, 35:21, 36:1, 36:10, 38:1, 38:9, 38:13, 38:21, 39:7, 39:17, 39:24, 40:6, 40:9, 40:12, 40:16, 40:21, 40:24, 42:22, 42:24, 43:4, 43:6, 43:20, 43:23, 44:1, 44:7, 44:13, 45:1, 45:13, 45:17, 45:23, 46:1, 46:8, 47:2, 47:20, 48:4, 48:12, 48:16, 49:17, 49:21, 50:18, 51:13, 51:20, 52:6, 52:9, 53:21, 53:23, 54:23, 55:17, 55:20, 56:9, 58:9, 60:1, 60:10, 60:17, 60:21, 62:1, 62:9, 63:8, 63:16, 63:22, 64:1, 64:6, 64:19, 65:22, 67:4, 67:7, 67:20, 68:17
 **Court's** [1] - 62:6
 **courts** [6] - 32:5, 35:25, 36:3, 60:5, 65:6
 **Courts** [1] - 66:18
 **courts..** [1] - 36:2
 **cover** [1] - 41:2
 **covered** [2] - 14:22, 22:23
 **covering** [1] - 14:17
 **created** [1] - 52:19
 **credit** [3] - 11:19, 50:2, 50:12
 **criteria** [2] - 38:7, 54:19
 **critical** [2] - 5:20, 26:20
 **cross** [1] - 22:16
 **cross-examine** [1] - 22:16
 **CRR** [1] - 68:23
 **cult** [1] - 55:11
 **cult-like** [1] - 55:11
 **cups** [1] - 28:16
 **current** [1] - 12:25
 **customer** [1] - 50:13

**customers** [8] - 9:15, 21:9, 21:11, 27:13, 50:2, 50:10, 50:11
**cut** [1] - 43:23

## D

**Dallas** [2] - 7:10, 9:10
**damages** [7] - 54:1, 57:21, 59:17, 59:18, 63:20, 66:3, 66:5
**dark** [1] - 24:12
**days** [1] - 17:4
**deal** [5] - 12:22, 33:16, 38:16, 53:17, 65:14
**dealing** [2] - 12:23, 15:15
**debit** [1] - 11:17
**decades** [1] - 16:24
**December** [1] - 59:2
**decide** [2] - 39:1, 63:3
**decided** [1] - 54:2
**deed** [1] - 35:3
**defendant** [7] - 7:6, 7:19, 8:9, 8:10, 10:23, 33:9, 33:10
**Defendants** [1] - 42:12
**defendants** [38] - 6:5, 7:18, 9:12, 10:2, 10:8, 10:22, 21:19, 21:20, 32:7, 32:10, 32:21, 32:23, 32:25, 33:15, 33:21, 33:23, 34:3, 34:7, 34:13, 34:16, 34:23, 35:4, 35:5, 35:9, 41:13, 41:18, 41:21, 42:10, 42:15, 42:21, 43:9, 46:1, 46:5, 54:16, 55:2, 68:4
**defendants'** [22] - 4:9, 5:25, 9:15, 10:5, 11:4, 19:18, 19:25, 20:18, 21:6, 21:11, 21:14, 21:24, 24:2, 24:17, 32:19, 33:25, 34:8, 34:11, 34:12, 43:8, 51:3, 67:22
**defense** [8] - 53:10, 53:18, 53:20, 53:21, 53:25, 54:2, 54:7, 55:2
**degree** [1] - 42:3
**delay** [2] - 59:16, 60:6
**delayed** [2] - 57:23, 57:25
**deluged** [1] - 51:11
**demonstrative** [1] - 7:20
**denial** [1] - 34:12
**denied** [2] - 67:23, 67:25
**deny** [2] - 50:23, 68:13
**depose** [1] - 44:21
**deposition** [4] - 8:7, 29:5, 29:18, 48:22
**designed** [4] - 36:21, 36:23, 38:5, 38:19
**desperately** [1] - 64:14
**determination** [2] - 57:24
**determine** [4] - 5:14, 6:20, 8:12, 9:7
**determined** [1] - 59:16
**development** [1] - 55:23
**difference** [8] - 34:4, 34:9, 34:14, 34:17, 36:6, 36:16, 37:7, 61:21
**different** [16] - 8:16, 16:15, 20:19, 23:2, 23:17, 29:2, 34:10, 36:18, 36:20, 36:22, 37:1, 37:2, 37:10, 37:14, 38:6, 54:16
**difficult** [1] - 37:19
**diluting** [1] - 41:14

**dilution** [32] - 26:23, 33:6, 36:17, 37:4, 37:10, 37:11, 37:14, 37:16, 37:20, 38:4, 38:7, 38:11, 38:14, 38:18, 38:24, 40:1, 40:2, 40:5, 41:2, 41:7, 41:8, 41:11, 41:14, 41:19, 41:22, 41:23, 41:24, 42:2, 42:8
**diminished** [1] - 25:14
**diminishes** [1] - 25:16
**directly** [2] - 8:15, 10:19
**director** [2] - 47:24, 55:23
**disagree** [2] - 38:22, 65:12
**discovery** [4] - 35:5, 35:6, 46:4, 49:19
**discuss** [1] - 53:19
**discussion** [1] - 52:12
**dispute** [2] - 29:9, 52:4
**dissimilar** [1] - 13:20
**distinctive** [4] - 26:24, 57:19, 62:23, 63:2
**District** [3] - 11:2, 41:16, 41:17
**divided** [1] - 8:16
**docket** [1] - 40:7
**document** [4] - 21:9, 59:9, 59:10, 61:8
**documents** [3] - 59:9, 59:11, 59:12
**dollar** [4] - 27:14, 47:16, 48:1, 48:8
**dollars** [1] - 55:6
**done** [10] - 6:11, 6:17, 18:19, 21:25, 25:6, 31:2, 35:11, 43:12, 45:7, 54:17
**down** [19] - 9:10, 12:24, 13:9, 13:10, 17:15, 17:18, 18:10, 23:12, 26:7, 26:9, 37:2, 56:18, 56:20, 58:8, 58:9, 58:10, 60:15, 65:20, 66:3
**Dr** [52] - 5:2, 5:13, 5:22, 6:5, 6:11, 6:17, 7:6, 8:7, 8:15, 8:19, 10:11, 19:5, 19:7, 20:4, 20:5, 20:20, 21:2, 21:22, 21:25, 24:8, 24:9, 24:11, 24:18, 25:1, 25:3, 25:4, 25:5, 25:12, 25:17, 29:5, 29:24, 33:22, 34:19, 34:24, 35:16, 40:20, 42:17, 43:10, 43:13, 43:19, 44:16, 44:24, 46:12, 46:20, 47:12, 47:14, 51:3, 67:23, 67:25
**dramatic** [1] - 25:20
**dramatically** [1] - 27:18
**drastically** [2] - 26:7, 27:2
**drilling** [1] - 44:2
**drive** [5] - 7:3, 7:12, 9:3, 9:5, 9:15
**driver's** [4] - 7:2, 9:9, 12:25, 22:24
**driving** [2] - 11:22, 12:24
**drove** [2] - 9:10, 10:5
**during** [5] - 10:8, 25:10, 26:7, 32:12, 32:13

## E

**early** [2] - 55:10, 65:10
**easily** [5] - 6:17, 7:6, 21:25, 22:1, 30:21
**Eastern** [1] - 41:17
**easy** [2] - 6:25, 30:11
**economic** [2] - 55:23, 55:24
**ee's** [76] - 4:6, 4:15, 4:20, 4:21, 4:22, 11:14, 11:24, 15:11, 19:14, 19:19, 19:22, 20:1, 21:3, 21:9, 24:10, 32:16,

32:17, 32:18, 32:22, 33:8, 33:16, 33:17, 33:18, 33:19, 33:20, 39:22, 42:10, 42:12, 42:18, 42:19, 43:7, 43:9, 44:24, 46:3, 46:4, 46:25, 47:6, 47:19, 48:1, 49:10, 50:2, 50:3, 50:11, 50:14, 51:3, 52:8, 52:18, 53:7, 53:11, 53:12, 54:4, 56:19, 57:2, 57:7, 57:14, 57:15, 58:11, 58:15, 58:21, 60:14, 61:2, 61:4, 61:9, 61:10, 61:13, 61:14, 61:20, 62:16, 66:9, 66:10, 66:15, 68:6, 68:11, 68:12
**effectively** [1] - 23:4
**eight** [3] - 10:23, 25:25, 33:19
**either** [5] - 10:8, 12:10, 13:2, 43:13, 46:11
**eliminate** [1] - 52:18
**Emerald** [1] - 41:16
**emphasize** [1] - 41:21
**end** [4] - 13:10, 44:11, 60:3, 63:19
**ended** [1] - 52:21
**enforcement** [2] - 4:22, 68:9
**enjoin** [1] - 40:4
**enjoy** [1] - 36:19
**enormous** [1] - 60:6
**entered** [2] - 56:23, 56:25
**entitled** [2] - 67:16, 68:21
**equals** [1] - 66:10
**equitable** [1] - 54:2
**eroding** [1] - 38:19
**establish** [1] - 26:23
**estoppel** [3] - 57:23, 59:5, 59:19
**et** [2] - 7:12, 67:3
**evidence** [19] - 20:6, 20:15, 24:18, 45:5, 45:25, 48:20, 49:15, 50:21, 51:23, 52:1, 56:12, 59:24, 66:1, 67:10, 67:11, 67:23, 67:25, 68:8, 68:11
**exact** [1] - 41:13
**exactly** [1] - 35:10
**examine** [1] - 22:16
**examined** [1] - 58:13
**example** [2] - 20:9, 65:6
**except** [3] - 16:21, 16:22, 18:8
**exception** [1] - 37:11
**excitement** [1] - 55:13
**exclude** [14] - 5:2, 5:17, 10:25, 24:18, 26:14, 33:13, 43:1, 52:8, 65:24, 67:22, 67:24, 68:1, 68:8, 68:10
**excluded** [8] - 9:18, 9:19, 14:12, 14:13, 18:20, 22:18, 66:4, 66:5
**excluding** [2] - 11:5, 11:6
**excuse** [2] - 40:17, 47:15
**exhibit** [3] - 11:9, 11:13, 61:7
**exhibits** [2] - 53:17, 67:6
**exist** [3] - 45:14, 46:4, 46:5
**existed** [1] - 59:14
**expanding** [1] - 58:18
**expansion** [4] - 12:22, 12:23, 15:7
**expensive** [1] - 26:8
**expert** [3] - 5:25, 24:20, 34:25
**explicitly** [1] - 47:15
**Express** [2] - 14:2, 30:17
**express** [2] - 52:15, 61:10

**F**

**facilities** [3] - 8:22, 8:24, 9:1
**fact** [18] - 12:14, 20:8, 23:19, 26:8, 28:21, 39:21, 48:17, 52:22, 53:9, 54:4, 55:3, 57:22, 62:12, 62:18, 63:4, 63:24, 64:1, 64:11
**factor** [4] - 22:5, 23:1, 23:4, 42:7
**factors** [5] - 41:22, 41:23, 42:1, 42:3, 42:5
**facts** [4] - 51:16, 51:17, 51:19, 63:9
**fail** [1] - 43:1
**failed** [12] - 4:16, 26:21, 27:21, 32:7, 32:11, 43:10, 43:12, 43:19, 46:16, 49:12, 50:24, 68:2
**failure** [1] - 62:25
**fair** [1] - 37:8
**faith** [2] - 63:24, 64:2
**fame** [26] - 21:1, 21:3, 25:2, 25:5, 25:6, 27:6, 32:6, 32:9, 32:16, 32:22, 33:7, 36:14, 39:12, 39:19, 41:23, 45:21, 55:7, 56:15, 66:9, 66:10, 66:11, 66:12, 67:10, 67:12
**famous** [24] - 27:4, 32:17, 32:18, 32:23, 36:12, 36:16, 36:17, 36:23, 37:1, 37:23, 38:20, 39:3, 39:15, 39:19, 39:21, 42:4, 42:10, 42:13, 42:16, 42:21, 55:4, 56:5
**fans** [1] - 55:11
**far** [3] - 13:5, 40:1, 57:11
**fast** [5] - 36:1, 38:13, 47:2, 47:3, 53:20
**federal** [5] - 37:25, 41:8, 41:25, 42:1, 60:5
**fees** [2] - 63:18, 63:21
**feet** [2] - 18:16, 26:2
**felt** [1] - 65:9
**few** [3] - 22:1, 28:10, 42:14
**Fifth** [1] - 10:20
**fight** [1] - 46:8
**fighting** [1] - 46:10
**figure** [2] - 22:11, 24:19
**file** [2] - 59:1
**filed** [8] - 40:20, 43:7, 51:11, 51:14, 54:18, 58:12, 59:22, 62:4
**files** [1] - 59:11
**filing** [2] - 62:23, 63:1
**filled** [1] - 55:11
**finally** [3] - 42:15, 61:22, 65:23
**fine** [5] - 20:20, 20:25, 46:22, 49:8, 49:10
**first** [15] - 4:14, 8:14, 9:8, 14:11, 19:4, 20:22, 29:5, 29:11, 29:13, 32:4, 34:19, 38:7, 41:1, 62:11, 64:13
**five** [2] - 17:4, 42:4
**fix** [1] - 52:20
**floods** [1] - 17:6
**fly** [2] - 27:5, 47:6

**food** [2] - 5:11, 20:3
**foot** [1] - 39:12
**foregoing** [1] - 68:19
**forth** [1] - 20:8
**fortunately** [1] - 24:22
**forward** [1] - 65:8
**foul** [1] - 22:2
**founding** [1] - 54:5
**four** [6] - 22:5, 23:7, 27:6, 54:12, 54:18
**four-year** [1] - 54:18
**fraud** [1] - 54:11
**friends** [1] - 12:7
**front** [3] - 8:14, 22:4, 34:22
**fuel** [4] - 4:23, 66:24, 67:1, 68:12
**fuels** [2] - 65:24, 66:2
**full** [2] - 10:12, 33:2
**future** [3] - 8:10, 10:9, 12:20

**G**

**game** [2] - 20:12, 20:14
**garnered** [1] - 30:14
**gas** [24] - 6:23, 7:3, 16:21, 16:23, 16:25, 17:3, 17:8, 17:11, 20:11, 20:13, 20:14, 26:3, 26:5, 26:7, 26:9, 26:10, 26:12, 26:13, 26:15, 26:16, 66:10, 66:16
**gasoline** [3] - 67:10, 67:11, 67:14
**gateway** [2] - 12:5, 22:13
**GEICO** [1] - 28:25
**general** [1] - 21:1
**gentlemen** [2] - 40:16, 40:17
**geographical** [1] - 50:12
**geographically** [1] - 18:8
**goods** [9] - 5:22, 5:24, 6:8, 21:7, 36:20, 37:1, 37:3, 62:13, 62:17
**gosh** [1] - 15:10
**grant** [1] - 68:9
**great** [1] - 28:3
**greater** [1] - 54:20
**grounds** [1] - 54:5
**group** [8] - 8:7, 20:22, 23:12, 23:14, 23:16, 23:19, 23:21, 23:22
**growth** [1] - 26:3
**guess** [3] - 8:6, 28:23, 60:4

**H**

**half** [4] - 10:4, 10:6, 54:19, 58:4
**hamstrung** [1] - 50:21
**hand** [5] - 8:1, 11:11, 30:7, 55:20, 67:7
**handed** [3] - 11:13, 27:12, 49:24
**handle** [4] - 4:23, 18:1, 18:3
**handled** [1] - 51:22
**handling** [1] - 65:20
**hands** [1] - 22:14
**Hanor** [16] - 11:8, 19:1, 19:5, 20:9, 20:18, 21:8, 24:8, 24:24, 34:18, 41:1, 42:24, 44:3, 49:9, 52:14, 62:8, 65:12
**HANOR** [74] - 5:6, 11:9, 11:13, 13:24, 14:21, 14:25, 15:3, 15:15, 15:22, 16:1,

16:5, 16:10, 16:12, 16:17, 16:20, 17:2, 17:7, 17:10, 17:21, 18:6, 18:15, 22:20, 23:11, 24:21, 25:1, 25:4, 25:11, 26:18, 35:22, 36:3, 36:11, 38:3, 38:11, 38:14, 38:24, 39:10, 39:18, 39:25, 44:5, 44:12, 44:15, 45:4, 45:15, 45:18, 45:24, 46:7, 46:11, 46:14, 48:7, 48:13, 48:19, 49:1, 49:14, 49:20, 49:23, 50:4, 50:16, 50:20, 51:5, 51:15, 52:4, 56:10, 58:10, 60:8, 60:13, 60:19, 62:10, 63:10, 63:17, 63:23, 64:3, 64:10, 67:5, 67:9
**Hanor's** [2] - 20:8, 32:3
**happy** [2] - 51:4, 65:17
**hard** [1] - 59:14
**harm** [1] - 22:2
**harp** [2] - 21:15, 21:16
**hate** [3] - 43:23, 49:17, 64:16
**head** [1] - 44:21
**hear** [6] - 9:9, 22:6, 22:7, 44:3, 54:23, 58:20
**hearing** [1] - 53:9
**hearsay** [2] - 30:1, 56:11
**heart** [1] - 38:9
**heavy** [1] - 45:13
**help** [2] - 36:23, 63:16
**herrings** [1] - 35:18
**hesitation** [1] - 60:1
**high** [2] - 26:10, 26:11
**higher** [1] - 56:17
**highway** [6] - 9:14, 12:24, 18:16, 20:10, 28:3
**Highway** [1] - 61:8
**highways** [4] - 9:13, 9:16, 12:4, 16:22
**himself** [5] - 5:23, 10:12, 17:19, 25:12, 25:17
**history** [3] - 57:9, 62:11, 64:14
**Hittner** [1] - 52:23
**honestly** [1] - 44:23
**Honor** [53] - 5:9, 5:19, 6:16, 7:17, 7:21, 7:25, 8:5, 8:7, 8:13, 10:18, 11:7, 11:9, 18:22, 19:4, 21:15, 22:12, 24:3, 24:6, 24:7, 24:11, 24:16, 32:2, 32:5, 32:10, 32:15, 35:1, 35:13, 35:19, 35:22, 40:25, 41:1, 41:5, 41:18, 41:20, 42:9, 42:15, 42:23, 43:3, 43:7, 46:13, 46:18, 48:25, 49:25, 50:4, 50:10, 51:1, 52:5, 56:10, 61:1, 61:7, 62:10, 65:11, 68:15
**honored** [1] - 62:10
**Houston** [12] - 7:10, 11:22, 14:1, 30:15, 31:14, 31:15, 31:18, 31:20, 31:22, 55:14, 55:15, 57:12
**hundred** [4] - 11:18, 11:20, 11:23, 57:4
**hundreds** [4] - 14:3, 14:4, 30:16, 31:5

**I**

**I-35** [5] - 12:6, 16:13, 16:18, 17:20, 58:24
**I-37** [3] - 12:6, 15:18, 17:21
**Icie's** [1] - 67:2
**idea** [3] - 7:8, 8:8, 23:15
**identical** [17] - 37:3, 38:15, 38:18,

38:20, 41:19, 41:20, 42:6, 62:13, 62:14, 62:16, 62:17, 62:18, 62:19, 62:20, 63:6
**impact** [1] - 55:24
**impaired** [1] - 26:25
**important** [3] - 21:18, 21:21, 54:1
**impossible** [1] - 5:14
**improperly** [1] - 32:10
**inadmissible** [2] - 8:12, 32:9
**include** [3] - 7:18, 9:16, 26:21
**included** [5] - 6:11, 22:1, 35:16, 53:16, 66:23
**includes** [1] - 20:6
**including** [2] - 22:2, 35:7
**incorrect** [1] - 41:6
**incredible** [1] - 26:3
**incumbent** [1] - 25:12
**Indian** [1] - 15:24
**indicated** [1] - 22:20
**industry** [1] - 38:2
**infer** [1] - 45:10
**influence** [1] - 43:14
**information** [2] - 49:6, 54:3
**infringe** [1] - 33:11
**infringed** [2] - 62:5, 65:9
**infringers** [1] - 62:25
**inside** [1] - 28:13
**insinuate** [1] - 43:11
**insinuating** [1] - 47:8
**insinuation** [1] - 49:11
**insinuations** [1] - 43:17
**instances** [1] - 41:2
**instantaneously** [1] - 63:13
**instantly** [1] - 63:12
**institution** [1] - 55:14
**instructions** [1] - 35:16
**insubstantial** [1] - 36:6
**intended** [1] - 37:4
**intends** [1] - 46:24
**interesting** [4] - 42:17, 52:22, 53:9, 55:4
**interpreted** [1] - 37:12
**interpreting** [1] - 41:4
**interrogatory** [4] - 50:5, 50:8, 50:15, 51:6
**interrupt** [1] - 40:12
**interruption** [1] - 40:17
**interstate** [5] - 12:4, 12:24, 13:7, 15:11, 16:22
**Interstate** [1] - 12:16
**interview** [1] - 17:12
**interviewed** [1] - 13:14
**introduce** [1] - 66:1
**introducing** [1] - 68:5
**introduction** [1] - 36:5
**intuition** [1] - 47:7
**invalid** [1] - 54:8
**involved** [1] - 26:6
**involving** [1] - 68:6
**iPad** [1] - 24:22
**irrelevant** [3] - 26:22, 54:4, 65:21
**isolation** [1] - 28:8
**issue** [10] - 8:11, 27:10, 29:4, 39:1,

40:2, 44:8, 51:10, 52:1, 53:25, 66:25
**issues** [2] - 15:6, 22:13
**itself** [3] - 13:14, 54:8, 61:22

## J

**j-a-c-o-b-y** [1] - 6:4
**Jacoby** [4] - 5:25, 6:6, 10:11, 21:22
**January** [1] - 58:25
**Johnny** [2] - 68:19, 68:23
**judge** [7] - 25:23, 52:7, 54:25, 60:9, 60:24, 62:2, 65:7
**Judge** [17] - 5:4, 40:8, 42:11, 46:2, 52:10, 52:23, 53:16, 53:24, 55:6, 55:8, 55:16, 55:21, 57:23, 61:18, 61:23, 64:20, 65:25
**judgment** [4] - 34:7, 34:9, 34:13, 65:12
**July** [2] - 14:1, 30:14
**jury** [25] - 5:14, 7:8, 8:12, 9:6, 9:7, 9:9, 10:1, 10:3, 10:14, 11:6, 22:4, 22:6, 22:11, 22:14, 26:15, 27:3, 45:5, 48:7, 48:10, 54:3, 57:22, 63:2, 64:16, 65:13, 65:15
**jury's** [2] - 22:17, 46:9

## K

**Katy** [2] - 11:24, 33:20
**keep** [6] - 38:19, 40:23, 51:16, 51:18, 59:25, 64:15
**kept** [1] - 9:25
**key** [1] - 67:12
**kind** [1] - 4:2
**kinds** [2] - 47:18, 48:3
**knock** [1] - 53:19
**knowledge** [1] - 49:7
**known** [2] - 36:17, 59:7
**knows** [1] - 41:5
**Kors** [1] - 41:15

## L

**laches** [7] - 53:20, 53:22, 53:23, 53:24, 54:21, 57:20, 59:18
**lack** [2] - 35:14, 63:1
**Lacoste** [1] - 28:25
**ladies** [1] - 40:17
**land** [2] - 12:16, 18:1
**Lanham** [2] - 54:10, 54:11
**Laredo** [8] - 9:13, 9:14, 12:10, 13:11, 17:15, 17:20, 17:21, 20:13
**large** [2] - 28:24, 67:11
**largest** [1] - 26:2
**last** [3] - 9:13, 56:10, 60:24
**late** [1] - 33:14
**law** [8] - 6:10, 8:1, 22:8, 22:11, 25:9, 38:4, 41:6, 54:9
**lawsuit** [16] - 14:7, 15:10, 30:22, 30:23, 44:10, 44:13, 52:12, 52:13, 54:18, 56:23, 60:3, 60:7, 63:7, 64:7,

64:17
**lawsuits** [15] - 44:9, 60:7, 62:3, 62:6, 62:12, 62:15, 62:22, 62:24, 63:3, 63:9, 64:9, 64:15, 64:18, 64:23
**least** [6] - 12:8, 14:23, 18:20, 31:17, 39:18, 41:4
**led** [1] - 6:18
**less** [1] - 31:12
**lessened** [1] - 37:18
**liability** [1] - 53:25
**liberally** [1] - 37:12
**license** [3] - 7:2, 13:1, 22:24
**licenses** [1] - 9:9
**life** [1] - 51:16
**likelihood** [10] - 12:19, 20:20, 21:4, 21:12, 23:10, 34:21, 37:5, 37:6, 37:11, 38:17
**likely** [15] - 5:21, 5:24, 6:7, 6:21, 6:23, 8:9, 8:10, 9:23, 10:6, 10:7, 15:4, 21:6, 21:13, 21:24, 32:18
**limine** [4] - 14:6, 51:11, 51:12, 51:22
**limitations** [3] - 54:12, 59:3, 59:4
**limited** [1] - 57:21
**line** [2] - 24:12, 60:21
**links** [1] - 35:7
**litany** [1] - 56:2
**litigation** [8] - 25:10, 32:6, 32:9, 32:12, 32:13, 33:2, 60:4
**live** [4] - 12:7, 35:7, 35:14, 50:3
**Live** [1] - 54:16
**lizard** [1] - 28:23
**local** [2] - 12:2, 12:3
**located** [1] - 7:6
**locations** [2] - 8:20, 11:3
**logical** [1] - 44:10
**logo** [27] - 19:8, 19:9, 19:12, 19:13, 19:18, 23:2, 23:17, 24:9, 24:10, 24:11, 24:12, 30:20, 42:18, 50:3, 50:9, 51:3, 53:4, 53:5, 53:14, 54:5, 61:3, 61:19, 61:25, 62:23, 63:4, 65:8, 68:12
**logos** [4] - 33:25, 53:6, 53:8
**look** [14] - 12:17, 13:19, 13:25, 16:20, 19:11, 21:5, 54:13, 58:1, 61:12, 62:18, 64:3, 67:17, 67:18, 67:19
**looked** [4] - 19:8, 28:23, 56:10, 67:15
**Looks** [1] - 19:10
**looks** [2] - 19:16, 64:4
**lose** [1] - 59:23
**Louis** [1] - 57:12
**Loves** [2] - 17:23, 17:24
**low** [1] - 31:10
**Luling** [5] - 12:16, 15:8, 25:22, 58:5, 67:15

## M

**Madisonville** [1] - 25:23
**magazine** [1] - 30:19
**majority** [1] - 54:20
**maneuver** [1] - 18:3
**map** [2] - 8:13, 16:20
**margin** [1] - 23:15

mark [40] - 11:10, 20:18, 21:1, 26:25, 29:2, 33:21, 33:22, 36:20, 36:21, 37:16, 37:18, 37:23, 38:15, 38:17, 38:20, 40:4, 41:14, 42:3, 42:4, 42:10, 42:17, 51:8, 53:7, 54:14, 58:13, 58:16, 62:13, 62:16, 62:17, 62:23, 62:24, 62:25, 63:1, 63:2, 64:4, 64:13, 66:20
market [3] - 45:8, 47:17, 60:13
marketing [3] - 44:21, 47:24, 51:8
marketplace [2] - 27:22, 36:6
markets [1] - 37:14
marks [22] - 13:18, 21:24, 27:21, 33:1, 34:5, 34:10, 34:15, 36:23, 36:25, 37:2, 38:6, 38:8, 38:20, 41:3, 41:19, 42:6, 42:7, 42:12, 51:7, 64:3, 64:8, 66:22
material [5] - 34:4, 34:9, 34:14, 34:17, 52:8
matter [3] - 18:8, 41:6, 68:21
matters [4] - 55:9, 60:2, 65:20, 68:9
mean [17] - 7:2, 7:3, 7:4, 9:2, 9:4, 9:5, 13:11, 14:8, 17:10, 39:4, 41:3, 46:24, 61:15, 61:19, 63:3, 64:16, 64:24
meaning [2] - 35:25, 36:4
means [1] - 29:10
meant [1] - 21:19
media [3] - 13:3, 13:5, 28:5
medium [1] - 25:23
meet [1] - 54:19
megastores [1] - 26:1
mention [2] - 66:15, 66:16
merit [1] - 63:1
met [2] - 17:13, 54:19
Mexico [3] - 12:5, 12:11, 18:11
Michael [1] - 41:15
Microsoft [9] - 36:24, 37:22, 38:1, 42:16, 42:19, 42:20, 56:17
might [3] - 33:1, 33:9, 33:11
miles [14] - 11:3, 11:18, 11:21, 11:23, 11:24, 12:1, 15:18, 15:22, 16:6, 16:12, 16:14, 16:17, 57:11, 58:23
million [2] - 31:15, 58:24
millions [2] - 31:5, 59:11
mind [2] - 55:1, 67:22
minute [1] - 18:25
minutes [1] - 40:11
missing [1] - 45:17
mistakes [1] - 47:11
Mitrius [1] - 4:18
MITRIUS [17] - 43:3, 43:5, 43:7, 43:22, 43:24, 44:4, 46:13, 46:18, 47:5, 47:23, 48:6, 48:25, 49:5, 49:25, 50:9, 51:1, 51:18
model [1] - 32:19
month [1] - 33:8
months [2] - 6:22, 6:23
most [10] - 5:21, 5:24, 6:6, 6:7, 20:16, 21:6, 21:18, 21:21, 54:9, 54:11
motion [31] - 4:6, 4:9, 4:15, 4:20, 4:21, 4:22, 5:2, 24:18, 26:12, 26:17, 26:18, 34:6, 34:8, 34:12, 42:25, 43:8, 43:15, 45:9, 51:20, 52:7, 52:11, 60:25, 62:2, 65:24, 67:22, 67:24, 68:1, 68:4, 68:8,

68:10
motions [7] - 4:5, 4:24, 14:6, 51:10, 51:11, 51:13, 51:21
move [1] - 60:25
moved [1] - 46:2
MR [117] - 4:5, 4:9, 4:12, 4:18, 5:4, 5:6, 5:8, 5:11, 6:4, 6:13, 6:16, 7:16, 7:24, 8:3, 8:5, 8:18, 9:4, 10:18, 11:9, 11:13, 13:24, 14:21, 14:25, 15:3, 15:15, 15:22, 16:1, 16:5, 16:10, 16:12, 16:17, 16:20, 17:2, 17:7, 17:10, 17:21, 18:6, 18:15, 18:22, 18:24, 19:2, 19:4, 22:20, 23:11, 24:3, 24:6, 24:16, 24:21, 24:24, 25:1, 25:4, 25:11, 26:18, 32:2, 32:14, 35:22, 36:3, 36:11, 38:3, 38:11, 38:14, 38:24, 39:10, 39:18, 39:25, 40:19, 40:22, 40:25, 42:23, 44:5, 44:12, 44:15, 45:4, 45:15, 45:18, 45:24, 46:7, 46:11, 46:14, 48:7, 48:13, 48:19, 49:1, 49:14, 49:20, 49:23, 50:4, 50:16, 50:20, 51:5, 51:15, 52:4, 52:7, 52:10, 53:22, 53:24, 54:25, 55:19, 55:21, 56:10, 58:10, 60:8, 60:13, 60:19, 60:24, 62:2, 62:10, 63:10, 63:17, 63:23, 64:3, 64:10, 64:20, 65:25, 67:5, 67:9, 68:15
MS [17] - 43:3, 43:5, 43:7, 43:22, 43:24, 44:4, 46:13, 46:18, 47:5, 47:23, 48:6, 48:25, 49:5, 49:25, 50:9, 51:1, 51:18
must [2] - 26:24, 27:4

## N

name [6] - 15:24, 42:4, 57:15, 60:14, 60:19, 61:20
NASDAQ [1] - 66:21
naturally [2] - 65:15, 66:1
nature [1] - 55:7
near [1] - 9:22
Nebraska [4] - 52:24, 53:2, 56:23, 60:8
need [4] - 27:2, 36:15, 43:25, 62:7
needed [1] - 10:13
never [10] - 13:17, 30:9, 30:11, 30:22, 30:23, 31:2, 47:17, 51:15, 64:22
New [3] - 11:2, 26:1, 55:24
new [2] - 57:9, 61:17
News [4] - 14:2, 30:17, 30:18
news [1] - 31:7
newspaper [3] - 13:3, 31:1
newspapers [1] - 61:12
next [12] - 6:22, 29:11, 33:21, 34:18, 35:1, 43:2, 43:4, 52:6, 52:7, 58:5, 60:25, 62:2
nice [3] - 17:16, 17:22
nine [1] - 33:19
noise [2] - 22:5, 23:1
nonexistent [1] - 50:16
north [1] - 18:10
note [1] - 34:20
notes [1] - 40:14
nothing [17] - 13:19, 23:2, 23:17, 23:25, 35:13, 39:12, 39:18, 42:24,

48:19, 48:20, 49:15, 53:7, 53:13, 58:11, 58:16, 61:17, 64:4
notice [1] - 61:9
Number [4] - 19:7, 19:12, 64:22, 66:7
number [5] - 7:13, 28:24, 33:14, 39:22, 39:23

## O

o'clock [1] - 40:7
Oak [1] - 54:16
object [1] - 20:7
objection [1] - 34:11
objectionable [1] - 18:20
obviously [7] - 23:23, 27:12, 38:22, 45:20, 49:24, 57:15, 57:18
occur [2] - 41:9, 57:9
occurred [2] - 52:13, 57:7
occurrence [1] - 61:15
occurring [1] - 57:10
October [1] - 55:10
offer [1] - 67:9
offered [1] - 51:23
Office [2] - 58:13, 58:14
often [1] - 25:10
oil [1] - 44:1
once [1] - 60:1
one [67] - 4:15, 6:20, 7:13, 10:12, 10:24, 11:4, 11:9, 13:2, 14:5, 14:11, 14:16, 14:23, 15:5, 15:6, 15:21, 16:22, 17:18, 18:13, 19:5, 20:7, 21:16, 21:18, 21:21, 22:13, 22:20, 25:2, 25:5, 27:12, 28:1, 29:9, 30:24, 33:3, 33:8, 33:14, 37:21, 38:6, 39:20, 40:22, 41:14, 42:2, 42:7, 43:21, 44:14, 44:20, 45:6, 46:1, 46:21, 49:24, 50:22, 51:10, 53:1, 53:2, 53:20, 54:15, 54:25, 55:16, 55:17, 55:21, 56:19, 60:24, 63:14, 64:22, 65:2, 65:25, 66:7, 66:20, 67:12
ones [2] - 9:7, 13:13
ongoing [1] - 53:1
open [1] - 33:3
opened [7] - 26:1, 33:16, 33:18, 33:19, 58:2, 58:3, 58:20
opens [1] - 64:24
operation [1] - 58:3
opportunity [1] - 47:14
order [7] - 4:1, 25:7, 28:1, 28:3, 33:5, 33:8, 41:19
ordered [1] - 46:3
original [1] - 12:17
otherwise [4] - 23:20, 56:6, 56:8
outcome [1] - 63:9
outside [5] - 9:1, 16:7, 16:9, 16:10, 24:13
overall [1] - 21:2
overlaid [1] - 8:19
overlap [1] - 40:3
overlaps [1] - 12:14
overlays [1] - 8:23
own [6] - 29:24, 34:25, 47:17, 55:12, 64:15, 64:18

## P

**p.m** [2] - 40:15, 68:16
**page** [10] - 8:14, 8:19, 9:14, 29:7, 29:8, 29:10, 30:6, 30:9, 35:15
**Page** [3] - 8:21, 8:23, 8:25
**pages** [2] - 30:5, 59:11
**Pages** [1] - 46:23
**paid** [1] - 11:17
**Palermo** [2] - 42:11, 46:2
**Pandora's** [1] - 64:24
**pants** [1] - 47:7
**paper** [1] - 53:11
**papers** [1] - 31:6
**paragraph** [2] - 12:17, 52:16
**part** [4] - 34:2, 34:6, 44:10, 66:5
**partial** [3] - 34:7, 34:8, 34:13
**parties** [6] - 5:18, 25:12, 38:22, 41:10, 52:17
**pass** [2] - 6:21, 18:13
**passed** [1] - 7:11
**passing** [1] - 9:23
**past** [3] - 6:22, 8:9, 10:8
**Patent** [1] - 58:14
**patient** [1] - 60:22
**pending** [3] - 60:4, 60:5, 64:7
**people** [89] - 5:15, 5:19, 5:21, 5:24, 6:7, 6:21, 7:10, 8:8, 9:16, 9:17, 9:21, 9:22, 10:5, 10:7, 11:16, 11:18, 12:4, 12:12, 12:24, 13:9, 13:14, 14:3, 14:7, 14:15, 14:16, 14:17, 14:21, 15:4, 15:9, 17:12, 18:10, 20:4, 20:17, 20:19, 20:22, 21:6, 21:12, 21:24, 22:3, 22:5, 22:21, 22:22, 22:24, 22:25, 23:6, 23:7, 23:13, 23:22, 23:24, 28:24, 29:25, 30:16, 30:19, 30:24, 31:2, 31:6, 31:7, 31:14, 31:15, 31:16, 31:19, 31:22, 36:23, 37:13, 38:19, 39:15, 42:20, 56:18, 56:20, 60:15, 60:21, 61:3, 61:4, 61:13, 61:16, 61:23, 62:4, 64:11, 66:13, 66:14
**percent** [15] - 11:17, 11:20, 14:16, 14:17, 14:20, 14:22, 14:25, 20:23, 22:23, 31:9, 31:14, 31:18, 31:21, 61:24, 61:25
**percentage** [2] - 10:7, 23:24
**perfect** [2] - 18:7
**perfectly** [1] - 46:22
**perform** [1] - 49:10
**performed** [1] - 43:9
**perfume** [3] - 36:24, 37:22, 38:1
**perhaps** [1] - 24:4
**period** [1] - 26:7
**person** [1] - 19:23
**perspective** [1] - 50:12
**phase** [2] - 57:21, 59:17
**PHD** [1] - 22:6
**pick** [3] - 13:8, 22:9
**picked** [6] - 14:14, 22:8, 22:9, 24:9, 24:12, 28:9
**picking** [1] - 8:6
**piece** [1] - 53:11

**place** [5] - 9:8, 16:4, 16:6, 21:10, 62:25
**plaintiff** [6] - 45:1, 47:12, 47:17, 62:11, 64:14, 66:9
**plaintiff's** [9] - 5:2, 42:25, 47:10, 65:24, 67:24, 68:1, 68:4, 68:8, 68:10
**plaintiffs** [4] - 21:16, 21:19, 32:20, 54:14
**plan** [1] - 43:11
**plus** [1] - 66:10
**point** [15] - 10:19, 15:14, 18:9, 18:14, 22:20, 24:7, 24:11, 24:14, 26:5, 26:15, 33:14, 42:9, 46:1, 65:3, 65:4
**pointed** [2] - 44:16, 46:23
**points** [1] - 67:12
**pools** [1] - 20:19
**population** [6] - 14:22, 15:1, 20:23, 20:24, 21:1, 21:2
**portion** [4] - 13:15, 33:24, 52:24
**posed** [1] - 47:25
**position** [3] - 52:18, 53:3, 62:6
**possible** [1] - 20:19
**possibly** [2] - 33:1, 57:13
**postpone** [1] - 49:17
**potential** [2] - 33:9, 60:5
**potentially** [2] - 33:11, 66:3
**pours** [1] - 60:9
**preclude** [9] - 4:6, 4:10, 4:16, 4:20, 4:21, 4:22, 47:24, 68:4
**precluded** [1] - 43:16
**predominately** [2] - 27:22, 28:10
**presence** [1] - 41:9
**present** [2] - 12:21, 27:21
**presented** [2] - 29:15, 35:13
**presenting** [1] - 68:5
**pressed** [1] - 41:20
**presumably** [1] - 49:18
**prevent** [5] - 47:19, 48:3, 48:4, 49:13, 52:12
**price** [3] - 26:7, 26:9, 26:10
**principal** [1] - 7:19
**privilege** [2] - 48:23, 49:3
**privileged** [2] - 49:4, 49:8
**problem** [5] - 7:13, 7:16, 10:4, 49:11, 50:17
**problems** [1] - 27:20
**proceed** [1] - 19:3
**proceedings** [2] - 68:6, 68:20
**produce** [3] - 27:16, 45:8, 51:6
**produced** [5] - 30:9, 30:11, 50:7, 59:8, 59:9
**product** [3] - 36:5, 55:12, 66:20
**production** [1] - 46:2
**products** [6] - 11:16, 11:19, 41:4, 41:11, 41:13, 66:22
**professor** [1] - 55:13
**pronounce** [1] - 16:2
**pronunciation** [1] - 15:25
**proper** [2] - 21:17, 21:21
**property** [2] - 18:2, 58:5
**propose** [2] - 4:13, 5:1
**protect** [1] - 62:24
**prove** [6] - 21:3, 21:4, 27:6, 34:21,

39:3, 60:20
**provide** [2] - 29:19, 46:3
**provided** [3] - 29:19, 43:14, 47:9
**proving** [1] - 42:2
**provision** [1] - 57:5
**publicity** [1] - 30:14
**published** [1] - 58:15
**pumps** [1] - 26:3
**purposely** [2] - 9:25, 24:13
**purposes** [1] - 55:8
**put** [13] - 10:3, 14:6, 32:22, 34:1, 39:22, 45:5, 45:24, 58:7, 61:3, 61:4, 61:23
**puts** [2] - 20:8, 28:14

## Q

**qualify** [1] - 37:25
**qualifying** [3] - 6:20, 7:14, 10:9
**questions** [8] - 5:16, 7:14, 9:18, 10:13, 22:1, 29:7, 29:8, 44:22
**quit** [2] - 44:2, 64:12
**quite** [1] - 66:18
**quote** [7] - 19:6, 21:17, 34:5, 34:8, 34:14, 36:2, 47:3
**quoting** [2] - 24:19, 42:12

## R

**rabbit** [1] - 24:12
**radio** [1] - 13:4
**ran** [1] - 17:3
**rather** [1] - 22:14
**re** [1] - 52:14
**re-sued** [1] - 52:14
**reach** [1] - 55:11
**real** [3] - 28:19, 37:20, 53:20
**realistic** [1] - 47:16
**really** [4] - 11:23, 13:4, 27:2, 63:2
**reason** [11] - 13:21, 25:19, 32:15, 37:14, 44:7, 45:2, 54:8, 57:13, 59:22, 63:14
**reasons** [7] - 7:17, 10:25, 11:5, 14:13, 17:18, 39:21, 66:17
**rebut** [1] - 62:7
**rebuttal** [1] - 64:21
**recent** [1] - 13:5
**recently** [1] - 52:14
**recessed** [1] - 40:15
**Recessed** [1] - 68:16
**reckoning** [1] - 31:10
**recognition** [4] - 37:18, 42:19, 51:9, 56:17
**recognize** [1] - 61:25
**recognized** [1] - 42:20
**recommendation** [3] - 4:2, 4:4, 34:12
**record** [1] - 68:20
**red** [1] - 35:18
**reference** [6] - 4:16, 4:21, 4:23, 43:1, 52:2
**references** [1] - 68:1

**referencing** [1] - 68:5
**referred** [1] - 59:10
**refitted** [1] - 14:3
**refused** [1] - 44:22
**refute** [1] - 6:5
**regard** [1] - 52:11
**regarding** [20] - 5:13, 30:12, 32:4, 32:6, 33:14, 33:15, 35:1, 35:22, 37:9, 41:11, 45:21, 46:3, 50:3, 50:9, 50:10, 51:7, 51:8, 52:8, 52:12, 68:6
**regardless** [1] - 23:25
**register** [2] - 56:24, 57:3
**registered** [1] - 58:17
**registrations** [1] - 57:2
**related** [1] - 66:9
**relating** [1] - 51:2
**relevance** [5] - 5:15, 7:9, 8:13, 53:18, 62:5
**relevant** [19] - 5:19, 5:21, 5:23, 6:6, 6:7, 9:3, 9:5, 9:8, 25:7, 31:12, 32:16, 32:18, 53:3, 53:8, 53:15, 56:13, 59:20, 62:21, 66:19
**rely** [2] - 13:6, 47:7
**remember** [5] - 18:15, 26:6, 26:11, 37:24, 65:10
**remind** [1] - 56:16
**remotely** [1] - 13:20
**renders** [1] - 26:22
**reply** [1] - 34:6
**report** [12] - 8:15, 8:19, 19:7, 20:5, 29:6, 29:14, 29:17, 35:16, 40:20, 42:11, 44:17, 46:21
**reported** [4] - 30:15, 30:17, 30:18
**reporter** [1] - 6:3
**REPORTER'S** [1] - 68:17
**reporting** [1] - 50:1
**represent** [1] - 50:22
**representative** [1] - 14:23
**reprinted** [1] - 14:1
**request** [2] - 49:19, 51:6
**researcher** [1] - 47:11
**reserve** [1] - 67:21
**reside** [1] - 9:17
**resolution** [2] - 65:4, 65:5
**responded** [3] - 14:3, 30:16, 50:8
**respondent** [4] - 19:7, 19:12, 19:17, 19:24
**respondents** [4] - 6:12, 8:20, 8:24, 35:10
**respondents'** [1] - 34:19
**response** [1] - 49:21
**responses** [1] - 46:5
**rest** [1] - 40:13
**restaurant** [3] - 58:6, 58:19, 58:20
**restrooms** [1] - 66:13
**resulted** [1] - 52:13
**results** [1] - 22:3
**retained** [1] - 52:23
**revenue** [1] - 56:1
**RICHARDSON** [17] - 4:5, 4:9, 4:12, 4:18, 5:4, 24:24, 52:7, 52:10, 53:22, 53:24, 54:25, 55:19, 55:21, 60:24, 62:2,

64:20, 65:25
**rip** [1] - 19:10
**Rivera** [3] - 11:12, 55:20, 67:8
**RMR** [1] - 68:23
**road** [2] - 65:20, 66:3
**Robertson** [17] - 4:7, 5:22, 6:5, 6:11, 6:17, 7:6, 8:7, 19:5, 20:4, 21:22, 21:25, 24:9, 24:11, 25:1, 34:20, 34:21, 67:25
**Robertson's** [8] - 5:2, 5:13, 8:15, 8:19, 19:7, 20:5, 20:20, 24:8
**rough** [1] - 5:12
**rule** [3] - 32:20, 33:5, 33:7
**run** [2] - 20:17, 59:4

## S

**sales** [12] - 26:5, 26:10, 26:12, 55:6, 56:6, 65:23, 66:19, 67:10, 67:11, 67:13, 67:14, 68:11
**San** [19] - 6:22, 7:5, 7:12, 12:5, 12:7, 13:10, 14:2, 15:18, 15:23, 16:6, 16:7, 16:9, 16:13, 18:9, 18:10, 18:12, 30:17, 58:19, 58:24
**Sanchez** [2] - 68:19, 68:23
**saw** [3] - 11:24, 30:25, 56:18
**screened** [1] - 31:2
**seat** [1] - 47:7
**second** [6] - 7:16, 8:18, 29:12, 29:13, 34:3, 41:18
**secondary** [2] - 35:25, 36:4
**seconds** [1] - 24:4
**see** [17] - 8:14, 8:25, 15:2, 18:6, 21:6, 27:3, 27:13, 27:17, 28:2, 28:3, 28:6, 28:7, 28:8, 40:2, 59:20, 60:5, 64:17
**seeing** [1] - 28:12
**seeking** [1] - 5:16
**seeks** [1] - 52:11
**Seguin** [1] - 56:3
**selecting** [2] - 5:19, 21:20
**Selecting** [1] - 21:17
**sell** [1] - 36:24
**selling** [3] - 4:23, 26:16, 66:22
**sense** [1] - 29:23
**sent** [1] - 52:24
**separated** [1] - 18:8
**September** [2] - 25:6, 30:13
**series** [2] - 32:3, 38:12
**serious** [1] - 29:16
**seriously** [1] - 48:1
**serve** [1] - 66:13
**served** [1] - 49:18
**services** [8] - 5:22, 5:25, 6:8, 36:20, 36:22, 37:3, 62:13, 62:17
**set** [3] - 6:6, 6:7, 59:5
**setback** [1] - 11:23
**settled** [5] - 63:10, 63:11, 63:12, 64:1
**settlement** [2] - 52:13, 57:17
**setup** [1] - 20:3
**several** [6] - 11:3, 20:18, 41:12, 42:16, 43:8, 45:20
**sharing** [1] - 5:11
**sheet** [1] - 24:21

**sheets** [1] - 24:25
**Shell** [6] - 26:12, 26:15, 26:16, 66:9, 66:10, 66:15
**shirts** [1] - 29:1
**shoes** [1] - 36:25
**short** [2] - 11:15, 40:23
**show** [32] - 7:21, 7:22, 17:15, 17:16, 17:17, 23:2, 23:16, 25:13, 25:20, 26:20, 26:24, 26:25, 28:18, 29:7, 32:9, 32:22, 34:19, 34:21, 34:23, 37:15, 37:17, 41:22, 44:25, 53:18, 56:6, 56:8, 56:15, 61:5, 64:2, 67:16
**showed** [8] - 27:23, 27:24, 29:14, 29:15, 34:22, 44:20, 45:7, 46:7
**showing** [1] - 31:7
**shown** [3] - 9:20, 27:22, 39:20
**shows** [10] - 8:21, 24:13, 28:18, 32:11, 35:14, 50:13, 61:24, 63:1, 63:17
**side** [9] - 7:23, 30:20, 31:7, 43:20, 49:19, 54:24, 55:18
**side-by-side** [2] - 30:20, 31:7
**sign** [5] - 28:6, 28:7, 28:15, 58:7, 58:8
**significant** [3] - 13:16, 30:14, 31:23
**significantly** [1] - 20:16
**signs** [4] - 18:16, 28:4, 65:16, 67:19
**similar** [2] - 41:4, 64:8
**similarities** [1] - 42:7
**similarity** [3] - 38:8, 42:3, 53:5
**Simonson** [20] - 4:10, 21:2, 21:22, 25:4, 25:5, 25:12, 25:17, 26:20, 29:24, 33:22, 34:19, 34:24, 43:19, 44:24, 46:12, 46:20, 47:12, 47:14, 67:23
**Simonson's** [9] - 24:18, 29:5, 35:16, 40:20, 42:17, 43:10, 43:13, 44:16, 51:3
**simple** [1] - 50:25
**simply** [3] - 32:19, 33:12, 43:17
**single** [5] - 23:18, 32:8, 32:11, 59:9, 59:10
**situation** [2] - 14:9, 27:2
**six** [5] - 6:22, 8:16, 8:25, 42:1
**size** [2] - 25:23, 66:13
**skewed** [1] - 22:3
**small** [1] - 36:13
**social** [3] - 13:2, 13:5, 28:5
**software** [1] - 35:12
**sold** [5] - 55:5, 66:2, 66:7, 67:1, 68:12
**solely** [2] - 13:6, 47:7
**solitary** [1] - 59:6
**someone** [3] - 36:15, 37:21, 57:24
**Someone** [1] - 30:7
**soon** [1] - 60:22
**sorry** [9] - 5:10, 8:5, 14:19, 16:13, 19:2, 25:4, 40:16, 40:18, 47:5
**sorts** [1] - 27:9
**South** [3] - 9:19, 13:13, 13:14
**Southern** [2] - 11:2, 41:15
**southwest** [5] - 15:22, 16:12, 16:13, 16:18, 58:23
**specific** [1] - 8:20
**specifically** [3] - 7:18, 9:18, 9:19
**specificity** [1] - 46:3
**speculated** [1] - 43:9

speculative [1] - 43:16
spell [3] - 6:2, 61:2, 61:13
spelled [2] - 61:9, 61:14
spend [1] - 33:2
spent [1] - 58:24
sponsors [2] - 19:17, 19:24
square [1] - 26:2
St [1] - 57:12
stack [1] - 55:22
stacks [1] - 55:22
stand [1] - 47:25
standalone [1] - 58:19
standard [1] - 34:24
start [7] - 5:1, 36:1, 44:9, 47:3, 54:13, 60:2, 60:6
started [1] - 32:24
starting [1] - 26:1
State [4] - 8:15, 22:23, 61:5, 61:10
state [4] - 32:9, 34:7, 34:13, 38:15
statements [2] - 14:7, 46:25
states [2] - 35:24, 42:11
station/convenience [2] - 6:24, 7:4
stations [5] - 16:23, 20:11, 20:13, 20:15, 66:8
statistically [2] - 13:15, 31:23
statues [1] - 37:12
statute [21] - 25:15, 27:7, 33:6, 36:18, 37:25, 38:19, 41:2, 41:7, 41:8, 41:22, 41:24, 41:25, 42:1, 54:9, 54:11, 54:12, 54:18, 54:21, 59:3, 59:4
statutes [2] - 36:17, 37:15
steered [1] - 47:10
steps [3] - 52:20, 57:6, 57:7
still [6] - 23:3, 23:17, 40:19, 46:5, 52:25, 61:24
stipulate [2] - 51:2, 51:4
stop [3] - 6:23, 39:22, 67:2
stopped [1] - 17:12
store [19] - 6:24, 7:4, 9:22, 12:3, 12:12, 16:25, 17:12, 19:10, 19:18, 19:25, 21:14, 28:5, 34:22, 39:16, 57:8, 58:23, 58:25, 61:9, 67:14
stores [38] - 7:6, 7:19, 8:9, 8:10, 10:5, 10:24, 11:4, 11:17, 11:19, 13:6, 16:23, 17:1, 17:2, 18:13, 18:15, 25:21, 25:24, 28:2, 28:12, 28:13, 28:14, 28:16, 33:16, 33:17, 33:19, 33:20, 36:8, 36:13, 39:4, 39:6, 39:9, 39:10, 39:11, 39:12, 39:13, 39:16, 67:16, 67:18
straightjacket [1] - 51:12
strength [1] - 62:24
stretch [2] - 20:10, 20:12
strict [1] - 37:15
strike [1] - 44:1
studies [3] - 45:8, 50:5, 50:6
study [5] - 11:14, 47:17, 50:7, 51:7, 51:8
stuff [1] - 15:16
stupid [1] - 14:7
subject [2] - 14:5, 26:12
substantially [1] - 38:15
subtract [1] - 23:14

subtracts [1] - 23:22
successful [1] - 63:20
sue [1] - 58:4
sued [8] - 12:18, 15:9, 52:14, 58:2, 63:4, 63:11, 64:11
suggesting [1] - 42:13
suing [1] - 52:21
suit [6] - 12:15, 59:1, 59:22, 62:19, 63:15
suite [1] - 62:19
suites [2] - 63:9, 63:18
suits [2] - 63:1, 63:6
summarize [1] - 11:15
summary [4] - 34:7, 34:9, 34:13, 65:11
support [3] - 20:9, 43:17, 51:19
supposed [2] - 14:18, 22:9
surprising [1] - 13:18
survey [90] - 4:7, 4:10, 5:13, 5:14, 5:17, 6:10, 7:9, 8:6, 8:12, 9:8, 10:3, 10:25, 11:3, 11:5, 11:6, 11:14, 14:22, 15:4, 19:7, 19:17, 20:21, 20:24, 20:25, 21:18, 23:19, 24:8, 24:18, 25:6, 25:20, 26:22, 26:25, 27:3, 27:12, 27:13, 27:17, 27:19, 27:20, 27:21, 28:8, 28:24, 29:19, 29:20, 29:25, 30:2, 30:3, 30:6, 30:13, 31:16, 31:24, 32:8, 32:11, 32:22, 32:23, 33:2, 33:10, 35:8, 35:10, 35:11, 35:14, 36:15, 37:23, 42:18, 43:10, 43:13, 43:14, 45:6, 46:16, 46:17, 47:17, 48:10, 48:17, 49:10, 50:1, 50:3, 50:4, 50:5, 51:4, 51:24, 51:25, 52:1, 56:14, 60:20, 61:1, 61:2, 61:22, 67:23, 67:24
surveyed [14] - 7:11, 8:8, 9:1, 10:22, 14:21, 15:1, 20:23, 22:21, 22:22, 22:25, 23:6, 30:25, 31:15, 56:21
surveys [54] - 4:16, 23:5, 25:1, 25:5, 25:10, 25:13, 27:9, 27:11, 27:15, 32:6, 33:3, 33:7, 33:13, 36:4, 37:6, 37:8, 43:1, 43:2, 43:9, 43:12, 43:18, 44:6, 44:17, 44:18, 44:20, 44:23, 44:25, 45:11, 45:19, 45:21, 46:2, 46:4, 46:5, 46:12, 46:20, 47:8, 47:13, 48:2, 48:3, 48:11, 49:4, 49:6, 49:12, 49:22, 49:24, 50:6, 50:9, 50:23, 50:24, 51:2, 68:2
synonymous [2] - 57:14, 61:21

## T

talks [3] - 36:8, 55:24, 66:17
tax [1] - 56:1
technique [1] - 57:1
ten [2] - 10:22, 10:23
tends [1] - 17:24
tennis [1] - 36:25
tens [2] - 56:25, 57:4
terms [1] - 11:15
territories [1] - 40:3
territory [1] - 40:4
test [2] - 20:16, 21:8
tested [2] - 21:2, 21:13
testimony [1] - 5:3
TexAg [1] - 14:3

TexAgs [2] - 30:18, 30:19
Texas [34] - 8:16, 9:19, 12:16, 13:13, 13:15, 14:16, 14:22, 15:1, 20:23, 20:24, 21:3, 22:23, 30:15, 30:19, 36:13, 38:24, 39:3, 41:7, 41:16, 41:17, 41:21, 41:24, 42:18, 42:20, 44:1, 52:19, 54:9, 54:12, 57:8, 58:5, 58:10, 61:5, 61:10
that'll [1] - 46:15
THE [120] - 4:3, 4:8, 4:11, 4:17, 5:1, 5:5, 5:7, 5:10, 6:2, 6:9, 6:14, 7:15, 7:22, 8:1, 8:4, 8:17, 9:2, 10:16, 11:8, 11:11, 13:22, 14:19, 14:23, 15:2, 15:13, 15:19, 15:24, 16:3, 16:8, 16:11, 16:15, 16:19, 17:1, 17:5, 17:9, 17:20, 18:5, 18:14, 18:21, 18:23, 18:25, 19:3, 22:19, 23:9, 24:1, 24:5, 24:15, 24:17, 24:23, 25:3, 25:9, 26:17, 32:1, 32:13, 35:21, 36:1, 36:10, 38:1, 38:9, 38:13, 38:21, 39:7, 39:17, 39:24, 40:6, 40:9, 40:12, 40:16, 40:21, 40:24, 42:22, 42:24, 43:4, 43:6, 43:20, 43:23, 44:1, 44:7, 44:13, 45:1, 45:13, 45:17, 45:23, 46:1, 46:8, 47:2, 47:20, 48:4, 48:12, 48:16, 49:17, 49:21, 50:18, 51:13, 51:20, 52:6, 52:9, 53:21, 53:23, 54:23, 55:17, 55:20, 56:9, 58:9, 60:1, 60:10, 60:17, 60:21, 62:1, 62:9, 63:8, 63:16, 63:22, 64:1, 64:6, 64:19, 65:22, 67:4, 67:7, 67:20
theirs [1] - 37:6
themselves [4] - 34:3, 34:16, 54:14, 56:7
thereby [1] - 42:13
therefore [5] - 7:8, 20:24, 53:8, 54:3, 66:5
thesis [1] - 26:21
they've [5] - 16:24, 27:14, 27:16, 45:7, 51:16
thinks [1] - 52:15
third [2] - 4:15, 29:12
thirty [1] - 31:22
thousand [1] - 57:11
thousands [4] - 31:5, 39:15, 56:25, 57:4
three [11] - 23:6, 23:7, 29:6, 36:9, 36:10, 36:11, 39:11, 53:19, 54:18, 58:4, 64:25
three-day [1] - 64:25
threshold [1] - 8:11
throughout [2] - 21:3, 55:2
timing [3] - 32:4, 33:14, 33:15
tiny [1] - 39:11
today [8] - 4:6, 4:25, 5:9, 11:22, 42:11, 51:24, 55:3, 55:9
took [9] - 28:9, 28:21, 28:22, 29:4, 35:11, 55:12, 57:7, 58:7, 61:23
top [1] - 66:18
topic [2] - 53:17, 62:8
totally [7] - 23:2, 23:16, 24:9, 29:1, 36:20, 37:13, 38:6
tough [2] - 22:12, 27:6
town [5] - 17:15, 17:16, 17:17, 20:12, 20:14
towns [1] - 36:13

**Toys** [1] - 66:21
**Toys-R-Us** [1] - 66:21
**TP2** [1] - 61:8
**trade** [1] - 42:4
**trademark** [2] - 57:2, 57:10
**Trademark** [3] - 58:12, 58:13, 58:14
**trademarks** [1] - 58:16
**traffic** [1] - 15:16
**transcript** [1] - 68:20
**translate** [1] - 25:7
**Travel** [2] - 28:4, 28:17
**travel** [6] - 13:9, 15:16, 15:17, 17:17, 17:22, 28:6
**traveling** [3] - 12:4, 13:7, 16:22
**trial** [11] - 48:21, 49:3, 49:15, 49:16, 51:21, 51:24, 51:25, 64:25, 68:3, 68:7
**tried** [6] - 33:15, 44:21, 48:22, 60:20, 62:12
**tries** [1] - 31:13
**Trouble** [1] - 11:1
**trucks** [4] - 17:24, 18:1, 18:2, 18:3
**true** [3] - 20:14, 25:11, 51:17
**truth** [1] - 18:7
**try** [2] - 44:13, 59:25
**trying** [14] - 15:10, 26:14, 28:19, 34:20, 34:23, 45:18, 47:19, 48:3, 48:4, 48:14, 49:13, 51:18, 60:3, 64:14
**turn** [6] - 18:3, 24:1, 24:17, 40:21, 40:22, 62:7
**turns** [1] - 64:25
**TV** [1] - 13:4
**two** [14] - 6:19, 13:18, 25:1, 25:5, 30:21, 31:7, 39:21, 53:1, 53:6, 53:19, 60:5, 64:25, 66:7, 66:21
**two-week** [1] - 64:25
**type** [3] - 20:17, 38:5, 56:24
**types** [1] - 37:7
**typographical** [1] - 29:16

## U

**U.S** [2] - 58:12, 58:14
**unbranded** [1] - 66:8
**unchanged** [1] - 36:7
**under** [3] - 32:19, 54:9, 68:12
**undertaken** [1] - 32:12
**unduly** [3] - 57:22, 57:25, 59:16
**UNIDENTIFIED** [2] - 40:8, 40:11
**uniform** [2] - 21:5, 32:5
**universe** [17] - 5:21, 5:23, 6:19, 13:8, 13:9, 14:10, 14:14, 18:18, 20:25, 21:10, 21:11, 21:17, 21:21, 21:23, 22:8, 22:9, 22:10
**University** [1] - 55:14
**unless** [1] - 48:20
**unlike** [1] - 24:10
**unpunished** [1] - 35:3
**unreal** [1] - 47:15
**unreliable** [1] - 26:23
**unworkable** [1] - 32:19
**up** [16] - 13:10, 13:16, 18:16, 28:5,

30:1, 37:21, 42:15, 45:4, 46:9, 52:21, 53:11, 55:3, 58:7, 60:3, 63:2, 64:24
**upside** [1] - 37:2

## V

**Valero** [4] - 39:13, 39:14, 39:16
**valid** [2] - 7:2, 22:24
**validate** [1] - 23:20
**validated** [2] - 13:25, 14:8
**Valley** [2] - 9:18, 12:11
**value** [1] - 25:16
**variations** [1] - 34:10
**various** [1] - 8:22
**vehicles** [1] - 55:25
**venue** [1] - 52:25
**vicinity** [1] - 7:5
**volume** [1] - 17:10
**volumes** [1] - 55:7

## W

**wait** [2] - 18:25, 59:17
**wants** [2] - 46:22, 66:9
**weakens** [1] - 62:25
**websites** [1] - 61:15
**week** [1] - 64:25
**weigh** [2] - 10:14, 11:6
**weight** [2] - 10:2, 22:16
**well-known** [1] - 36:17
**Westlaw** [2] - 35:24
**Wharton** [1] - 25:22
**whatsoever** [1] - 13:19
**Whitsett** [3] - 12:10, 58:8, 58:10
**whole** [3] - 38:21, 55:22, 56:1
**willing** [1] - 51:1
**witnesses** [1] - 45:20
**word** [3] - 16:19, 53:6, 53:7
**wording** [1] - 53:14
**words** [10] - 17:7, 23:16, 27:23, 27:25, 28:11, 28:12, 29:1, 34:1, 38:16, 38:17
**workable** [1] - 33:12
**world** [3] - 28:19, 57:9, 66:16
**Wow** [1] - 55:5
**write** [3] - 27:7, 30:4, 61:16
**written** [1] - 41:24
**wrote** [2] - 56:18, 56:20

## Y

**year** [4] - 27:15, 47:16, 54:18, 55:25
**years** [4] - 27:6, 42:14, 54:12, 58:4
**yellow** [2] - 24:13, 33:23
**York** [1] - 11:2
**yourself** [1] - 33:6

## Z

**zero** [13] - 13:17, 13:22, 13:24, 22:4, 22:6, 22:7, 23:4, 23:10, 23:12, 55:12

**zip** [3] - 11:18, 11:20, 50:12